# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------x
:
In re                                  :    Chapter 11
:
PROLIANCE INTERNATIONAL, INC., *et al.*,[1]  :    Case No. 09-_____ (____)
:
        Debtors.               :    (Jointly Administered)
:
:    **Bidding Procedures Order Hearing Date and**
:    **Time: [___], 2009 at [___] _.m. (EDT)**
:
:    **Objection Deadline for Bidding Procedures**
:    **Order: [___], 2009 at [___] _.m. (EDT)**
---------------------------------------------------------------x

## MOTION OF THE DEBTORS FOR (I) AN ORDER (A) APPROVING BIDDING PROCEDURES FOR THE SALE OF CERTAIN ASSETS, (B) AUTHORIZING THE DEBTORS TO OFFER CERTAIN BID PROTECTIONS AND (C) SCHEDULING FINAL SALE HEARING AND APPROVING FORM AND MANNER OF NOTICE THEREOF, AND (II) AN ORDER AUTHORIZING AND APPROVING (A) THE SALE OF CERTAIN ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES, (B) THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND (C) RELATED RELIEF

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors") file this motion (the "Motion"), pursuant to sections 105, 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for the entry of (i) an order, substantially in the form attached hereto as Exhibit A, (the "Bidding Procedures Order"), (a) approving bidding procedures (the "Bidding Procedures"), substantially in the form attached hereto as Exhibit 1 to Exhibit A, in connection with the (i) sale

---

[1]    The Debtors are the following four entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Proliance International, Inc. (7383); Aftermarket Delaware Corporation (9862); Aftermarket LLC; and Proliance International Holding Corporation (9275). The address of each of the Debtors is 100 Gando Drive, New Haven, Connecticut 06513.

of substantially all of Debtor Proliance International, Inc.'s ("Proliance") North American assets, excluding the stock of Radiadores GDI, S.A. de C.V. and Aftermarket Delaware Corp. (and the direct and indirect subsidiaries of such entities), as well as substantially all of the assets of Debtors Aftermarket LLC ("Aftermarket") and Proliance International Holding Corporation ("PIHC," together with Proliance and Aftermarket, the "Sellers") (collectively, the "North American Assets"), (ii) assumption of certain liabilities of the Sellers (the "Assumed Liabilities") and (iii) the assumption and assignment of certain executory contracts and unexpired leases of the Sellers (the "Assumed Contracts," and together with the North American Assets and Assumed Liabilities, the "Purchased Assets"), (b) authorizing the Debtors to offer certain bidder protections to the Buyer (as described below) and (c) scheduling a final sale hearing (the "Sale Hearing") to consider entry of the Sale Order (as defined below) and approving the form and manner of notice of, and scheduling, an auction for the Purchased Assets (the "Auction") and the Sale Hearing, including the form and manner of service of the notice (the "Auction and Sale Notice") attached hereto as Exhibit 3 to Exhibit A; and (ii) an order, substantially in the form attached hereto as Exhibit B, (the "Sale Order") authorizing and approving (a) the sale of the Purchased Assets to the Successful Bidder (as such term is defined in the Bidding Procedures) free and clear of all liens, claims, interests and encumbrances (the "Sale Transaction"), (b) the assumption and assignment of the Assumed Contracts to the Successful Bidder (as defined in the Bidding Procedures) and (c) granting other relief related thereto. In support of this Motion, the Debtors (i) incorporate the statements contained in the Affidavit of Arlen F. Henock in Support of First Day Pleadings (the "First Day Affidavit"), filed contemporaneously herewith, and (ii) further respectfully state as follows:

## Jurisdiction

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue for this matter is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

2.      On the date hereof (the "Petition Date"), each of the Debtors commenced a case under chapter 11 of the Bankruptcy Code.[2]  The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner or statutory committee has been appointed in these cases.

## Facts Relevant to Relief Requested

3.      As set forth in the First Day Affidavit, the Debtors operate in a highly competitive environment, made even more challenging by the highly publicized decline of the U.S. auto industry.  These obstacles, however, were dwarfed by the series of events that led to the commencement of these chapter 11 cases, beginning with the strong storms and tornadoes that struck and destroyed the Debtors' principal distribution center in Southaven, Mississippi on February 5, 2008, and the effects of which led to a significant decrease in the Debtors' borrowing capacity under the Prepetition Credit Facility (as defined and described in greater detail in the First Day Affidavit) that left the Debtors without the necessary financial wherewithal to rebuild their inventory base and resume their business.

4.      When it became clear to the Debtors that satisfactory amendments to the Prepetition Credit Facility that would allow them to get access to sufficient liquidity with which

---

[2]      Background information regarding, among other things, the Debtors' business and the events leading to the commencement of these chapter 11 cases, and an affirmation of the facts and circumstances supporting this Motion are contained in the First Day Affidavit.

to rebuild their business were not forthcoming, the Debtors began comprehensive a process, with the assistance of their advisors, to evaluate all available options to address the Debtors' liquidity constraints.

5.      These efforts, however, failed or were stalled because of the deterioration of the credit markets.  By the beginning of 2009, all parties that had expressed an interest in refinancing the Prepetition Credit Facility, or investing in or partnering with the Debtors, had advised the Debtors that the collapse of the market would prevent them from effectuating a transaction with the Debtors.  By this time, the Debtors' liquidity position had considerably worsened, leaving the Debtors with no option available other than to pursue a transaction that would allow for the sale of the Debtors' business as a going concern in order to avoid what would be a likely further deterioration of the Debtors' business and liquidation.

