# **EXHIBIT A**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------------x
                                        :
In re                                   :   Chapter 11
                                        :
PROLIANCE INTERNATIONAL, INC., et al.,[1]  :   Case No. 09-12278 (CSS)
                                        :   (Jointly Administered)
       Debtors.                         :
                                        :   Proposed Hearing Date: 8/21/09 at 11:30 a.m.
                                        :   Proposed Objection Deadline: 8/17/09 at 4:00 p.m.
-------------------------------------------------------------x
```

## MOTION OF THE DEBTORS FOR
## ENTRY OF AN ORDER AUTHORIZING SALE-
## RELATED PAYMENTS TO INCENTIVE PLAN PARTICIPANTS

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors")

hereby file this motion (the "Motion"), pursuant to sections 105(a), 363(b)(l) and 503(c)(3) of

title 11 of the United States Code (the "Bankruptcy Code"), for the entry of an order:

(a) authorizing the Debtors to implement the Proliance International, Inc. Executive Incentive

Plan, a copy of which is attached hereto as Exhibit A (the "Incentive Plan"), and (b) authorizing

the Debtors to pay sale-related incentive pay contemplated thereunder to Senior Management (as

defined below) pursuant to the terms of the Incentive Plan.[2] In support of this Motion, the

Debtors respectfully state as follows:

---

[1] The Debtors are the following four entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Proliance International, Inc. (7383); Aftermarket Delaware Corporation (9862); Aftermarket LLC; and Proliance International Holding Corporation (9275). The address of each of the Debtors is 100 Gando Drive, New Haven, Connecticut 06513.

[2] A copy of the proposed order (the "Order") is attached hereto as Exhibit B.

## Preliminary Statement

1. As discussed in greater detail in the First Day Affidavit (as defined below), as a result of the extensive marketing efforts conducted by the Debtors prior to the Petition Date (as defined below), three of the Debtors entered into a Purchase Agreement, dated July 2, 2009 (the "Purchase Agreement"), which provides for the sale of their North American business (the "North American Assets") to Centrum Equities XV, LLC ("Centrum"). Following entry by the Court on July 24, 2009 of the Order (I) Approving Bidding Procedures For The Sale of The Debtors' Assets, (II) Authorizing The Debtors To Offer Certain Bid Protections And (III) Schedule Final Sale Hearing And Approving Form And Manner of Notice Thereof (Docket No. 137) (the "Bidding Procedures Order" and the bidding procedures approved thereby, the "Bidding Procedures"), the Debtors are now continuing the sale process to realize the highest and best price for the North American Assets.

2. The success of the process to sell the North American Assets, and the subsequent process to be commenced shortly for the sale of the stock of the Debtors' Dutch subsidiary, Nederlandse Radiateuren Fabriek B.V. ("NRF"), will depend, in large part, on the efforts of the Debtors' Senior Management, all of whom have been working tirelessly to maximize the value of the Debtors' estates with no future employment prospects, as Centrum has advised Senior Management that they have no job with Centrum after the sale of the North American Assets is complete.

3. To incentivize the five senior executives of the Debtors (the "Senior Management") whose services will be critical to maximizing the value of the Debtors' estates, the Debtors' Board of Directors (the "Board"), in consultation with its advisors, developed and approved the Incentive Plan (as described in greater detail below), which aligns the interests of

Senior Management with the interests of all of the Debtors' other stakeholders because payments to Senior Management under the Incentive Plan depend on the Debtors' successful and timely completion of the two principal asset sales.

4.     The Debtors' prepetition secured lenders (collectively, the "Prepetition Lenders") agreed with this conclusion as part of the Final Order (I) Authorizing Use of Cash Collateral; (II) Granting The Prepetition Lenders Adequate Protection; And (III) Granting Related Relief, entered by this Court on July 24, 2009 (Docket No. 136) (the "Final Cash Collateral Order"). In the Final Cash Collateral Order, the Prepetition Lenders agreed to fund up to $5.6 million of wind-down costs from the proceeds of the sale of the North American Assets, which amount includes payments under an incentive plan.

5.     The Debtors respectfully submit that the Incentive Plan, which has a maximum aggregate payout of $910,000, plus any Additional Contribution (as defined in the Incentive Plan) available and authorized by the Board, provides significant value in helping to ensure that the Debtors can consummate going concern sales for their principal assets. In light of the size and complexity of the Debtors' businesses, in addition to the issues that have already arisen and will continue to arise in these cases, the Debtors believe that the amounts to be paid to Senior Management under the Incentive Plan are reasonable, narrowly tailored to maximize the value of the Debtors' estates and responsibly targeted and, thus, serve the best interests of the Debtors' estates. Accordingly, the Debtors' respectfully submit that the Incentive Plan and the payments proposed thereunder should be approved in their entirety.

### Jurisdiction

6.     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue for this

matter is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory basis for the relief requested herein are sections 105(a), 363(b)(l) and 503(c)(3) of the Bankruptcy Code.

## Background

7.     On July 2, 2009 (the "Petition Date"), each of the Debtors commenced a case under chapter 11 of the Bankruptcy Code.[3]  The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8.     On July 15, 2009, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the official committee of unsecured creditors (the "Committee").  No trustee or examiner has been appointed in these chapter 11 cases.

## Facts Relevant to Relief Requested

### *The North American and NRF Sale Processes*

9.     On the Petition Date, the Debtors filed the Motion of the Debtors for (I) an Order (A) Approving Bidding Procedures for the Sale of Certain Assets, (B) Authorizing the Debtors to Offer Certain Bid Protections and (C) Scheduling Final Sale Hearing and Approving Form and Manner of Notice Thereof, and (II) an Order Authorizing and Approving (A) the Sale of Certain Assets Free and Clear of Liens, Claims and Encumbrances, (B) the Assumption and Assignment of Executory Contracts and Unexpired Leases and (C) Related Relief (Docket No. 19) (the "Sale Motion").

10.     As described above, the Sale Motion and the Bidding Procedures Order contemplate the continuation of an intensive marketing and sale process during the initial stages of the Debtors' chapter 11 cases that began almost a year and a half prior to the Petition Date

---

[3]     Background information regarding, among other things, the Debtors' business and the events leading to the commencement of these chapter 11 cases is contained in the Affidavit of Arlen F. Henock in Support of First Day Pleadings (the "First Day Affidavit"), which was filed on the Petition Date.

(the "North American Sale Process").  The sale of the North American Assets will be followed by a process, to be submitted for approval by this Court in the near term to continue another marketing and sale process initiated by the Debtors prior to the Petition Date to sell the stock of NRF to the bidder submitting the highest and best bid (the "NRF Sale Process" and, together with the North American Sale Process, the "Sale Processes").