6.      As a result, the Debtors spent the last several months running a comprehensive marketing process for the going concern sale of their business.  While the Debtors were able to secure several bids, all of the bids required that any sale would be subject to a chapter 11 filing by the Debtors and an order under section 363 of the Bankruptcy Code authorizing the sale of the Purchased Assets free and clear of all claims, liens and interests.  After intense efforts by the Debtors and their advisors to increase the consideration to be paid, and other terms to be offered, for the Purchased Assets, the Sellers and Centrum Equities XV, LLC (the "Buyer") entered into that certain Acquisition Agreement (the "Purchase Agreement"), dated as of July 2, 2009, a copy of which is attached hereto as Exhibit 4 to Exhibit A.

7.      The Debtors submit that given their current liquidity situation and continuing deterioration of the Debtors' business, an expeditious sale of the Purchased Assets, as contemplated under the Purchase Agreement, is the best option available for the Debtors to

maximize the value of their estates. The potential purchase price for the Purchased Assets is likely to decrease in the event that the proposed Sale Transaction is not timely consummated. Furthermore, the Debtors do not have sufficient working capital to continue to operate their business, and thus, a sale of the Purchased Assets to a party that can provide sufficient liquidity to rebuild the business is the only available option to save the business while also maximizing the value of the Debtors' assets for the benefit of all stakeholders. Entry of the Bidding Procedures Order and the expeditious sale of the Purchased Assets, therefore, are important to maintain and maximize the value of the Purchased Assets, and, in turn, to ensure the best possible recovery for all stakeholders, and is consistent with the timeframe required by the Buyer in the Purchase Agreement.

8.    The Debtors therefore request approval of the Bidding Procedures Order no later than July [__], 2009.

## A.    Proposed Bidding Procedures

9.    The Debtors are requesting that the Court approve expedited Bidding Procedures for the Purchased Assets, with a final sale hearing to occur by [_____], or as soon thereafter as counsel may be heard.[3] The other key provisions of the Bidding Procedures are as follows:

- Qualification. In order to perform due diligence and be allowed to submit a bid for some or all of the Purchased Assets, a party expressing an interest in the Purchased Assets (each, a "Potential Bidder") must provide to the Debtors (a) an executed confidentiality agreement in form and substance satisfactory to the Debtors, and (b) current audited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Purchased Assets, current audited financial statements of the equity holder(s) to be responsible for the Potential Bidder's obligations in connection with the Sale Transaction. A Potential Bidder that satisfies these requirements will become a "Qualified Bidder."

---

[3]    The proposed form of Bidding Procedures Order contains proposed dates from the Debtors. These dates are subject to the availability of the Court.

- Bid Requirements. A bid is a signed letter from a Qualified Bidder offering to purchase all or a portion of the Purchased Assets (and may also include, in addition to all or certain of the Purchased Assets, any of the Debtors' other assets that are not Purchased Assets (the "Other Assets")) that is not subject to any due diligence investigation, receipt of financing or receipt of further approvals and is irrevocable until the consummation of the Sale Transaction, together with an asset purchase agreement, marked to show any proposed changes to the Purchase Agreement, and written evidence of available cash or a firm commitment for financing and such other evidence of ability to consummate the Sale Transaction as may be reasonably requested by the Debtors. A bid must also offer to pay a purchase price for the Purchased Assets that is equal to or greater than an aggregate value of $21.5 million in cash, plus the Break-Up Fee and Expense Reimbursement (as defined below), plus $250,000 (i.e., $22.925 million). In addition, upon closing, the Successful Bidder (as defined below) will be required to pay amounts sufficient to fund the Individual Health Insurance Escrow Deposit, the D&O Escrow Deposit and the IBNR Escrow Deposit pursuant to Section 3.5 of the Purchase Agreement (the "Closing Escrows"). Following the closing of the Sale Transaction, the Successful Bidder will also reimburse the Sellers for the amount of any inventory that was prepaid prior to closing but delivered between the date of the closing and the two month anniversary thereof.

- Good Faith Deposit. In order to participate in the Auction, a Qualified Bidder must accompany its bid with a good faith deposit equal to 10% of the purchase price offered in such bid (the "Good Faith Deposit") in the form of a wire transfer.

- Baseline Bid. As soon as practicable after the Bid Deadline, the Debtors will select the bid or bids that will serve as the "Baseline Bid" for the Auction.

- Bidding at the Auction. The Debtors retain discretion with respect to how to conduct the Auction if bids are received on differing packages of Purchased Assets and the Other Assets.

- Bidding Increment. The minimum Bidding Increment at the Auction will be $250,000 or such other amount as the Debtors, in consultation with the official committee of unsecured creditors appointed in these cases, if any (the "Committee"), determine is appropriate.

- Return of Deposits. The Good Faith Deposit of a Qualified Bidder will be returned within three business days of the earlier of (a) the closing of the Sale Transaction and (b) 45 days after the Sale Hearing.