***The Incentive Plan***

11.     Critical to the successful sale of the Debtors or their assets is the full experience, expertise and active and committed involvement of Senior Management.  To that end, the Incentive Plan, a copy of which is attached as Exhibit A hereto, is designed to maximize estate assets available for distribution to creditors by providing incentives to Senior Management to maximize the net recovery from the Sale Processes.

12.     On July 24, 2009, this Court entered the Final Cash Collateral Order, pursuant to which the Debtors and their Prepetition Lenders agreed to the creation of an account to be funded from the proceeds of the sale of the North American Assets that will fund a wind-down budget governing any expenditures of cash by the Debtors in winding down their estates and liquidating any assets upon completion of the Sales Processes (the "Wind-Down Budget").[4] The Wind-Down Budget includes, among other things, amounts to cover payments contemplated to be made to Senior Management under the Incentive Plan.

---

[4]     The Debtors have also been in discussions with the Committee about the Incentive Plan and hope to be able to obtain the Committee's support of same.

13.     The following is a summary of the major terms of the Incentive Plan,

which have been narrowly tailored and specifically targeted to maximize the value received for

the Assets for the benefit all of the Debtors' stakeholders:[5]

- **Contributions**: The Debtors shall make contributions (each, a "Contribution") to a pool (the "Plan Pool") from which to make payments under the Incentive Plan, which will be no more than $910,000 plus any Additional Contribution available and authorized by the Board, and shall be based upon the following two objective criteria:

  > *North American Asset Sale*:[6] The Contribution, if any, upon the North American Assets Sale (the "North American Assets Sale Contribution") shall be calculated based upon the extent to which to which the gross proceeds of the North American Assets Sale (the "North American Proceeds") exceed certain threshold amounts.

    o    The "North American Proceeds" shall include (i) the amount paid by the purchaser(s) to the Debtors at the closing of the North American Assets Sale (after giving effect to any purchase price adjustments made at the closing in connection therewith but specifically excluding post-closing purchase price adjustments), including any escrow deposits released to the Debtors at the closing, plus (ii) an amount equal to the Debtors' good faith estimate of pre-paid inventory up to $1 million, to the extent the purchaser is required to pay such amount and provided that that the Debtors present sufficient proof at the closing reasonably acceptable to Silver Point Finance, LLC, the agent under the Debtors' prepetition secured credit facility, that such amount will be paid post-closing by the buyer of the North American Assets, plus (iv) any amounts remaining in the Wachovia concentration account after the funding of the professional fee account and the wind-down account as provided in paragraph seven of the Final Cash Collateral Order, less the amount of (1) funding into the Accounts as provided in the Cash Collateral Order and (2) any increased payments by the buyer of the North American Assets to the Debtors to reimburse the Debtors for additional expenses incurred in connection with the North American Assets Sale.

---

[5]    This summary of the Incentive Plan is intended only to assist the Court in understanding key aspects of the arrangement and is qualified in its entirety by reference to the Incentive Plan, as it may be modified or supplemented by any Order approving same. All capitalized terms not otherwise defined in this summary have the meanings given to them in the Incentive Plan.

[6]    "North American Assets Sale" means the consummation of a sale of the North American Assets pursuant to the Acquisition Agreement between the Debtors and Centrum Equities XV, LLC, dated July 2, 2009, or similar transaction(s) with different purchaser(s) that result in North American Proceeds over $9.4 million..

- The North American Assets Sale Contribution shall be made if and only if the North American Proceeds are more than $9.4 million, in which case the North American Assets Sale Contribution shall be $370,000.

- There shall be no North American Assets Sale Contribution if the North American Assets Sale is not consummated on or before February 1, 2010.

➢ *NRF Sale*: The Contribution, if any, upon the NRF Sale (the "NRF Sale Contribution") shall be calculated based upon the extent to which the gross proceeds of the NRF Sale (the "NRF Proceeds") exceed certain threshold amounts.

- "NRF Sale Proceeds" shall include (i) the amount paid by the purchaser(s) to the Debtors at or after the closing of the NRF Sale (after giving effect to any purchase price adjustments in connection therewith, other than post-closing purchase price adjustments), plus (ii) the amount of any escrow deposit made by the purchaser(s) in connection with the NRF Sale, regardless of whether such deposit is made prior to or at the closing of the NRF Sale, but only to the extent such deposit ultimately is received by the Debtors, less the amount of (1) any investment banking fees or expenses and (2) any legal fees or expenses, in each case directly related to and in connection with the NRF Sale.

- If the NRF Proceeds are $16 million or less, the NRF Sale Contribution shall be equal to $140,000. If the NRF Proceeds are $24 million or more, the NRF Sale Contribution shall be equal to $540,000. In no event shall the NRF Sale Contribution exceed $540,000. If the NRF Proceeds are over $16 million but less than $24 million, the NRF Sale Contribution shall be equal to the sum of (i) $140,000 plus (ii) $0.05 for each dollar the NRF Proceeds exceed $16 million.

- The following table illustrates NRF Sale Contribution amounts at various levels of NRF Proceeds:

| NRF Proceeds | NRF Sale Contribution |
|---|---|
| $16 million or less | $140,000 |
| $17 million | $190,000 |
| $18 million | $240,000 |
| $19 million | $290,000 |
| $20 million | $340,000 |
| $21 million | $390,000 |
| $22 million | $440,000 |
| $23 million | $490,000 |

| NRF Proceeds | NRF Sale Contribution |
|---|---|
| $24 million or more | $540,000 |

- There shall be no NRF Sale Contribution unless both the NRF Sale and the North American Assets Sale are consummated on or before February 1, 2010.

- **Plan Payments**: Plan Payments shall be in lieu of any other future bonus or severance compensation under any other plan, program, applicable law or policy otherwise applicable to Senior Management and the Debtors. As a condition precedent to any obligation of the Debtors to make any Plan Payment to Senior Management, the relevant member of Senior Management shall be required to fully execute and return to the Debtors a general release and waiver of claims, excluding those claims specifically excepted from the release and waiver as described therein, in substantially the form attached as Schedule 2 to the Incentive Plan (the "Release"). The Debtors shall have no obligation to make any Plan Payment to any member of Senior Management who does not satisfy such release requirement or who otherwise revokes the Release within any revocation period afforded by (i) the Release or (ii) applicable law, whichever is longer.

  ➢ *Allocation of Plan Payments*: Subject to Section 5 of the Incentive Plan, the Debtors shall pay the Plan Payments to Senior Management in accordance with the percentages of the Contributions identified on Schedule 1 to the Incentive Plan.[7]

  ➢ *Timing of Plan Payments*:

    - Plan Payments Related to the North American Assets Sale: Within five days following the date upon which the Release executed by any member of Senior Management in connection with the North American Assets Sale becomes irrevocable, the Debtors shall pay such member of Senior Management a Plan Payment equal to his percentage of the North American Assets Sale Contribution.