10. The Bidding Procedures set forth a flexible process where the Debtors will be soliciting bids for the Purchased Assets. This process will allow the Debtors to maximize the

value of the Purchased Assets given the severe liquidity constraints and accompanying time pressure they face. The Debtors expressly reserve the right, after consultation with the Committee, once, and if, appointed, to modify the relief requested in this Motion prior to or at the applicable hearings, including modifying the proposed Bidding Procedures. The Debtors also reserve the right to adjourn the Auction or Sale Hearing or remove any of the Purchased Assets or Other Assets from the Sale Transaction if the Debtors determine, upon consultation with the Committee, that such action will maximize the value of the Debtors' estates.

**B.     The Purchase Agreement[4]**

11.     After extensive arms-length, good faith negotiations among the parties and their respective advisors, the Sellers and the Buyer executed the Purchase Agreement, pursuant to which they have agreed, among other things, on the following:[5]

- <u>Consideration</u>. The Buyer will pay (i) $500,000 upon execution of the Purchase Agreement and an additional $1.5 million within three Business Days of such execution (the "<u>Initial Escrow Deposit</u>") to an escrow agent acceptable to the Buyer and the Sellers (the "<u>Escrow Agent</u>"), and (ii) $19.5 million in cash upon closing to the Sellers, subject to a working capital adjustment pursuant to the provisions of the Purchase Agreement, which amount will be adjusted dollar for dollar up or down based on the Estimated Closing Working Capital Amount and later, the Closing Working Capital, each as defined in the Purchase Agreement, less the amount of cure costs for which the Sellers have liability under the Purchase Agreement, and less $400,000 to be put in escrow to fund certain potential expenses under the Sellers' benefits plans. The Initial Escrow Deposit shall be held by the Escrow Agent to satisfy any obligations of the Sellers with respect to the working capital adjustment and any indemnification obligations pursuant to the Purchase Agreement. Upon the later to occur of (i) the date that is the two month anniversary of the Closing Date and (b) the final determination of Closing Working Capital in accordance with Section 3.4 of the Purchase Agreement, any amounts relating to the Initial Escrow Deposit remaining in escrow shall be disbursed to the Sellers. In addition, upon closing, the Buyer will pay to the Escrow Agent amounts sufficient to fund the Closing Escrows.

---

[4]     Capitalized terms used but not defined herein have the meanings given to them in the Purchase Agreement.

[5]     To the extent that there are any inconsistencies between the summary description of the Purchase Agreement contained herein and the terms and conditions of the Purchase Agreement, the terms of the Purchase Agreement control.

Following the closing of the Sale Transaction, the Buyer will also reimburse the Sellers for the amount of any inventory that was prepaid prior to closing but delivered between the date of the closing and the two month anniversary thereof.

- Purchased Assets. The assets to be acquired by the Buyer pursuant to the Purchase Agreement include certain of the Sellers' assets, including, but not limited to, the stock of certain of the Sellers' foreign subsidiaries.

- Assumed Liabilities. The liabilities to be assumed include, among other things, (i) certain postpetition liabilities under the Assumed Contracts, (ii) certain of the Sellers' accounts payable and Assumed Trade Payables, (iii) liabilities arising from the sale of the Sellers' products pursuant to product warranties, product returns, customer programs, credits and rebates under the Assumed Contracts, (iv) liabilities for Taxes due or payable for any Tax period (or portion thereof) beginning after the Closing Date that arise out of the ownership or operation of the Debtors' business or the Purchased Assets following the Closing Date and (v) an amount equal to one-half of the first $200,000 of transfer taxes incurred in the Sale Transaction, and all transfer taxes in excess of such amount. In addition, the Buyer will fund the Closing Escrows to fund the payments of certain obligations of the Sellers and its employees post Closing.

- Sale Free and Clear. The Purchased Assets to are to be transferred free and clear of all mortgages, liens, security interests, charges, easements, leases, subleases, covenants, rights of way, options, claims, restrictions or encumbrances of any kind, other than Permitted Liens and those expressly assumed by the Buyer in the Purchase Agreement.

- Closing Conditions. The obligation of Buyer to close the Sale Transaction is subject to the satisfaction of the conditions to closing set forth in the Purchase Agreement, including those relating to the truth and accuracy of the parties' representations and warranties, the performance by the parties of their covenants, customary deliveries providing for the necessary transfers contemplated by the Sale Transaction, lack of injunctions or laws restraining or prohibiting the transaction, the entry of the Bidding Procedures Order, including approval of the Break-Up Fee and Expense Reimbursement, the entry of the Sale Order, the availability of financing to permit the Sellers to operate their businesses, and, if required, applicable antitrust approvals.

## C.  Break-Up Fee and Expense Reimbursement

12.     The Buyer and its advisors have engaged in extensive good faith negotiations and have expended, and likely will continue to expend, considerable time, money and energy

pursuing the purchase of the Purchased Assets and the assumption and assignment of the Assumed Contracts. The Purchase Agreement is the culmination of these efforts.

13. In recognition of this significant expenditure of time, energy and resources, the Sellers have agreed that if the Buyer is not the Successful Bidder, the Sellers will, in certain circumstances as set forth above and in section 6.2 of the Purchase Agreement, pay to the Buyer a break-up fee of $900,000 (the "Break-Up Fee") plus an expense reimbursement of up to $275,000 (the "Expense Reimbursement").