    - Plan Payments Related to the NRF Sale: Within five days following the date upon which the Release executed by any member of Senior Management in connection with the NRF Sale becomes irrevocable, the Debtors shall pay such member of Senior Management a Plan Payment equal to his percentage of the NRF Sale Contribution.

    - Plan Payment End Date: Notwithstanding anything to the contrary in the Incentive Plan, in no event shall any Plan Payment be made after March 15 of the calendar year following the calendar year in

---

[7] Contemporaneously herewith, the Debtors have filed a motion to file Schedule 1 to the Incentive Plan under seal due to the confidential and sensitive nature of the information contained therein.

which the Plan Payment is due pursuant to Section 4(b)(i) or 4(b)(ii) of the Incentive Plan.

## Relief Requested

14.     By this Motion, the Debtors seek the entry of an order, pursuant to section 105(a), 363(b)(l) and 503(c)(3) of the Bankruptcy Code, (a) authorizing the Debtors to implement the Incentive Plan and (b) authorizing the Debtors to make the Contributions to the Plan Pool and the Plan Payments to Senior Management.

## Basis for Relief Requested

15.     Senior Management has actively managed and directed the Debtors' business and managed the Sale Processes, despite severe financial constraints of the Debtors' estates prior to and since the Petition Date. Their expertise, skill and attention have been instrumental in maintaining the Debtors' business as a going concern and preserving value for their estates, particularly during a very difficult and challenging time for the business. In order for the Debtors to maintain their business as a going concern and complete the Sale Processes in order to maximize the value of their estates for the benefit of all their stakeholders, Senior Management's continued involvement is crucial. Accordingly, the Debtors, in the exercise of their sound business judgment, believe that it is imperative that they provide Senior Management these modest and appropriate incentives to support that marketing of the Assets and continued operation of the Debtors' business through the closing of the Asset Sales, especially in light of the fact that Senior Management will not have a job with certainty following the completion of the sale of the North American Assets.

16.     The Incentive Plan was developed and approved by the Debtors' management and their Board, in close consultation with the Debtors' professional advisors. As

described above payments under the Incentive Plan are specifically contemplated by and budgeted for under the Wind-Down Budget.

17.    In the exercise of its sound business judgment, the Board has concluded that the Incentive Plan is in the best interests of the Debtors' estates, and will contribute directly to successful sales of the North American Assets and NRF, which result exceeds the amounts of such additional compensation. Moreover, Senior Management has been using its maximum efforts, including forgoing taking valuable accrued vacation time during these summer months in furtherance of the Sale Processes, with the understanding that the Incentive Plan was to be proposed and with the expectation that it would be approved.

***The Implementation of the Incentive Plan is a Valid Exercise***
***of the Debtors' Sound Business Judgment Under Section 363(b)(1) of the Bankruptcy Code***

18.    Section 363(b)(1) of the Bankruptcy Code provides: "The trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 105(a) of the Bankruptcy Code provides:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent the abuse of process.

11 U.S.C. § 105(a). Section 105(a) of the Bankruptcy Code grants bankruptcy courts broad authority and discretion to enforce the provisions of the Bankruptcy Code either under specific statutory fiat or under equitable common law principles.

19.    The Debtors respectfully submit that the Court should approve the Incentive Plan and the payments contemplated thereunder to Senior Management because a sound business justification exists for such payments. See In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983); In re Abbotts Dairies, Inc., 788 F.2d 143, 147-48 (3d Cir. 1986) (implicitly

NYI-4203387v5
RLF1-3421230-1

adopting the "sound business judgment" test of Lionel Corp. and requiring good faith); see also In re Delaware & Hudson Ry. Co., 124 B.R. 169, 175-76 (D. Del. 1991) (concluding that the Third Circuit adopted the "sound business judgment" test in the Abbotts Dairies decision); Dai-Icho Kangyo Bank v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (Bankr. D. Del. 1999) (same).

20.     Once a debtor articulates a valid business justification, the business judgment rule creates "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the Debtors." Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985); Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1990) (holding that the Delaware business judgment rule has "vitality by analogy" in chapter 11, especially where the debtor is a Delaware corporation) (quotations omitted); In re Johns-Manville Corp., 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtors' management decisions.").

21.     The Incentive Plan is the product of the Debtors' sounds business judgment and, thus, the Debtors respectfully submit that it should be approved. First, the Incentive Plan is precisely calibrated to achieve the desired performance. The postpetition efforts of Senior Management in furtherance of the Sale Processes, which extend well beyond the ordinary course responsibilities attendant to their positions as Senior Management, will be critical to the Debtors' efforts to maximize the value of their estates. Without Senior Management's extraordinary efforts to (a) implement the Bidding Procedures, (b) respond to inquiries from potential bidders, support and direct their due diligence efforts, assess and

evaluate competing bids and, ultimately, decide (in consultation with the Debtors' professionals) the highest and best bid to present to the Court for approval, (c) manage and preserve the going concern value of the Debtors' business throughout the course of the Sale Processes and (d) assist in insuring that the Sales Processes are consummated in an orderly and expeditious manner, the Debtors would be unable to implement the Bidding Procedures and continue and successfully consummate the value-maximizing Sale Processes.

22.     As outlined above, the Incentive Plan is structured to maximize value for the Debtors' estates and creditors. Indeed, the Plan Payments are tied directly to the proceeds received by the Debtors from the Sale Processes. Thus, the motivations of Senior Management are aligned with the motivations of the Debtors' estates and their creditors.

23.     In addition, the Debtors' ability to preserve the value of their estates would be substantially hindered if the Debtors are unable to properly incentivize their employees. The fact that the Debtors are essentially preserving the value of their businesses for sale makes it virtually impossible to attract any employees, let alone those equal to the caliber of Senior Management. Authorization to implement the Incentive Plan will provide Senior Management with a reasonable incentive, thereby minimizing the need to seek other employment, which would otherwise distract from the necessary tasks Senior Management needs to perform in order to maximize the value of the Debtors' estates.

24.     Further, the aggregate potential cost of the Incentive Plan is reasonable, particularly in the context of the magnitude of the Sale Processes and as compared to the size of the Debtors' estates. Indeed, the Debtors' ability to generate any real recovery for creditors depends entirely upon the proper and timely execution of the Sale Processes, along with a dedicated focus toward the efficient management of these cases.