**D.     The Notice Procedures**

14. Under Bankruptcy Rules 2002(a) and (c), the Debtors are required to notify their creditors of the Auction and the Sale Hearing, including a disclosure of the date, time, and place of the Auction, the terms and conditions of the proposed Sale Transaction, the date, time and place of the Sale Hearing and the deadline for filing any objections to the relief requested herein. The Debtors request the authority to conduct the Auction on July [_], 2009 at **[10:00 a.m.]** (Prevailing Eastern Time) at the offices of Jones Day, 222 East 41st Street, New York, New York 10017, or such other location as may be selected by the Debtors.

15. The Debtors propose to give notice, within two business days following the entry of the Bidding Procedures Order, of the Bidding Procedures, the time and place of the Auction, the time and place of the Sale Hearing and the objection deadline for the Sale Hearing by sending the Auction and Sale Notice to (i) the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"), (ii) counsel to the Debtors' prepetition secured lenders, (iii) counsel to the Committee, (iv) all parties known to be asserting a lien in the Purchased Assets, (v) all state attorneys general in states in which the Debtors conduct business, (vi) various federal and state agencies, including the Internal Revenue Service, (vii) the Potential Bidders and all parties known by the Debtors to have expressed interest in acquiring the

Purchased Assets or the Other Assets in the previous calendar year and (viii) all other entities entitled to notice in these chapter 11 cases. The Debtors request that the Court approve the form of the Auction and Sale Notice and that service of the Auction and Sale Notice upon the parties set forth above be deemed adequate and sufficient notice as required by the Bankruptcy Rules.

### E. The Assumption and Assignment Procedures

16. The Debtors believe that there are no existing defaults under the Assumed Contracts that the Debtors will need to cure prior to the assumption and assignment thereof.

17. In light of the foregoing and the need to expedite the sale of the Purchased Assets, the Debtors submit the following assignment procedures (the "Assumption and Assignment Procedures") for the Court's approval:

a. The Debtors shall, no more than three business days after entry of the Bidding Procedures Order, serve an individual notice substantially in the form attached hereto as Exhibit 2 to Exhibit A (the "Assumption and Assignment Notice") by first class mail on each counterparty under each Assumed Contract (each a "Counterparty") (and its attorney, if known) at the last known address available to Debtors. Each Assumption and Assignment Notice shall set forth the following information: (i) the name and address of the Counterparty; (ii) notice of the proposed effective date of the assignment; (iii) identification of the Assumed Contract; (iv) the amount, if any, determined by the Debtors to be necessary to be paid to cure any existing default (the "Cure Amount"); and (v) a description of the Buyer and a statement as to the Buyer's ability to perform the Sellers' obligations under the Assumed Contracts. All Assumption and Assignment Notices will be accompanied by a copy of the Bidding Procedures Order.

b. To the extent necessary to consummate a sale of the Sellers' assets as contemplated by this Motion, the Buyer will assume from Sellers the Assumed Contracts that are deemed to be executory contracts or unexpired leases under section 365 of the Bankruptcy Code. The cure amounts necessary to cure all defaults under such any Assumed Contracts set forth on Schedule 2.5(a) of the Purchase Agreement will be paid by the Buyer on behalf of the Sellers at the Closing as set forth in Section 3.2(b) of the Purchase Agreement, as such amounts are finally determined by the Bankruptcy Court pursuant to the procedures set forth in the Bidding Procedures Order and/or the Sale Order (the "Final Cure Costs"), and the Buyer will have no liability therefor (other than to make such payments on the Sellers' behalf). The cure amounts necessary to cure all defaults under any such Assumed Contracts set forth on Schedule 2.5(b) of the Purchase Agreement will be paid by the Buyer at the Closing, as such amounts are finally

determined by the Bankruptcy Court pursuant to the procedures set forth in the Bidding Procedures Order and/or the Sale Order, and the Sellers will have no liability therefore.

c.     The Debtors shall file with the Court and deliver to (i) counsel to the Buyer or the Successful Bidder, (ii) the U.S. Trustee, (iii) counsel to the Debtors' prepetition and postpetition secured lenders and (iv) counsel to the Committee (collectively, the "Notice Parties") a full, alphabetized list of the Counterparties, in conformance with Bankruptcy Rule 6006(f).

d.     Any Counterparty will be deemed to have received adequate assurance of future performance as required by section 365 of the Bankruptcy Code if the Debtors, after payment of any Cure Amounts, would no longer have any payment or delivery obligations under the Assumed Contract.