25.     Finally, courts in this District have repeatedly approved similar incentive programs that are tied to certain levels of proceeds to be received in estate asset sales and other benchmarks, as having particular value in motivating management teams. See, e.g., In re Acendia Brands, Inc., Case No. 08-11787 (BLS) (Bankr. D. Del. Sep. 22, 2008) (approving employee incentive plan providing for payments tied to the amount of gross proceeds received from the sale of substantially all of the debtors' assets); In re American Home Mortgage Holdings, Inc., Case No. 07-11047 (CSS) (Bankr. D. Del. Nov. 28, 2007) (same); In re Fedders North America, Inc., Case No. 07-11176 (BLS) (Bankr. D. Del. Oct. 24, 2007) (approving employee incentive plan providing for payments tied to certain restructuring-related and performance goals); In re Werner Holding Co. (DE), Inc., Case No. 06-10578 (KJC) (Bankr. D. Del. Dec. 27, 2006) (same); In re Global Home Products LLC, Case No. 06-10340 (KG) (Bankr. D. Del. May 30, 2006) (approving employee incentive plan providing for payments if plan participants fulfilled their obligations to the debtors through the closing of a sale of substantially all of the debtors' assets); In re Riverstone Networks, Inc., Case No. 06-10110 (CSS) (Bankr. D. Del. Apr. 3, 2006) (approving employee incentive plan providing for payments for successful completion of certain individual and company performance goals); In re Pliant Corp., Case No. 06-10001 (MFW) (Bankr. D. Del. Feb. 21, 2006) (approving employee incentive plan providing for payments for achievement of personal and corporate performance targets); In re Nobex Corp., Case No. 05-20050 (MFW) (Bankr. D. Del. Jan. 20, 2006) (approving employee incentive plan providing for payments in event of sale to bidder with higher purchase price than that provided by stalking horse bidder).[8]

---

[8]     Unreported orders cited in the Motion are not attached thereto. Copies of such orders will be made available to the Court at or prior to the hearing on this Motion and are available to parties in interest upon request made to the Debtors' counsel.

***The Incentive Plan is Similarly Justified by the Facts and Circumstances of These Cases
Under Section 503(c)(3) of the Bankruptcy Code***

26.     The Debtors further submit that, for reasons similar to those for which the

implementation of the Incentive Plan and the payments thereunder are a product of the Debtors'

sound business judgment under section 363(b)(1) of the Bankruptcy Code, the payments

proposed to be made to Senior Management under the Incentive Plan are also certainly "justified

by the facts and circumstances of [these] case[s]." See 11 U.S.C. § 503(c)(3).  Further, neither

section 503(c)(1)[9] nor section 503(c)(2)[10] of the Bankruptcy Code limit or otherwise apply to this

Court's decision whether to approve the Incentive Plan and the payments proposed to be made

thereunder.

27.     By the statute's plain language, section 503(c)(1) applies solely to retention

plans for "insiders" and section 503(c)(2) concerns only the payment of severance; neither

provision applies to performance-based incentive plans. See, e.g., In re Nobex Corp., No. 05-

20050, January 12, 2006, Hearing Tr. at 67 (Bankr. D. Del. 2006) (Walrath, J.).

---

[9]     Section 503(c)(1) of the Bankruptcy Code prohibits a transfer made to "an insider of the debtor for the purpose of inducing such person to remain with the debtor's business, absent a finding by the court based on evidence in the record that —

(A) the transfer or obligation is essential to retention of the person because the individual has a bona fide job offer from another business at the same or greater rate of compensation;

(B) the services provided by the person are essential to the survival of the businesses; and

(C) either —

> (i) the amount of the transfer made to . . . the person is not greater than the amount equal to 10 times the amount of the mean transfer . . . of a similar kind given to nonmanagement employees for any purpose during the calendar year in which the transfer is made . . .; or

> (ii) if no such similar transfers were made to . . . such nonmanagement employees during such calendar year, the amount of the transfer . . . is not greater than an amount equal to 25 percent of the amount of any similar transfer . . . made to . . . such insider for any purpose during the calendar year before the year in which such transfer is made . . . ."

[10]    Section 503(c)(2) of the Bankruptcy Code prohibits a "severance payment to an insider of the debtor, unless—

> (A) the payment is part of a program that is generally applicable to all full-time employees; and

> (B) the amount of the payment is not greater than 10 times the amount of the mean severance pay given to nonmanagement employees during the calendar year in which the payment is made . . . ."

28.     Clearly, the Incentive Plan does not operate as a means to retain the members of Senior Management, but, rather, to motivate them. As mentioned above, members of Senior Management are in the process of assisting with the consummation of the Sales Processes. Importantly, none of the payments proposed under the Incentive Plan will be made unless the Debtors' estates and their stakeholders benefit from the successful achievement of certain benchmarks. Accordingly, there is nothing retentive about the Plan Payments (i.e., Senior Management do not receive any Plan Payments merely for staying in the Debtors' employ through the closing of either Asset Sale). On the contrary, Senior Management needs to achieve certain benchmarks (i.e., are incentivized) in order to receive any Plan Payments under the Incentive Plan. Therefore, the Incentive Plan is properly characterized as a performance based, sale-related management incentive plan, not a retention plan for insiders subject to the requirements of section 503(c)(1) of the Bankruptcy Code.

29.     In addition, the Incentive Plan does not constitute severance for insiders subject to section 503(c)(2) of the Bankruptcy Code because it does not provide benefits to Senior Management upon termination of their employment with the Debtors. See 11 U.S.C. § 503(c)(2). Under the terms of the Incentive Plan, rather, a member of Senior Management will receive compensation upon achievement of the relevant benchmarks regardless of whether such Senior Management employee thereafter remains employed by the Debtors. Therefore, the Incentive Plan is a management and sales-incentive plan, not a severance plan for insiders subject to section 503(c)(2) of the Bankruptcy Code.

30.     Further, to the extent that they are outside the ordinary course of business, the Plan Payments clearly pass muster under section 503(c)(3) of the Bankruptcy Code, which prohibits:

other transfers or obligations that are outside the ordinary course of business and not <u>justified by the facts and circumstances of the case,</u> including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition.

11 U.S.C. 503(c)(3) (emphasis added).

31. "The test in section 503(c)(3) appears to be no more stringent a test than the one courts must apply in approving any administrative expense under section 503(b)(1)(A). Any expense must be an actual, necessary cost or expense of preserving the estate." <u>In re Dana Corp.</u>, 358 B.R. 567, 576 (Bankr. S.D.N.Y. 2006) (applying such test and the business judgment test to determine that the debtor's incentive plan was "justified by the facts and circumstances of the case") (citing 4 COLLIER ON BANKRUPTCY § 503.17[3] (15th ed. 1982)). Accordingly, this Court has discretion under section 503(c)(3) to authorize a debtor's entry into bonus and incentive plans that were formulated as an exercise of the debtor's sound business judgment. <u>See</u> <u>id.</u> (citing <u>In re Nobex Corp.</u>, No. 05-20050 (MFW), 2006 WL 4063024 (Bankr. D. Del. Jan. 19, 2006) (concluding that section 503(c)(3) is nothing more than a reiteration of the standard under 363 for transfers outside the ordinary course of business, which views only whether the debtor exercised sound business judgment)). In fact, since courts have begun to analyze various payments under section 503(c)(3), they have been unanimous in holding that they must use the "business judgment" standard as the proper standard for determining whether incentive programs and the payments thereunder are justified. <u>See, e.g.,</u> <u>In re Werner Holding Co. (DE), Inc.,</u> Case No. 06-10578 (KJC) (Bank. D. Del. Jul. 20, 2006, Aug. 22, 2006 and Dec. 20, 2006); <u>In re</u> <u>Nobex Corporation,</u> No. 05-20050 (CSS) (Bankr. D. Del. May 15, 2006 and Dec. 21, 2005); <u>In</u> <u>re Riverstone Networks. Inc.,</u> No. 06-10110 (CSS) (Bankr. D. Del. Mar. 28, 2006); <u>In re Pliant</u> <u>Corporation,</u> No. 06-100001 (MFW) (Bankr. D. Del. Mar. 14, 2006).