e.     To the extent that any Counterparty wishes to object on the grounds of (i) the proposed Cure Amount, (ii) the need to cure a default or early termination event, including, without limitation, any default or early termination event with respect to the Debtors and each of their respective affiliates, successors and assigns (a "Default") other than a Default relating to the commencement of a case under the Bankruptcy Code by any of the Debtors, or the insolvency or financial condition of any of the Debtors, which Defaults need not be cured prior to assignment or (iii) the adequate assurance of future performance under the applicable Assumed Contract, then such Counterparty must serve a written notice of objection (a "Section 365 Objection"), so that such objection is actually received no later than [ ]:[   ] .m. on July [   ], 2009 (the "Section 365 Objection Deadline"), on (a) counsel to the Debtors:  Jones Day, 222 East 41st Street, New York, New York 10017, Fax:  (212) 755-7306 (Attention:  Pedro A. Jimenez, Esq. and Ross S. Barr, Esq.), (b) counsel to the Buyer:  Much Shelist, 191 N. Wacker Drive, Ste. 1800, Chicago, Illinois 60606, Fax:  (312) 521-2100 (Attention:  Don S. Hershman, Esq.), (c) counsel to the Committee:  [_____], (d) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Fax:  (302) 573-6497 (Attention:  Mark S. Kenney, Esq.) and (e) counsel to the Debtors' prepetition secured lenders:  Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York 10019, Fax: (212) 728-9764 (Attention:  Paul V. Shalhoub, Esq.).  Any such notice must specify the grounds for such objection to assignment, including stating the Counterparty's alleged Cure Amount (including, on a transaction by transaction basis, calculations and detail of specific charges and dates, and any other amounts receivable or payable supporting such alleged Cure Amount, and in any event containing no less detail than the calculation of the Cure Amount provided by the Sellers) if the Counterparty disagrees with the Sellers' proposed Cure Amount and any other defaults or termination events the Counterparty alleges must be cured to effect assignment of the Assumed Contract.

f.     To the extent that any Counterparty does not timely serve a Section 365 Objection as set forth above by the Section 365 Objection Deadline, such Counterparty will

be deemed to have (i) consented to such Cure Amounts, if any, and to the assumption and assignment of the Assumed Contract, (ii) agreed that the Buyer or the Successful Bidder has provided adequate assurance of future performance within the meaning of section 365(b)(l)(C) of the Bankruptcy Code, (iii) agreed that all Defaults (as defined in the Purchase Agreement) under the Assumed Contracts arising or continuing prior to the assignment have been cured as a result or precondition of the assignment, such that the Buyer or the Successful Bidder, or the Sellers shall have no liability or obligation with respect to any Default occurring or continuing prior to the assignment, and from and after the date of the assignment the Assumed Contract shall remain in full force and effect for the benefit of the Buyer or the Successful Bidder and the Counterparty in accordance with its terms, (iv) waived any right to terminate the Assumed Contract or designate an early termination date under the applicable Assumed Contract as a result of any Default that occurred and/or was continuing prior to the assignment date and (v) agreed that the terms of the Sale Order shall apply to the assignment.

g.  Upon receipt of a Section 365 Objection from a Counterparty, the Debtors shall attempt to resolve such objection consensually with the objecting Counterparty, subject to the terms of Section 2.5 of the Purchase Agreement. If the Debtors and the Counterparty are unable to consensually resolve any timely served objection before [__]:[__] _.m. on July [__], 2009 (the "Dispute Resolution Deadline"), then (i) the objecting Counterparty will seek the intervention of the Court to settle the dispute by filing a formal objection no later than two days prior to the Sale Hearing and such dispute will be resolved by the Court at the Sale Hearing, (ii) if the dispute relates solely to the amount of the Cure Amount, pursuant to Section 2.5 of the Purchase Agreement, the Buyers may pay to the Counterparty any undisputed portion of the proposed Cure Amount (the "Undisputed Cure Amount") and place any disputed portion thereof (the "Disputed Cure Amount") into a segregated interest-bearing account such that, upon any resolution by the Court of the Disputed Cure Amount, or agreement between the Sellers and the Counterparty, which such resolution by the Court or agreement between the Sellers and the Counterparty shall occur prior to the Closing, the Counterparty will be entitled to payment from the segregated account of any such Court-determined or agreed Disputed Cure Amount and/or (iii) subject to the limitations set forth in the Purchase Agreement, the Sellers may elect not to assume the relevant Assumed Contract and instead reject it.

h.  Prior to the entry of the Sale Order, the Buyer or the Successful Bidder shall provide adequate assurance of its future performance under each Assumed Contract to the Counterparties thereto (other than the Debtors), as reasonably necessary to satisfy section 365(f)(2)(B) of the Bankruptcy Code. Any Cure Amounts still outstanding at the time of closing shall be paid, pursuant to Section 2.5 of the Purchase Agreement, to the appropriate Counterparty as a condition subsequent to assumption and assignment.

18.     Bankruptcy Rule 6006(e) allows for the sale of multiple contracts in one motion if all executory contracts or unexpired leases to be assumed or assigned are to be assigned to the same assignee, or upon authorization of the Court. The Debtors' proposed Assumption and Assignment Procedures contemplate that all Assumed Contracts will be assigned to the Buyer or the Successful Bidder and, therefore, the Debtors request that the Court grant authorization to file an omnibus motion to assume and assign all Assumed Contracts pursuant to Bankruptcy Rule 6006(f).