32.     The Debtors incorporate herein by reference their statements above as to why the implementation of the Incentive Plan, the Contributions to the Plan Pool and the Plan Payments to Senior Management thereunder represent an exercise of the Debtors' sound business judgment under section 363(b)(1) of the Bankruptcy Code.  For those very same reasons, the implementation of the Incentive Plan, the Contributions to the Plan Pool and the Plan Payments to Senior Management thereunder are justified by the facts and circumstances of these chapter 11 cases and are narrowly targeted to maximize the value of the Debtors' estates for the benefit of all stakeholders therein.

### Request for Waiver of Stay

33.     Pursuant to Rule 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Debtors seek a waiver of any stay of the effectiveness of an order granting the relief requested herein.  Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise."

34.     As set forth above, the implementation of the Incentive Plan, the Contributions to the Plan Pool and the Plan Payments to Senior Management thereunder are critical to incentivizing Senior Management to continue to diligently pursue the Asset Sales through the Sale Processes in order maximize the value of the Debtors' estates for the benefit of all stakeholders therein.  Accordingly, the Debtors submit that ample cause exists to justify a waiver of the ten-day stay imposed by Bankruptcy Rule 6004(h), to the extent that it applies.

### Notice

35.     The Debtors shall provide notice of this Motion by facsimile and/or overnight mail to:  (a) the U.S. Trustee; (b) counsel to the Committee; (c) counsel to the Prepetition Lenders; (d) the Internal Revenue Service; (e) the Securities Exchange Commission;

and (f) those parties who have filed notices of appearance pursuant to Bankruptcy Rule 2002. The Debtors submit that no other or further notice need be given.

## No Prior Request

36.    No prior request for the relief sought in this Motion has been made to this or any other Court.

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as Exhibit B: (i) granting the relief sought herein; and (ii) granting to the Debtors such other and further relief as the Court may deem proper.

Dated: August 3, 2009
Wilmington, Delaware

Respectfully submitted,

Daniel J. DeFranceschi (DE No. 2732)
Christopher M. Samis (DE No. 4909)
Zachary I. Shapiro (DE No. 5103)
RICHARDS, LAYTON & FINGER, P.A.
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

-and-

Paul D. Leake
Pedro A. Jimenez
Ross S. Barr
JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306

*ATTORNEYS FOR THE DEBTORS*

# EXHIBIT A

# PROLIANCE INTERNATIONAL, INC.

## EXECUTIVE INCENTIVE PLAN

## 1. __Plan Objective__

The Proliance International, Inc. Executive Incentive Plan (the "Plan") is designed to maximize the value of the estates of Proliance International, Inc. and its debtor subsidiaries (collectively, the "Debtors") by providing incentives to certain executives of the Debtors to (i) consummate the sale of the Debtors' North American operations and certain related business assets (the "North American Assets") and (ii) consummate the sale of the operations of Nederlandse Radiateuren Fabriek B.V. ("NRF").

## 2. __Plan Participants__

The Plan covers the Debtors' employees listed on Schedule 1 hereto (the "Plan Participants").

All payments under the Plan (the "Plan Payments") shall be in lieu of any other future bonus or severance compensation under any other plan, program, agreement, applicable law or policy otherwise applicable to the Plan Participants and the Debtors. As a condition precedent to any obligation of the Debtors to make any Plan Payment to a Plan Participant, the Plan Participant shall be required to fully execute and return to the Debtors a general release and waiver of claims, excluding those claims specifically excepted from the release and waiver as described therein, in substantially the form attached hereto as Schedule 2 (the "Release") with all revocation periods having expired. The Debtors shall have no obligation to make any Plan Payment and shall not make any Plan Payment to any Plan Participant who does not satisfy such release requirement or who otherwise revokes the Release within any revocation period afforded by (i) the Release or (ii) applicable law, whichever is longer.

## 3. __Plan Contributions__

The amounts authorized to be contributed to an incentive pool by the Debtors (each, a "Contribution") in respect of the Plan Payments shall be determined based upon two objective components and shall be calculated as follows:

### (a) __North American Assets Sale__

The Contribution, if any, upon the North American Assets Sale (the "North American Assets Sale Contribution") shall be calculated based upon the extent to which the net proceeds of the North American Assets Sale (consisting of (i) the amount paid by the purchaser(s) to the Debtors at the closing of the North American Assets Sale (after giving effect to any purchase price adjustments made at the closing in connection therewith but specifically excluding post-closing purchase price adjustments), including any escrow deposits released to the Debtors at the closing, plus (ii) an amount equal to the Debtors' good faith estimate of pre-paid inventory up to $1 million, to the extent the purchaser is required to pay such amount and provided that that the Debtors present sufficient proof at the closing reasonably acceptable to Silver Point Finance, LLC, the agent under the Debtors' prepetition secured credit facility, that

such amount will be paid post-closing by the buyer of the North American Assets, plus (iv) any amounts remaining in the Wachovia concentration account after the funding of the professional fee account and the wind down account as provided in paragraph seven of the final order authorizing the use of cash collateral (the "Cash Collateral Order")), less the amount of (1) funding into the Accounts as provided in the Cash Collateral Order (the "Accounts Funding") and (2) any increased payments by the buyer of the North American Assets to the Debtors to reimburse the Debtors for additional expenses incurred in connection with the North American Assets Sale (the "North American Proceeds") exceed certain threshold amounts. "North American Assets Sale" means the consummation of a sale of the North American Assets pursuant to the Acquisition Agreement between the Debtors and Centrum Equities XV, LLC dated July 2, 2009, or similar transaction(s) with different purchaser(s) that result in North American Proceeds over $9.4 million.

The North American Assets Sale Contribution shall be made if and only if the North American Proceeds are more than $9.4 million, in which case the North American Assets Sale Contribution shall be $370,000 (which includes $200,000 plus $170,000 of the $400,000 budgeted for accrued vacation pursuant to paragraph seven of the Cash Collateral Order); provided, however, that there shall be no North American Assets Sale Contribution if the North American Assets Sale is not consummated on or before February 1, 2010.

(i)     **Additional Contribution**