19.     To facilitate the assumption and assignment of the Assumed Contracts, the Debtors further request that the Court find the anti-assignment provisions of the Assumed Contracts, if any, to be unenforceable under section 365(f) of the Bankruptcy Code.[6]

## F.      Request to Set a Date for the Sale Hearing

20.     The Debtors intend to present the Successful Bid for approval by the Court pursuant to the provisions of sections 105, 363 and 365 of the Bankruptcy Code at the Sale Hearing to be scheduled by the Court and currently proposed as [_____] [__], 2009 at [____] _.m. (Prevailing Eastern Time). The Debtors reserve the right to adjourn the Sale Hearing without further notice. The Debtors shall be deemed to have accepted a bid only when the bid has been approved by the Court at the Sale Hearing. Upon the failure to consummate a sale of the Purchased Assets after the Sale Hearing because of the occurrence of a breach or default under the terms of the Successful Bid, the next highest or otherwise best Qualified Bid, if any, as

---

[6]     Section 365(f)(l) provides in part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease . . ." 11 U.S.C. § 365(f)(l). Section 365(f)(3) further provides that "Notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3).

disclosed at the Sale Hearing, shall be deemed the Successful Bid without further order of the Court, and the parties shall be authorized to consummate the transaction contemplated by the Qualified Bid.

## Basis for Relief Requested

I.   Approval of the Bidding Procedures is Appropriate and
in the Best Interests of the Debtors' Estates and Their Creditors

### A.   *The Bidding Procedures Are Appropriate under the Circumstances*

21.   To maximize the probability that the Debtors will obtain the greatest return possible for the Purchased Assets, the Debtors request approval of the Bidding Procedures. The Bidding Procedures set forth a transparent and competitive process designed to achieve the highest or otherwise best offer for the Purchased Assets. The Debtors reserve their right to modify the Bidding Procedures as necessary or as they, in their business judgment, deem appropriate to maximize value for the Debtors' estates and stakeholders.

22.   Maximization of proceeds received by the estate is the dominant goal of any proposed sale of estate property. See, e.g., Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 659 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993) ("It is a well-established principle of bankruptcy law that the . . . [debtors'] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting In re Atlanta Packaging Prods., Inc., 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)).

23.   In furtherance of maximizing the value received by the estate, courts typically find that use of procedures that are intended to enhance competitive bidding is appropriate in the context of bankruptcy sales. See, e.g., In re Fin'l News Network, Inc., 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . .[should] provide an

adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates"); In re Edwards, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) (bid procedures should allow for "an open and fair public sale designed to maximize value for the estate").

24.     The Debtors submit that the Bidding Procedures establish an appropriate process for identifying, selecting and soliciting bids and will enable them to review and compare any bids received and determine which bid(s) is the highest or best bid.  Similar procedures have been previously approved by other courts in this District.  See, e.g., MMS Precision Holdings Corp., No. 09-10998 (BLS) (Bankr. D. Del. Apr. 23, 2009); In re Drug Fair Group, Inc., No. 09-10897 (BLS) (Bankr. D. Del. Apr. 8, 2009); In re Hoop Holdings, LLC, No. 08-10544 (BLS) (Bankr. D. Del. Apr. 23, 2008); In re Goody's Family Clothing, Inc., No. 08-11133 (CSS) (Bankr. D. Del. Jun. 10, 2008); In re Linens Holding Co., No. 08-10832 (CSS) (Bankr. D. Del. May 13, 2008); In re Sharper Image Corp., No. 08-10322 (KG) (Bankr. D. Del. Mar. 12, 2008); In re ResMae Mortgage Corp., No. 07-10177 (KJC) (Bankr. D. Del. Feb. 13, 2007).

**B.      The Break-Up Fee and Expense Reimbursement Are Reasonable and Appropriate Under the Circumstances**

25.     As part of the Purchase Agreement, the Debtors will, in certain circumstances as set forth above and in section 6.2 of the Purchase Agreement, pay to the Buyer the Break-Up Fee in the amount of $900,000 and Expense Reimbursement in the amount of up to $275,000.  The Debtors submit that in light of the amount to be paid by the Buyer, and the lack of any other meaningful options other than the Sale Transaction, approval of the Break-Up Fee and Expense Reimbursement are warranted.

26.     In the Third Circuit, termination or break-up fees are considered administrative expenses because such fees provide a postpetition benefit to the bankruptcy estate.  Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 533 (3d

Cir. 1999). As outlined above, the Break-Up Fee and Expense Reimbursement are fair and reasonable, are reasonably calculated to produce the best and highest offers for the Purchased Assets and thereby confer actual benefits upon the estates herein. As such, the Break-Up Fee and Expense Reimbursement are consistent with the "business judgment rule," satisfy the Third Circuit's "administrative expense" standard and are in accord with bid protections approved by this District in other comparable chapter 11 cases. See In re Nortel Networks Inc., No. 09-10138 (Bankr. D. Del. Feb. 27, 2009) (approving $650,000 break-up fee in connection with $17.65 million sale, or 3.68%); In re Tallygenicom, L.P., No. 09-10266 (Bankr. D. Del. Feb. 19, 2009) (approving $2 million break-up fee in connection with $36.6275 million sale, or 5.5%); In re Archway Cookies LLC, No. 0812323 (Bankr. D. Del. Dec. 3, 2008) (approving $750,000 break-up fee in connection with a $25 million sale, or 3%); see also In re Fluid Routing Solutions Intermediate Holding Com., No. 09-10384 (Bankr. D. Del. February 19, 2009) (court approved expense reimbursement of up to $1.25 million in connection with a $11 million sale).

## C. *Notice of the Auction and the Sale Hearing Is Reasonable Under the Circumstances*

27. In order to receive the highest and best price in return for the Purchased Assets, the Debtors have filed this Motion and are seeking to conduct the Auction and hold the Sale Hearing on the dates set forth herein. In order to yield the greatest possible return for the benefit of creditors and minimize the amount of administrative expenses, the Debtors believe that the proposed expedited auction and sale process is warranted and appropriate.