Pursuant to paragraph seven of the Cash Collateral Order, any portion of the $400,000 budgeted for accrued vacation funded as part of the Accounts Funding (after giving effect to the $170,000 included in the North American Assets Sale Contribution pursuant to Section 3(a) hereof) that is not utilized upon or after consummation of the North American Assets Sale may be added to the North American Assets Sale Contribution in the sole discretion of the Board of Directors of Proliance International, Inc. (the "Board").

(b)     **NRF Sale**

The Contribution, if any, upon the NRF Sale (the "NRF Sale Contribution") shall be calculated based upon the extent to which the gross proceeds of the NRF Sale (consisting of (i) the amount paid by the purchaser(s) to the Debtors at or after the closing of the NRF Sale (after giving effect to any purchase price adjustments in connection therewith, other than post-closing purchase price adjustments), plus (ii) the amount of any escrow deposit made by the purchaser(s) in connection with the NRF Sale, regardless of whether such deposit is made prior to or at the closing of the NRF Sale, but only to the extent such deposit ultimately is received by the Debtors, less the amount of (1) any investment banking fees or expenses and (2) any legal fees or expenses, in each case directly related to and in connection with the NRF Sale (the "NRF Proceeds") exceed certain threshold amounts. "NRF Sale" means the consummation of a sale of all or substantially all of the equity interests or assets of NRF and its subsidiaries (whether in one transaction or a series of related transactions).

If the NRF Proceeds are $16 million or less, the NRF Sale Contribution shall be equal to $140,000. If the NRF Proceeds are $24 million or more, the NRF Sale Contribution shall be equal to $540,000. In no event shall the NRF Sale Contribution exceed $540,000. If the

NRF Proceeds are over $16 million but less than $24 million, the NRF Sale Contribution shall be equal to the sum of (i) $140,000 plus (ii) $0.05 for each dollar the NRF Proceeds exceed $16 million. The following table illustrates NRF Sale Contribution amounts at various levels of NRF Proceeds:

| NRF Proceeds | NRF Sale Contribution |
|---|---|
| $16 million or less | $140,000 |
| $17 million | $190,000 |
| $18 million | $240,000 |
| $19 million | $290,000 |
| $20 million | $340,000 |
| $21 million | $390,000 |
| $22 million | $440,000 |
| $23 million | $490,000 |
| $24 million or more | $540,000 |

Notwithstanding anything herein to the contrary, there shall be no NRF Sale Contribution unless both the NRF Sale and the North American Assets Sale are consummated on or before February 1, 2010. The NRF Sale Contribution may be adjusted downward in the sole discretion of Board to reflect other considerations.

4. **Plan Payments**

(a) **Allocation of Plan Payments**

Subject to Section 5 hereof, the Debtors shall pay the Plan Payments to Plan Participants in accordance with the percentages of the Contributions identified on Schedule 1 (the "Contribution Percentages").

(b) **Timing of Plan Payments**

(i) **Plan Payments Related to the North American Assets Sale**

Within five days following the date upon which the Release executed by any Plan Participant in connection with the North American Assets Sale becomes irrevocable, the Debtors shall pay such Plan Participant a Plan Payment equal to the Plan Participant's percentage of the North American Assets Sale Contribution.

(ii) **Plan Payments Related to the NRF Sale**

Within five days following the date upon which the Release executed by any Plan Participant in connection with the NRF Sale becomes irrevocable, the Debtors shall pay such Plan Participant a Plan Payment equal to the Plan Participant's percentage of the NRF Sale Contribution.

(iii)     **Plan Payment End Date**

Notwithstanding anything herein to the contrary, in no event shall any Plan Payment be made after March 15 of the calendar year following the calendar year in which the Plan Payment is due pursuant to Section 4(b)(i) or 4(b)(ii) hereof.

5.     **Termination of Employment**

Awards under the Plan are offered as discretionary incentive amounts. Subject to this Section 5, Plan Payments shall be made to each entitled Plan Participant in accordance with the terms of the Plan, regardless of whether such Plan Participant is then employed by the Debtors (including if the Plan Participant voluntarily resigned or was terminated without Cause) at the time a Plan Payment is authorized to be made, provided that the Board makes a determination that the Plan Participant substantially contributed to the achievement of the goal with respect to which the Plan Payment is authorized. Notwithstanding the foregoing, if a Plan Participant is terminated for Cause prior to any Plan Payment, the Plan Participant shall not be entitled to any Plan Payments after the termination of the Plan Participant's employment.

For purposes of the Plan, "Cause" means, either before or after adoption of the Plan, with respect to the applicable Plan Participant:

- The arrest or conviction (or plea of guilty or *nolo contendere*) of the Plan Participant of any felony or other crime, in each case (i) involving dishonesty or moral turpitude and (ii) in the performance of his or her duties;

- A finding by the Board that the Plan Participant engaged in willful misconduct in the performance of his or her duties;

- Unlawful use of narcotics or other controlled substances by the Plan Participant in the performance of his or her duties;

- The existence of a material and direct conflict of interest involving the Plan Participant and the Debtors, not specifically waived in advance by the Debtors;

- Unauthorized use or disclosure of confidential information by the Plan Participant that belongs to the Debtors, their customers or employees;

- Repeated failure of the Plan Participant to perform the Plan Participant's job duties in a satisfactory manner, provided that such failure continues for more than 21 days after written notice thereof that specifically identifies the manner in which the Plan Participant is believed to have materially failed to perform said duties;

- The Plan Participant's refusal to follow the instructions of a direct supervisor or member of the Board; or

- Other material misconduct by the Plan Participant involving the Debtors including, but not limited to falsification of the Debtors' records, theft, sexual harassment or possession of firearms, controlled substances or illegal drugs on the Debtors premises or while performing the Debtors' business.

To the extent that any Plan Participant is not entitled to a Plan Payment pursuant to this Section 5, the Board may reallocate such Plan Participant's Contribution Percentage to other Plan Participants, as determined in the sole discretion of the Board. In no event, however, shall the sum of all Contribution Percentages for all Plan Participants exceed 100%.

6.    **Further Actions**

As a condition to each Plan Participant's eligibility to participate in the Plan, such Plan Participant shall agree to take such further actions as are reasonably requested by the Debtors, including such actions as the Debtors may request subsequent to the termination of such Plan Participant's employment with the Debtors, as the case may be, to assist the Debtors in the conduct of their chapter 11 cases.

7.    **Change of Address**

The Plan Participants shall be responsible for notifying the Debtors of any change of address before payment is made by mail notification to:

> Richard Wisot
> 100 Gando Drive
> New Haven, CT 06513

> with a copy to:

> Pedro Jimenez, Esq.
> Jones Day
> 222 East 41st Street
> New York, NY 10017

8.    **No Promise of Continued Employment**

The Plan and any Plan Participant's selection as a participant in the Plan does not, and is in no manner intended to, constitute a promise of employment for any period of time or to change a Plan Participant's status, if applicable, as an at-will employee subject to termination at any time for any reason.

9.  **Taxes**