28. Accordingly, the Debtors submit that the Auction and Sale Notice is reasonable and appropriate and will be adequate to ensure that all interested parties have the opportunity to bid for the Purchased Assets, and/or to object to the proposed sale of the Purchased Assets.

II.     Approval of the Proposed Sale Is Appropriate and
        in the Best Interests of the Debtors' Estates and Creditors

A.      **_The Sale of the Purchased Assets Pursuant to the Purchase Agreement is Warranted_**
        **_Under Section 363 of the Bankruptcy Code as a Sound Exercise of the Debtors'_**
        **_Business Judgment_**

        29.     Section 363(b) of the Bankruptcy Code provides that a debtor, "after notice and a

hearing, may use, sell, or lease, other than in the ordinary course of business, property of the

estate." 11 U.S.C. § 363(b). A debtor must articulate a valid business justification to obtain

court approval to proceed with asset sales outside of the ordinary course of business under

section 363(b) of the Bankruptcy Code. See, e.g., Myers v. Martin (In re Martin), 91 F.3d 389,

395 (3d Cir. 1996) (citing Fulton State Bank v. Schipper (In re Schipper), 933 F.2d 513, 515 (7th

Cir. 1991)); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063,

1070-71 (2d Cir. 1983); In re Abbotts Dairies, Inc., 788 F.2d 143, 147-48 (3d Cir. 1986)

(implicitly adopting the "sound business judgment" test of Lionel Corp. and requiring good

faith); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 175-76 (D. Del. 1991) (concluding that

the Third Circuit adopted the "sound business judgment" test in the Abbotts Dairies decision);

Dai-Icho Kangyo Bank v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding

Corp.), 242 B.R. 147, 153 (Bankr. D. Del. 1999) (same). Generally, Third Circuit courts require

a debtor to establish the following in connection with a sale under section 363 of the Bankruptcy

Code: (1) a sound business purpose; (2) a fair sale price; (3) adequate and reasonable notice has

been provided by the debtor; and (4) good faith by the purchaser. In re Decora Indus., Inc., 2002

WL 32332749 at * 2 (D. Del. May 20, 2002) (citing Del. & Hudson Railway Co., 124 B.R. 169,

176 (D. Del. 1991)).

        30.     When a debtor demonstrates a valid business justification for a decision, a strong

presumption arises "that in making [the] business decision the directors of a corporation acted on

an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1990) (holding that the Delaware business judgment rule has "vitality by analogy" in chapter 11, especially where the debtor is a Delaware corporation) (quotations omitted).

31.     As set forth herein and in the First Day Affidavit, Debtors have demonstrated a strong business justification for the Sale Transaction. The Sale Transaction will maximize value by monetizing the Purchased Assets for the benefit of all constituents, not to mention preserve jobs and a business capable of generating new business for many of the Debtors' creditors. As such, the Debtors, in their business judgment and in consultation with their legal and financial advisors, have determined that the proposed Sale Transaction is the best available method to maximize the value of the Debtors' estates for the benefit of all of the Debtors' stakeholders. Absent approval of the Sale Transaction, the Debtors will be left with no other option but to shut down their business and liquidate their assets – a result that stands in stark contrast to the bedrock principles of preserving a going concern business and maximizing value.

**B.      *No Consumer Privacy Ombudsman is Necessary in Connection with Sale***

32.     Under section 363(b)(l) of the Bankruptcy Code, if the sale of a consumer customer list containing personal information relating to individual persons is inconsistent with the debtor's consumer privacy policy, section 332 governs the appointment of a consumer privacy ombudsman. 11 U.S.C. § 332(b)(l). Here, section 363(b)(l) does not apply and a consumer privacy ombudsman is not required because none of the Debtors' customers are individuals, and the Debtors do not have a consumer privacy policy.

## C. Assumption and Assignment of the Assumed Agreements Is Authorized by Section 365 of the Bankruptcy Code

33.     To facilitate and effect the sale of the Purchased Assets, the Debtors also seek to assume and assign certain executory contracts and unexpired leases to the Successful Bidder, to the extent required by a Successful Bid at the Auction.

34.     Section 365(f)(2) of the Bankruptcy Code provides, in pertinent part, that:

The trustee may assign an executory contract or unexpired lease of the debtor only if –

> A)     the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> B)     adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2). Under Bankruptcy Code section 365(a), a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."

11 U.S.C. § 365(a). Bankruptcy Code section 365(b)(l), in turn, codifies the requirements for assuming an executory contract of a debtor. That subsection provides:

> (b)     If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee –
>
> A)     cures, or provides adequate assurance that the trustee will promptly cure, such default;
>
> B)     compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> C)     provides adequate assurance of future performance under such contract or lease.

11 U.S.C. §365(b)(l).

35.     Accordingly, section 365 of the Bankruptcy Code authorizes the proposed assumption assignment of executory contracts and unexpired leases, provided that the defaults under such contracts are cured and adequate assurance of future performance is provided.