All payments made pursuant to the Plan shall be subject to standard withholding and deductions. Neither the Debtors nor their officers or agents makes or has made any representation about the tax consequences of any payments or benefits offered by the Debtors to any Plan Participant.

10.  **Severability**

If any provision of the Plan is determined to be invalid or unenforceable, in whole or in part, this determination shall not affect any other provision of the Plan and the provision in question shall be modified as to be rendered enforceable in a manner consistent with the intent of the parties insofar as possible. Any waiver of or breach of any of the terms of the Plan shall not operate or be construed as a waiver of any other breach of such terms or conditions or of any other terms and conditions, nor shall any failure to enforce any provision hereof operate or be construed as a waiver of such provision or of any other provision.

11.  **Choice of Law and Venue**

The Plan shall be governed by the laws of the State of Delaware, notwithstanding that State's conflict of law provisions. The Debtors and each of the Plan Participants irrevocably and unconditionally consent to the exclusive jurisdiction of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Debtors and each of the Plan Participants irrevocably and unconditionally waive any right to a jury trial or objection to the laying of venue of any action, suit or proceeding arising out of or related to the Plan in the Bankruptcy Court and further irrevocably and unconditionally waive and agree not to plead or claim that any such action, suit or proceeding brought in the Bankruptcy Court has been brought in an inconvenient forum.

12.  **Entire Agreement and Amendment**

This document constitutes the complete, final and exclusive embodiment of the terms and conditions of the Plan and may only be modified in writing signed by an authorized officer of one of the Debtors. Any agreement between any Plan Participant and the Debtors with regard to the Plan and its subject matter is superseded in its entirety by this document.

13.  **No Assignment**

The rights of a Plan Participant or any other person to any payment or other benefits under the Plan may not be assigned, transferred, pledged or encumbered, except by will or the laws of decent and distribution.

# SCHEDULE 1

## PROLIANCE INTERNATIONAL, INC.

## EXECUTIVE INCENTIVE PLAN

## PARTICIPANT AND PLAN CONTRIBUTION PERCENTAGE LIST

## MOTION TO FILE SCHEDULE UNDER SEAL PENDING

NYI-4205833v1

# SCHEDULE 2

## FORM RELEASE AGREEMENT

NYI-4205833v1

# RELEASE

This GENERAL RELEASE ("Release") dated as of this _____ by
_____ (the "Executive").

WHEREAS, the Executive **[was / is]** an employee of Proliance International, Inc. and / or certain of its direct and indirect affiliates (collectively, the "Company"); and

WHEREAS, the Executive was a participant in the Proliance International, Inc. Executive Incentive Plan (the "Plan") dated _____, 2009; and

WHEREAS, pursuant to the Plan, Executive is eligible for certain incentive compensation, contingent upon the full execution of this Release.

NOW, THEREFORE, in consideration of the premises and mutual agreements contained in the Plan, the Executive agrees as follows:

1.      Executive, on Executive's own behalf and on behalf of Executive's heirs, estate and beneficiaries, does hereby release the Company, and any of its subsidiaries or affiliates, and each past or present officer, director, agent, employee, shareholder and insurer of any such entities (collectively, the "Released Parties"), from any and all claims made, to be made, or that might have been made of whatever nature, whether known or unknown, from the beginning of time, including those that arose as a consequence of Executive's employment by the Company, or arising out of the severance of such employment relationship, or arising out of any act committed or omitted during or after the existence of such employment relationship, all up through and including the date on which this Release is executed, including, but not limited to those that were, could have been or could be the subject of an administrative or judicial proceeding filed by Executive or on Executive's behalf under federal, state or local law, whether by statute, regulation, in contract or tort, and including, but not limited to every claim for front pay, back pay, wages, bonus, fringe benefit, accrued vacation, severance, any form of discrimination (including, but not limited to every claim of race, color, sex, religion, national origin, disability or age discrimination), wrongful termination, emotional distress, pain and suffering, breach of contract, compensatory or punitive damages, interest, attorney's fees, reinstatement or reemployment, other than claims for benefits under the Company's welfare and pension benefit plans, and other than claims for indemnification under any indemnification policy, the Company's by-laws and organizational documents. If any court rules that such waiver of rights to file, or have filed on Executive's behalf, any administrative or judicial charges or complaints is ineffective, Executive agrees not to seek or accept any money damages or any other relief upon the filing of any such administrative or judicial charges or complaints. Executive acknowledges and agrees that even though claims and facts in addition to those now known or believed by Executive to exist may subsequently be discovered, it is Executive's intention to fully settle and release all claims Executive may have against the Released Parties, whether known, unknown or suspected.

2.      Executive has been informed and acknowledges that Executive is also releasing any rights or claims Executive may have against the Released Parties under the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621, *et seq.* ("ADEA"), up

Sch. 2 - 2

to and including the date of execution of this Release. Executive acknowledges that Executive has consulted with an attorney before signing this Release, and further understands that Executive has a period of 21 days during which time Executive may consider whether to accept the terms of this Release. Executive has a right to revoke this Release as far as it extends to potential claims under the ADEA, by informing the Company of Executive's intent to revoke this Release within seven calendar days following its execution. To be effective, written notice of revocation must be delivered by hand or overnight mail to _____ at the following address: _____. No payments or benefits shall be provided to Executive pursuant to the Plan until Executive executes this Release and the revocation period described in this paragraph has expired.

      3.    The Company and Executive acknowledge and agree that the releases contained in Paragraphs 1 and 2 do not, and shall not be construed to, release or limit the scope of any existing obligation of the Company (i) to Executive and Executive's eligible, participating dependents or beneficiaries under any existing group health plan and retirement plan of Company in which Executive and/or such dependents are participants or (ii) to Executive under the terms of the Plan, including any rights Executive may have to incentive compensation payments following the execution of this Release.

      IN WITNESS WHEREOF, the parties have executed this Release on the date first written above.

EXECUTIVE


_____


Proliance International, Inc.


By:_____

NYI-4205833v1

# EXHIBIT B

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
--------------------------------------------------------------x
                                        :
In re                                   :   Chapter 11
                                        :
PROLIANCE INTERNATIONAL, INC., et al.,¹ :   Case No. 09-12278 (CSS)
                                        :
        Debtors.                        :   (Jointly Administered)
                                        :
--------------------------------------------------------------x
```