36.     It is well settled that the meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." EBG Midtown South Corp. v. McLaren/Hart Env. Eng'g Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 593 (S.D.N.Y. 1992); In re Prime Motor Inns Inc., 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994); Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

37.     Among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. See, e.g., In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

38.     To the extent any defaults exist under any Assumed Contract, any such default will be promptly cured or adequate assurance that such default will be cured will be provided prior to the assumption and assignment of such Assumed Contract. If necessary, the Debtors will submit facts prior to or at the Sale Hearing to show the financial credibility of the Buyer or the Successful Bidder, and their willingness and ability to perform under the Assumed Contracts. The Sale Hearing will therefore provide the Court and other interested parties the opportunity to evaluate and, if necessary, challenge, the ability of the Buyer or Successful Bidder to provide adequate assurance of future performance under the Assumed Contracts, as required pursuant to

section 365(b)(l)(C) of the Bankruptcy Code. Thus, the Debtors submit that, at the conclusion of the Sale Hearing, the assumption and assignment of the Assumed Contracts should be approved.

**D.    The Sale of the Purchased Assets Free and Clear of Liens, Claims and Encumbrances is Authorized by Section 363(f) of the Bankruptcy Code**

39.    Pursuant to section 363(f) of the Bankruptcy Code, the Debtors seek authority to sell and transfer the Purchased Assets to the Buyer or Successful Bidder free and clear of all liens, claims and encumbrances asserted against the Purchased Assets, with any such liens, claims and encumbrances to attach to the proceeds of the sale of the Purchased Assets, subject to any rights and defenses of the Debtors and other parties in interest with respect thereto. Section 363(f) of the Bankruptcy Code provides, in pertinent part:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –
>
> (1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)    such entity consents;
>
> (3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)    such interest is in bona fide dispute; or
>
> (5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). See also In re Elliot, 94 B.R. 343, 345 (E.D. Pa. 1988) (holding that section 363(f) written in disjunctive; court may approve sale "free and clear" provided at least one of the requirements is met).

40.    A sale free and clear of liens, claims and encumbrances is necessary to effect the Sale Transaction. A sale subject to liens, claims and encumbrances would result in a lower

purchase price and be of substantially less benefit to the Debtors' estate. A sale free and clear of liens, claims and encumbrances is particularly appropriate under the circumstances because any lien, claim or encumbrance in, to or against the Debtors' assets that exists immediately prior to the closing of any sales will attach to the sale proceeds with the same validity, priority, force and effect as it had at such time, subject to the rights and defenses of the Debtors or any other party in interest. The Debtors submit that holders of liens, claims and encumbrances, if any, will be adequately protected by the availability of the proceeds of the sale to satisfy their liens, claims and encumbrances. Thus, the proposed sale satisfies section 363(f) of the Bankruptcy Code.

### Waiver of Automatic Ten-Day Stay Under Bankruptcy Rules 6004(h) and 6006(d)

41. Pursuant to Bankruptcy Rules 6004(h) and 6006(d), the Debtors seek a waiver of any stay of the effectiveness of an order granting the relief sought in this Motion. Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." Similarly, under Bankruptcy Rule 6006(d), unless the Court orders otherwise, all orders authorizing the assignment of contracts or unexpired leases are automatically stayed for ten days after entry of the order. The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h); Advisory Committee Notes to Fed. R. Bankr. P. 6006(d).

42. As described herein and in the First Day Affidavit, given the likelihood that, absent a prompt sale, the Debtors' assets would rapidly diminish in value and no going concern sale would be possible, legitimate business reasons exist to justify this Court's approval of an order waiving the requirements of Bankruptcy Rule 6004(h). Therefore, it is imperative that the Bidding Procedures Order be effective immediately following the hearing thereon to expedite the

close of the Sale Transaction promptly after all closing conditions have been satisfied or waived, without any further delay, by providing that the 10-day stay under Bankruptcy Rule 6004(h) is waived.

43.     In light of the exigent circumstances outlined above mandating the expeditious consummation of the Sale Transaction as the only means to preserve and maximize the value of the Debtors' business for the benefit of all stakeholders therein, the Bidding Procedures Order, if entered, and the assumption and assignment of the Assumed Contracts to the Buyer or Successful Bidder thereunder must be effective immediately upon entry of such order. Therefore, waiver of the ten-day stay under Bankruptcy Rule 6006(d) is requested.

## Notice

44.     Notice of this Motion has been given to: (a) the U.S. Trustee; (b) the Debtors' 30 largest unsecured creditors on a consolidated basis, as identified in their chapter 11 petitions; (c) counsel to the Debtors' prepetition secured lenders; (d) counsel to the Buyer; (e) counsel to all Counterparties under the Assumed Contracts. The Debtors submit that under the circumstances no other or further notice need be given.

## No Prior Request

45.     No prior request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein, (ii) enter the proposed Bidding Procedures Order, in substantially the form attached hereto as Exhibit A and (iii) grant such other and further relief to the Debtors as the Court deems just and proper.

Dated: July 2, 2009
       Wilmington, Delaware

Respectfully submitted,

Daniel J. DeFranceschi (DE No. 2732)
Christopher M. Samis (DE No. 4909)
RICHARDS, LAYTON & FINGER, P.A.
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

-and-

Paul D. Leake
Pedro A. Jimenez
Ross S. Barr
JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306

*PROPOSED ATTORNEYS FOR THE DEBTORS*