## ORDER AUTHORIZING
## THE DEBTORS TO PAY SALE-RELATED
## PAYMENTS TO INCENTIVE PLAN PARTICIPANTS

This matter coming before the Court on the Motion of the Debtors for Entry of an

Order Authorizing Them to Pay Sale-Related Payments to Incentive Plan Participants

(the "Motion"),[2] filed by the above-captioned debtors and debtors-in-possession (collectively,

the "Debtors"); the Court having reviewed the Motion and having considered the statements of

counsel and the evidence adduced with respect to the Motion at a hearing before the Court

(the "Hearing"); the Court having found that (i) the Court has jurisdiction over this matter

pursuant to 28 U.S.C. §§ 157 and 1334, (ii) venue for this matter is proper in this district

pursuant to 28 U.S.C. §§ 1408 and 1409, (iii) this is a core proceeding pursuant to 28 U.S.C.

§ 157(b) and (iv) notice of the Motion and the Hearing was sufficient under the circumstances;

after due deliberation the Court having determined that the relief requested in the Motion is

necessary, is the product of the Debtors' sound business judgment, is justified by the facts and

---

[1] The Debtors are the following four entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Proliance International, Inc. (7383); Aftermarket Delaware Corporation (9862); Aftermarket LLC; and Proliance International Holding Corporation (9275). The address of each of the Debtors is 100 Gando Drive, New Haven, Connecticut 06513.

[2] Capitalized terms not otherwise defined herein shall have the meanings given to them in the Motion.

circumstances of these chapter 11 cases and is in the best interests of the Debtors, their estates and their creditors; and good and sufficient cause having been shown;

IT IS HEREBY ORDERED THAT:

1.    The Motion is GRANTED.

2.    The Debtors are authorized, but not required, (a) to adopt and implement the Incentive Plan, (b) to make Contributions to the Plan Pool and Plan Payments to Senior Management in accordance with the terms of the Incentive Plan and (c) to take such other actions as may be necessary, desirable or appropriate to effect, implement and/or consummate the Incentive Plan.

3.    The Contributions and Plan Payments, in each case, are hereby allowed as administrative expenses of the Debtors' estates.

4.    The authorization granted hereby to make Plan Payments to Senior Management under the Incentive Plan shall not create any obligation on the part of the Debtors or their officers, directors, attorneys or agents to make Plan Payments under the Incentive Plan and none of the foregoing persons shall have any liability on account of any decision by the Debtors not to honor the Incentive Plan.

5.    Neither this Order nor any payment or performance by the Debtors authorized hereunder shall be deemed an assumption of any executory contract or otherwise affect the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract.

6.    Notwithstanding Bankruptcy Rule 6004(h), this Order shall be effective and enforceable immediately upon entry thereof.

7.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Order.


Dated: _____, 2009
          Wilmington, Delaware          _____
                                        THE HONORABLE CHRISTOPHER S. SONTCHI
                                        UNITED STATES BANKRUPTCY JUDGE