## Exhibit 1

## Bid Procedures

Set forth below are the bid procedures (the "Bid Procedures") to be employed with respect to the sale of certain of the assets (the "Purchased Assets")[1] and the assumption of specified liabilities (the "Assumed Liabilities") of Debtors Proliance International, Inc. ("Proliance"), Aftermarket LLC ("Aftermarket") and Proliance International Holding Corporation ("PIHC," together with its United States debtor subsidiaries, the "Sellers," and together with Proliance's other United States debtor subsidiaries, the "Debtors"). The Purchased Assets and Assumed Liabilities being purchased and assumed and the terms and conditions upon which the Sellers contemplate consummating a sale are further described in the Purchase Agreement, dated July 2, 2009 (the "Purchase Agreement"), among stalking horse bidder Centrum Equities XV, LLC (the "Buyer") and the Sellers, filed with the Bankruptcy Court on July 2, 2009.[2] The sale of the Purchased Assets and assumption of the Assumed Liabilities (collectively, the "Sale") pursuant to the Purchase Agreement is subject to competitive bidding as set forth herein and approval by the Bankruptcy Court pursuant to section 363 of the Bankruptcy Code and Rule 6004 of the Federal Rules of Bankruptcy Procedure.

## Participation Requirements

Any person desiring to submit a bid for the Purchased Assets and, if applicable, the Other Assets, and Assumed Liabilities (a "Potential Bidder") will be required to deliver (unless previously delivered) to the Debtors, on or before the Bid Deadline (as defined below), the following in addition to the other materials required hereby:

> (1) an executed confidentiality agreement in form and substance satisfactory to the Debtors; and

> (2) current audited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Purchased Assets and Assumed Liabilities, current audited financial statements of the equity holder(s) of the Potential Bidder and the written commitment of such equity holder(s) to be responsible for the Potential Bidder's obligations in connection with the Sale.

The financial information and credit-quality support of any Potential Bidder must demonstrate the financial capability of the Potential Bidder to timely consummate the Sale pursuant to a Qualified Bid (as defined below).

---

[1]  The "Purchased Assets" do not include consigned goods held by the Debtors pursuant to consignment agreements.

[2]  Unless otherwise defined herein, all capitalized terms have the meanings set forth in the Purchase Agreement, and to the extent that a capitalized term is not defined herein or in the Purchase Agreement, such terms shall have the meanings set forth to them in the Sale Order, to which this Motion is attached.

## Due Diligence

The Debtors will afford any Potential Bidder who satisfies the participation requirements described above such due diligence access or additional information as the Debtors, in their business judgment, determine to be reasonable and appropriate; provided, however, that the same access and information must also be made available to the Buyer. Additional due diligence will not be provided after the Bid Deadline.

Interested investors requesting information about the qualification process, and Qualified Bidders (as defined below) requesting information in connection with their due diligence, should contact: Broadpoint Capital, 12 East 49th Street, 31st Floor, New York, New York 10017, attn: Sunny Cheung (sunny.cheung@bpsg.com; fax number: (212) 273-7320).

## Bid Deadline

A Potential Bidder that desires to make a bid must deliver written copies of its bid by facsimile and email to the following parties by no later than 4:00 p.m. prevailing Eastern Time on August 10, 2009 (the "Bid Deadline"): (1) Proliance International, Inc., 100 Gando Drive, New Haven, Connecticut 06513, attn: Arlen F. Henock (ahenock@pliii.com; fax number: (203) 865-3723); (2) Broadpoint Capital, 12 East 49th Street, 31st Floor, New York, New York 10017, attn: Sunny Cheung (sunny.cheung@bpsg.com; fax number: (212) 273-7320); (3) Jones Day, 222 East 41st Street, New York, New York 10017, attn: Pedro A. Jimenez (pjimenez@jonesday.com; fax number: (212) 755-7306) and attn: Andrew M. Levine (amlevine@jonesday.com; fax number: (212) 755-7306); and (4) counsel to the Committee: Lowenstein Sandler PC, 65 Livingston Avenue, Roseland, New Jersey 07068, attn: Kenneth A. Rosen, Esq. (krosen@lowenstein.com; fax number 973-597-2371) and Thomas A. Pitta, Esq. (tpitta@lowenstein.com; fax number 973-597-2371).

## Bid Requirements

Each bid must be a written offer from a Potential Bidder, not contingent on any event, including any due diligence investigation, receipt of financing or receipt of further approvals, that (1) offers to consummate the Sale (or some portion of the Purchased Assets, with or without Other Assets) on the terms set forth in a copy of the Purchase Agreement, marked to show any proposed amendments thereto (the "Marked Agreement"), (2) states that such offer is binding and irrevocable until the consummation of the Sale, (3) offers to pay a purchase price that is greater than $22,532,500, which is the purchase price contained in the Purchase Agreement ($21.5 million cash) plus the Break-Up Fee ($645,000) plus the Expense Reimbursement ($137,500) plus $250,000 (the "Initial Bid Increment"), (4) does not entitle a Potential Bidder (other than the Buyer) to any break-up fee, termination fee or similar payment, (5) includes the irrevocable agreement to pay the full amount of the Break-Up Fee to Buyer upon the acceptance of such Potential Bidder's bid by the Debtors (which payment will reduce the amount of the payment made to the Debtors upon the consummation of the Sale with such Potential Bidder), (6) offers to fund the Closing Escrows pursuant to Section 3.5 of the Purchase Agreement and (7) offers to reimburse the Sellers for the amount of any inventory that was prepaid prior to closing but delivered between the date of the closing and the two month anniversary thereof.

- 2 -

Additionally, bids must be accompanied by (1) a wire transfer to the Debtors of an amount in immediately available funds equal to 10% of the purchase price offered in such bid (the "Good Faith Deposit"), and (2) written evidence of available cash or a firm commitment for financing and such other evidence of ability to consummate the transaction as the Debtors may reasonably request. To the extent any Potential Bidder proposes to include non-cash consideration in its bid, such non-cash consideration must be freely marketable and such bid must be accompanied by the form of note or other type of instrument in connection with such non-cash consideration. Potential Bidders also must specify any prepetition contracts and/or leases that such Potential Bidder intends to assume from the Debtors.

## Qualified Bids and Bidders

A bid received from a Potential Bidder that meets the requirements set forth in the preceding two paragraphs will be considered a "Qualified Bid" if the Debtors reasonably believe that such bid is higher or otherwise better than the bid set forth in the Purchase Agreement and would be reasonably expected to be consummated if selected as the Successful Bid (as defined below). The Debtors reserve the right, in their sole discretion, to waive noncompliance with any one or more of these requirements and deem an otherwise not Qualified Bid to be a Qualified Bid. The Debtors will advise all Qualified Bidders of any such waiver and the basis for which it was granted at the Auction.

The Debtors will review each bid received from a Potential Bidder and determine whether it meets the requirements of a Qualified Bid. A Potential Bidder making a Qualified Bid who has also satisfied the participation requirements described above will be deemed a "Qualified Bidder." The Purchase Agreement is a Qualified Bid and the Buyer is a Qualified Bidder for all purposes and requirements of these Bidding Procedures.

In determining whether a bid is a Qualified Bid, the Debtors will consider factors such as (1) the amount of such bid, (2) the risks and timing associated with consummating such bid, (3) the risks associated with any non-cash consideration in such bid, (4) any excluded Purchased Assets, included Other Assets or excluded or included executory contracts and unexpired leases and (5) any other factors deemed relevant by the Debtors.

In addition, the Debtors may reject any bid that (1) is on terms that are more burdensome or conditional than the terms of the Purchase Agreement, (2) requires any indemnification of such Potential Bidder in excess of the indemnification provided in the Purchase Agreement, (3) includes non-cash consideration which is not freely marketable, (4) is subject to any due diligence, financing condition or other contingencies or conditions that are not included in the Purchase Agreement or (5) is received after the Bid Deadline.

The Debtors will, no later than 4:00 p.m. Prevailing Eastern Time on August 11, 2009, advise each Potential Bidder that submits a bid whether its bid is a Qualified Bid and provide the Buyer with copies of all Qualified Bids and advise the Buyer of any material changes to any Qualified Bids on the same day such changes are proposed.

- 3 -

## Auction Participation

Only Qualified Bidders are eligible to participate at the Auction (as defined below). Each Qualified Bidder must inform the Debtors whether it intends to participate in the Auction on the same day that it receives notice from the Debtors that it has submitted a Qualified Bid (i.e., the day before the Auction). The Debtors will promptly thereafter inform in writing each Qualified Bidder who has expressed its intent to participate in the Auction of the identity of all other Qualified Bidders that have indicated their intent to participate in the Auction. If the Debtors do not receive any Qualified Bids other than the Purchase Agreement or if no Qualified Bidder other than the Buyer has indicated its intent to participate in the Auction, the Debtors will not hold an auction and the Buyer will be named the Successful Bidder.

## Auction

If more than one Qualified Bid has been received and more than one Qualified Bidder has indicated its intent to participate in the Auction, the Debtors will conduct an auction (the "Auction") for the sale of the Purchased Assets and, if applicable, the Other Assets. Each Qualified Bidder participating at the Auction will be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale. The Debtors will determine, based on the nature of the Qualified Bids received and in its sole reasonable discretion, whether to (1) conduct separate Auctions for the sale of individual assets, and/or (2) conduct a single Auction of all of the Purchased Assets, together with any Other Assets, as the Debtors' may deem appropriate in their sole discretion and exercise of their sound business judgment. For each such Auction to be conducted, the Debtors will select, in their sole reasonable discretion, the Qualified Bid that represents the then-highest or otherwise best value to the Debtors (the "Baseline Bid") to serve as the starting point for the Auction. The Baseline Bid may be comprised of a combination of Qualified Bids.

The Auction shall take place at 9:00 a.m. Prevailing Eastern Time on August 12, 2009 at the offices of Jones Day, located at 222 East 41st Street, New York, New York 10017. At the Auction, Qualified Bidders will be permitted to increase their bids. The bidding will start at the purchase price and terms proposed in the Baseline Bid, plus the Initial Bid Increment and continue in increments of at least $250,000 in cash or cash equivalents. If the Buyer is not the party that has made the Baseline Bid, the Debtors will provide the Buyer with a copy of the documentation evidencing the Baseline Bid prior to the Auction. The Buyer will be entitled to credit bid the Break Up-Fee throughout the Auction.

Based upon the terms of the Qualified Bids received, the number of Qualified Bidders participating in the Auction and such other information as the Debtors determine is relevant, the Debtors may conduct the Auction in the manner they determine, in their business judgment, will promote the goals of the bidding process, will achieve the maximum value for all parties in interest and is not inconsistent with any of the provisions of these Bidding Procedures, the Bankruptcy Code or any order of the Bankruptcy Court entered in connection herewith. Such rules will provide that (1) the procedures must be fair and open, with no participating Qualified Bidder disadvantaged in any material way as compared to any other Qualified Bidder, (2) all bids will be made and received in one room, on an open basis, and all other Qualified Bidders will be entitled to be present for all bidding with the understanding that the true identity of each

- 4 -

Qualified Bidder will be fully disclosed to all other Qualified Bidders and that all material terms of each Qualified Bid will be fully disclosed to all other bidders throughout the entire Auction and (3) each Qualified Bidder will be permitted a fair, but limited, amount of time to respond to the previous bid at the Auction. Bidding at the Auction will continue until such time as the highest or otherwise best offer is determined. The Debtors will, from time to time, in an open forum, advise Qualified Bidders participating in the Auction of their determination as to the terms of the then-highest or otherwise best bid.

Immediately prior to the conclusion of the Auction, the Debtors shall (1) review each bid made at the Auction on the basis of financial and contractual terms, including the proposed treatment of the Title IV Defined Benefit Pension Plans, and such factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Sale, (2) identify the highest or otherwise best bid for the Purchased Assets and, if applicable, the Other Assets, as the case may be, and Assumed Liabilities (the "Successful Bid") and (3) notify all Qualified Bidders at the Auction, prior to its conclusion, of the name or names of the maker of the Successful Bid (the "Successful Bidder") and the amount and other material terms of the Successful Bid. In determining the highest and best bid under clause (2) of the preceding sentence, the Debtors will consider, among other factors, the assumption of liabilities, including liabilities under Title IV Defined Benefit Pension Plans, contemplated by each bid.

### Acceptance of Qualified Bids

The Debtors presently intend to sell the Purchased Assets (in combination with, if applicable, the Other Assets, as the case may be) to the Qualified Bidder(s) that submit(s) the highest and best bid(s). The Debtors' presentation to the Bankruptcy Court for approval of any Successful Bid does not constitute the Debtors' acceptance of such bid. The Debtors will be deemed to have accepted a bid only when it has been approved by the Bankruptcy Court at the Sale Hearing (defined below).

### Modifications

The Debtors may (1) determine, in their business judgment, which bid or bids, if any, constitute the highest or otherwise best offer for the applicable Purchased Assets, (2) reject, at any time before entry of an order of the Bankruptcy Court approving any bid as the Successful Bid, any bid that, in the Debtors' sole discretion, is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code or the Bidding Procedures or (c) contrary to the best interests of the Debtors and the Debtors' estates and creditors and (3) withdraw, in their business judgment, the Sale Motion if contrary to the best interests of the Debtors and the Debtors' estates and creditors. The Debtors may extend or alter any deadline contained herein that will better promote the maximization of the value of their estate.

### The Sale Hearing

The Debtors will seek entry of an order from the Bankruptcy Court at a hearing (the "Sale Hearing") to begin on August 13, 2009 at 11:30 a.m., to approve and authorize the Sale to the Successful Bidder on terms and conditions determined in accordance with the Bidding Procedures.

NYI-4201746v4
RLF1-3418268-1

### Return of Good Faith Deposit

The Good Faith Deposits of all Qualified Bidders will be retained by the Debtors, notwithstanding Bankruptcy Court approval of a sale, until three business days after the earlier of (a) the closing of the Sale, or (b) 45 days after the Sale Hearing. If the Successful Bid does not close, the Debtors will have the right to present any other bid, whether made prior to or at the Auction, to the Bankruptcy Court for approval.

- 6 -

**PROLIANCE INTERNATIONAL, INC.**
**100 Gando Drive**
**New Haven, Connecticut 06513**

August 13, 2009


Centrum Equities XV, LLC
c/o SSI Automotive, LLC
5111 Maryland Way, Suite 210
Brentwood, Tennessee 37027
Facsimile No.: (615) 221-1199
Attn: Roger Brown

Re: <u>Second Amendment to Acquisition Agreement</u>

Ladies and Gentlemen:

Reference is hereby made to the Acquisition Agreement (as previously amended, the "<u>Acquisition Agreement</u>"), dated July 2, 2009, by and among Proliance International, Inc. and certain of its subsidiaries (collectively, "<u>Sellers</u>") and Centrum Equities XV, LLC ("<u>Buyer</u>").  Capitalized terms used herein and not otherwise defined have the meanings given to them in the Acquisition Agreement.

The undersigned wish to amend the Acquisition Agreement.  Accordingly, the undersigned agree as follows:

1.      <u>Schedules</u>.  (a) <u>Schedule 1.1A</u> to the Acquisition Agreement (Purchased Contracts) is deleted in its entirety and replaced with <u>Schedule 1.1A</u> attached hereto.

(b)      <u>Schedule 2.1(b)(i)</u> to the Acquisition Agreement (Subsidiary Equity Interests) is amended to delete "Proliance International Sales, LTD."

(c)      <u>Schedule 2.2(b)(ix)</u> to the Acquisition Agreement (Excluded Assets) is deleted in its entirety and replaced with <u>Schedule 2.2(b)(ix)</u> attached hereto.

(d)      <u>Schedule 2.3(b)</u> to the Acquisition Agreement (Post-Petition Liabilities) is deleted in its entirety and replaced with <u>Schedule 2.3(b)</u> attached hereto.

(e)      <u>Schedule 2.5(a)</u> to the Acquisition Agreement (Seller Cure Costs)  is deleted in its entirety and replaced with <u>Schedule 2.5(a)</u> attached hereto.

(f)      <u>Schedule 2.5(b)</u> to the Acquisition Agreement (Buyer Cure Costs) is deleted in its entirety and replaced with <u>Schedule 2.5(b)</u> attached hereto.

(g)      <u>Schedule 7.9(a)</u> to the Acquisition Agreement (New Hires) is deleted in its entirety and replaced with <u>Schedule 7.9(a)</u> attached hereto.

2.    Article III. Article III of the Acquisition Agreement is deleted in its entirety and replaced with the revised Article III attached hereto as Exhibit A.

3.    Defined Terms. (a) Section 1.1 of the Acquisition Agreement is amended to delete the defined term "Initial Escrow Period" in its entirety and replace it with the following:

> "Initial Escrow Period" means the period of time beginning July 2, 2009 and ending on the Closing Date.

(b)    Section 1.2 of the Acquisition Agreement is hereby amended to insert the following defined terms in alphabetical order:

> COBRA ....................................................3.5(c)
> Closing Week Cash ................................3.4(a)
> Excess Cash ..........................................3.4(a)
> Salary Continuation Amount ....................3.2(b)
> Transition Services Agreement...............8.3(e)

(c)    Sections 1.1 and 1.2 of the Acquisition Agreement are hereby amended to delete the following defined terms:

> Adjustment Determination Effective Time
> Closing Escrow Deposit
> Closing Working Capital
> Conclusive Closing Working Capital Statement
> D&O Escrow Deposit
> Delivered Prepaid Inventory
> Disputed Items
> Estimated Closing Working Capital Amount
> Estimated Closing Working Capital Statement
> Estimated IBNR/FSA Liability Amount
> Final Cure Costs
> Final Prepaid Inventory Statement
> IBNR Escrow Deposit
> IBNR Escrow Period
> IBNR Shortfall
> Individual Health Insurance Escrow Deposit
> Individual Health Insurance Escrow Period
> Inventory Price
> Neutral Arbitrator
> Post Closing Working Capital Statement
> Potential Prepaid Inventory
> Resolution Period
> Target Working Capital
> Sale Hearing
> Sellers' Accounting Principles and Practices

- 2 -

4.     Bank Accounts.  A new Section 2.1(b)(xv) is hereby added to the Acquisition Agreement (and existing Section 2.1(b)(xv) will become Section 2.1(b)(xvi)) that reads as follows:

> (xv)  all rights of Sellers as the holder of the following bank accounts:  (a) the depository account at JP Morgan Chase / Bank One with the account number ending in 7012; (b) the depository account at Regions Bank with the account number ending in 6927; (c) the lockbox account at Wachovia Bank with the account number ending in 3188; (d) the depository account at Wachovia Bank with the account number ending in 3201; (e) the depository account at Wells Fargo Bank with the account number ending in 9679; (f) the lockbox account at Wachovia Bank numbered 75586; and (g) the lockbox account at Wachovia Bank numbered 79508; provided, however, that this Section 2.1(b)(xv) will not be deemed to transfer any cash, cash equivalents, bank deposits or similar cash items, which, for the avoidance of doubt are Excluded Assets pursuant to Section 2.2(b)(i); and

5.     Cure Costs.  (a) Section 2.4(c) of the Acquisition Agreement is hereby amended by deleting the phrase "(or have paid on their behalf)" therein.

       (b)     Section 2.5 of the Acquisition Agreement is deleted in its entirety and replaced with the following:

> Cure Amounts.  At Closing and pursuant to section 365 of the Bankruptcy Code, Sellers will assume and assign to Buyer and Buyer will assume from Sellers, the Purchased Contracts that are deemed to be executory contracts or unexpired leases for purposes of section 365 of the Bankruptcy Code.  The cure amounts necessary to cure all defaults under any Purchased Contracts set forth on Schedule 2.5(a) will be paid by Sellers at or prior to the Closing, as such amounts are finally determined by the Bankruptcy Court pursuant to the procedures set forth in the Bid Procedures Order and/or the Sale Order, and Buyer will have no liability therefor.  The cure amounts necessary to cure all defaults under any Purchased Contracts set forth on Schedule 2.5(b) will be paid by Buyer at the Closing, as such amounts are finally determined by the Bankruptcy Court pursuant to the procedures set forth in the Bid Procedures Order and/or the Sale Order, and Sellers will have no liability therefore.

6.     Excluded Assets.  Section 2.2(b)(i) of the Acquisition Agreement is hereby amended by adding the phrase "subject to Section 3.4(a)," to the beginning thereof.

NYI-4207872v5

7.    Transition Services Agreement. At the Closing, the parties agree to execute and enter into the Transition Services Agreement substantially in the form attached hereto as Exhibit B. Section 10.3 of the Acquisition Agreement is amended to add the words ", the Transition Services Agreement" immediately after "hereto)" and before "and the Confidentiality Agreement." A new Section 8.3(e) to the Acquisition Agreement is added that reads:

> (e)    TSA. Buyer and Sellers shall have delivered, or caused to be delivered, dully executed copies of the transition services agreement, in the form previously agreed to by the parties, by such party or their Affiliates, as applicable (the "Transition Services Agreement").

8.    Receivables Program Participation Agreements. (a) Without limiting any other provision of the Acquisition Agreement (as amended hereby), Buyer will use its commercially reasonable best efforts to obtain the consents (the "Bank Consents") of the banks under the Contracts identified on Schedule 1.1A of the Acquisition Agreement under the heading "Receivables Program Participation Agreements" (such banks, the "Banks," and such Contracts, the "Receivables Agreements"). Until such time as either (i) such Bank Consent is obtained from the applicable Bank or (ii) the Bankruptcy Court has entered an Order providing that such Bank Consent is not required, such Bank Consents will be deemed "Necessary Consents" for purposes of Section 2.6 of the Acquisition Agreement.

(b) In the event that any Bank Consent is not obtained as of the Closing, Sellers will serve a notice to the applicable Bank of their intention to assume and assign the applicable Receivables Agreement, which will include the proposed cure amount, if any, necessary to cure any defaults under such applicable Receivables Agreement. Pursuant to Section 365 of the Bankruptcy Code, Sellers will assume and assign to Buyer, and Buyer will assume from Sellers, the Receivables Agreements that are deemed to be executory contracts or unexpired leases for purposes of section 365 of the Bankruptcy Code following the determination of such cure amounts in accordance with the procedures set forth in the Sale Order (unless at such time Buyer designates such Receivable Agreement an Excluded Asset for all purposes under the Acquistion Agreement). The cure amounts necessary to cure all defaults under the applicable Receivables Agreements, if any, will be paid by Buyer, as such amounts are finally determined by the Bankruptcy Court pursuant to the procedures set forth in Sale Order, and Seller will have no liability therefor.

9.    Escrow Release. At the Closing, Buyer and Sellers hereby agree to execute and deliver to the Escrow Agent the notice attached hereto as Exhibit C and to cause the Escrow Agent to execute such notice in order to (a) cause the Initial Escrow Deposit to be disbursed to the Company on the Closing Date and (b) terminate the Escrow Agreement pursuant to the terms thereof.

- 4 -

10.     Amendment; No Further Effect.  This letter agreement will be deemed to be an amendment of the Acquisition Agreement pursuant to Section 10.8 of the Acquisition Agreement.  Except as expressly set forth herein, this letter agreement does not, by implication or otherwise, alter, modify, amend or in any way affect any of the terms, conditions, obligations, covenants or agreements contained in the Acquisition Agreement.

11.     Miscellaneous.  This letter agreement may be signed in any number of counterparts, each of which will be an original, with the same effect as if the signatures on each counterpart were actually upon one instrument.

*[Signature Page Follows]*

NYI-4207872v5

PROLIANCE INTERNATIONAL, INC.

By: _____
Name: Arlen F. Henock
Title: Executive Vice President and
       Chief Financial Officer

AFTERMARKET LLC

By: _____
Name: Arlen F. Henock
Title: Vice President

PROLIANCE INTERNATIONAL HOLDING
CORPORATION

By: _____
Name: Arlen F. Henock
Title: President

**Accepted and agreed:**

CENTRUM EQUITIES XV, LLC

By: _____
Name: Roger Brown
Title: LLC Manager

**Purchased Contracts**

**[See Attached]**

PURCHASED CONTRACTS

| Counterparty Name | Address | City | State | ZIP Code | Contact Name | Type of Contract |
|---|---|---|---|---|---|---|
| 2009 Alliance Group Program and Aftermarket Auto Parts Alliance Guaranty Agreement (including all Alliance Group Members) | 2706 Treble Creek, Suit 100 | San Antonio | TX | | Bruce Lestorti | Customer agreement |
| A.C. Radiator Supply, Inc. | 10114 North Palafox | Pensacola | FL | 32534 | Alen Eafinga | Agency agreement |
| ARI Lease Agreement (Vehicles) | 9000 Midlantic Drive, PO Box 5039 | Mt. Laurel | NJ | 08054 | Tony Kylm | Equipment lease |
| Automotive Distribution Network | 3085 Fountainside Drive, Suite 210 | Germantown | TN | 38138 | Dave Lambert | Customer agreement |
| Automotive Parts Assocs. | 1551 Lackman Road | Lenexa | KS | 66219 | Dan Freeman | Customer agreement |
| Bank of America | PO Box 7023 | Troy | MI | 48007-7023 | | Equipment lease |
| Contrato De Maquila Y. Asistencia Tecnica | TBD | TBD | TBD | TBD | | Maquiladora Agreement |
| De lage landen Financial Services (Lily) | TBD | TBD | TBD | TBD | | Equipment Leases |
| Dell Computers | Legal Department, One Dell Way | Round Rock | TX | 78882 | | Equipment lease |
| Esprix Technologies L.P. | 7680 Matoaka Road | Sarasota | FL | 34243 | | Consignment agreement |
| Fast Undercar | 4277 Transport Street | Ventura | CA | 93003 | Victor Davis | Customer agreement |
| GE (Transpro) | 1010 Thomas Edison Blvd S.W., | Cedar Rapids | IA | 52404 | | Equipment lease |
| GE Capital (Blooms Business Systems) | 1967 Hirst Drive | Moberly | MO | 55270 | | Equipment lease |
| GE Capital (CBS) | 1967 Hirst Drive | Moberly | MO | 55270 | | Equipment lease |
| GE Capital (Proliance International—Fax Server T1) | Connecticut Business Systems, 50 Rockwell Road | Newington | CT | 06111 | | Equipment lease |

| Counterparty Name | Address | City | State | ZIP Code | Contact Name | Type of Contract |
|---|---|---|---|---|---|---|
| GE Capital (Proliance International—Ricoh 2020 SPF) | Connecticut Business Systems, 50 Rockwell Road | Newington | CT | 06111 | | Equipment lease |
| GE Capital (Proliance International—Ricoh 3025) | Connecticut Business Systems, 50 Rockwell Road | Newington | CT | 06111 | | Equipment lease |
| GE Capital (Proliance International—Ricoh 3045 S/P) | Connecticut Business Systems, 50 Rockwell Road | Newington | CT | 06111 | | Equipment lease |
| GE Capital (Proliance International—Ricoh 3310Le) | Connecticut Business Systems, 50 Rockwell Road | Newington | CT | 06111 | | Equipment lease |
| GE Capital (Proliance International—Ricoh 4410 L and 3320L) | Connecticut Business Systems, 50 Rockwell Road | Newington | CT | 06111 | | Equipment lease |
| GE Capital (Proliance International—Ricoh Aficio 1013, Ricoh Fax 1160 L) | Connecticut Business Systems/ Bloom's Business System, 31 Inwood Road | Rocky Hill | CT | 06067 | | Equipment lease |
| GE Capital (Proliance International—Ricoh Aficio 2018, Orlando, FL) | Connecticut Business Systems/ Bloom's Business System, 31 Inwood Road | Rocky Hill | CT | 06067 | | Equipment lease |
| GE Capital (Proliance International—Ricoh MP5500 & 3045) | Connecticut Business Systems, 50 Rockwell Road | Newington | CT | 06111 | | Equipment lease |
| GE Capital (Proliance International—Ricoh Aficio 2018, San Bernardino, CA) | Connecticut Business Systems/ Bloom's Business System, 31 Inwood Road | Rocky Hill | CT | 06067 | | Equipment lease |
| GE Capital Vehicles | 3 Capital Drive | Eden Prairie | MN | 55344 | Mike Osdoba | Equipment lease |
| Harborside Capital Group, LLC | 18 Sylvia Court | Woodcliff Lake | NJ | 07677 | | Equipment lease |
| Heatex Radiator | TBD | TBD | TBD | TBD | Joseph Deponio JR | Supply and Asset Transfer agreement |

| Counterparty Name | Address | City | State | ZIP Code | Contact Name | Type of Contract |
|---|---|---|---|---|---|---|
| IBM Corporation | 1360 Rene Levesque Blvd. West | Montreal | QC Canada | H3G 2V6 | Robert St-Pierre | Disaster Recovery |
| Miller Radiator Service | 711 W. 6th | Amarillo | TX | 79101 | Floyd Fain | Agency agreement |
| Mr. Gasket | 10601 Memphis Avenue #12 | Cleveland | OH | 44144 | Tyler Cooper LLP | IP License agreement |
| National Cooling Products | 717 SW 4th Street | Oklahoma City | OK | 73109 | John Schneider | Agency Agreement |
| O'Reilly/Ozark Purchasing LLC | 233 S. Patterson | Springfield | MO | 65802 | Michael Swearengin | Customer agreement |
| Ready Aire Compressors, Inc. | 100 Gando Drive | New Haven | CT | 06513 | | JV agreement |
| Roppel Industries | TBD | TBD | TBD | TBD | Thomas Roppel | Supply and Asset Transfer agreement |
| Standard Customer Terms and Conditions (Proliance) | 100 Gando Drive | New Haven | CT | 06513 | | Customer agreement, Product warrantee |
| Toyota Motor Credit | P.O. Box 3457 | Torrance | CA | 90510 | | Equipment lease |
| US BankCorp Lease | 1310 Madrid Street | Marshall | MN | 56258 | Natasha Miller | Equipment lease |
| Val's Radiator + AC Inc | 1715 2nd Ave. N. | Billings | MT | 59101 | Dave Doll | Agency agreement |
| Wells Fargo | CBS/Blooms Business 006-601-0871-001-007 95 N. Route 17 South | Paramus | NJ | | Sandy Swanson | Equipment lease |

**UNEXPIRED LEASES OF REAL PROPERTY**

| Lessor Name | Address | City | State | ZIP Code | Contact Name | Property Location |
|---|---|---|---|---|---|---|
| Raulet Partners | 621 North Ave., N.E. | Atlanta | GA | 30308 | | Atlanta |
| Layland Busch LLC | 210 W. 22nd Street, Suite 138 | Oak Brook | IL | 60523 | | Burr Ridge |
| Kyle Budd Sr. and Kyle Budd Jr. | 605 Philomena | Corpus Christie | TX | 78412 | | Corpus Christi |
| Maple/Douglas, L.P. | 402 Calle Miramar | Redondo Beach | CA | 90277 | | Dallas |
| Bryant Street Quad & Annex Ltd. | 8400 E. Prentice Ave. | Greenwood Village | CO | 80111 | | Denver |
| J & S Project, Inc. | 748 Peggs St. | De Sota | TX | 75115 | | Ferris |
| One Laredo Industrial | 100 Sandau , Suite 300 | San Antonio | TX | 78216 | | Laredo |
| Star Supply | P.O. Box 9494 | New Haven | CT | 08534 | | New Haven |
| Prologis | 4105-A 34th St. | Orlando | FL | 32811 | | Orlando |
| Ronald B. Davey | 76-809 Io Place | Kailua-Kona | HI | 96740-9707 | | Sacramento |
| G&S Properties, LLC | P.O. Box 9069 | Salt Lake City | UT | 84109-0069 | | Salt Lake City |
| Pan Am Realty C/O Cavender & Hill | 900 Isom Road , Suite 306 | San Antonio | TX | 78216 | | San Antonio |
| Donald M. Kaplan and Linda Kaplan | 1719 Stewart Street | Santa Monica | CA | 90404 | | San Bernardino |
| Kenyon Industrial Park | 1302 Puyallup St. | Summer | WA | 98340 | | Seattle |

| Lessor Name | Address | City | State | Zip Code | Contact Name | Property Location |
|---|---|---|---|---|---|---|
| Colliers Turley Martin Tucker | 4678 World Parkway Circle | St. Louis | MO | 63134 | | Southaven |
| Carpenters District Council of St. Louis | 1401 Hampton Avenue | St. Louis | MO | 63139 | | St. Louis |
| G.O.S.S. Industries International, Inc.[1] | 8226 Danville Road | Mississauga | ON | L5T2H7 | Mike Laneville | Toronto, ON |
| New Beverly Realty | 436 Hayden Station | Windsor | CT | | | Windsor |

### RECEIVABLES PROGRAM PARTICIPATION AGREEMENTS

| Bank Name | Address | City | State | Zip Code | Related Customer |
|---|---|---|---|---|---|
| BB&T | 950 East Paces Ferry Rd | Atlanta | GA | 30326 | AutoZone Parts, Inc. |
| BB&T | 317 W. High Street Market Square Tower | High Point | NC | 27260 | General Parts, Inc. db/a Carquest |
| SunTrust Bank | 55 Park Place | Atlanta | GA | 30303 | AutoZone, Inc. |
| SunTrust Bank | 250 Piedmont Ave, Suite 500 | Atlanta | GA | 30308 | Genuine Parts Company (NAPA) |
| SunTrust Bank | 55 Park Place | Atlanta | GA | 30303 | Advance Stores Company Incorporated |
| Bank of America | 1000 W. Temple Street, Mail Code CA9-705-07-05 | Los Angeles | CA | 90012 | Carquest Products, Inc. |
| Branch Banking | 950 Ease Paces Ferry | Atlanta | GA | 30326 | O'Reilly |

[1] Note that this agreement governs Seller's rental of certain space in a warehouse for a sum certain, and is not a traditional lease.

| and Trust Company – dated November 12, 2007 | Rd., Suite 2200 | | | Automotive, Inc. |
|---|---|---|---|---|

## OTHER EXCLUDED ASSETS

1.      Leases with respect to the following locations:

| Building City | Premises | State | Landlord |
|---|---|---|---|
| Arlington | 2100 Design Road | TX | Ridge Southridge |
| Bakersfield | 4300 Easton Dr. | CA | 4300 Easton Associates |
| Chesapeake | 3804 Cook Blvd | VA | Chesapeake Virginia Properties |
| Fresno | 1611 & 1619 E Street | CA | Herman or Erlene Toews |
| Kansas City | 1137 Saline Street | MO | Block & Company, Inc. |
| Knoxville | 113 Sherlake Road | TN | John Fiser |
| Largo | 15370 US Highway 19 N | FL | Argyle Management, Inc. |
| Little Rock | 1701 East Roosevelt Rd | AR | Goff Distribution & Warehouse |
| Pittsburgh | 288 Corliss Street | PA | The Buncher Company |
| Portland | 12730 N.E. Marx St. | OR | Pacific Realty Assoc. LP |
| Richmond | 8516 Sanford Drive | VA | The Wilton Companies, Inc |
| San Diego | 4394 Pepsi Drive | CA | John C. Edgerton |
| Springfield | 1312 N. Nias Avenue | MO | A&H Enterprises, LLC |
| Tallahassee | 111-3 Hamilton Park Drive | FL | Hamilton Leasing Partnership |
| Tampa | 1212 N.39th Street | FL | Prologis |

2.      All Contracts in connection with the "reverse Morris Trust" transaction entered into by the Company and Modine Manufacturing Company in 2005, including:

| Agreement, as amended | Parties | Date |
|---|---|---|
| Agreement and Plan of Merger | Modine Manufacturing Company, Modine Aftermarket Holdings, Inc. and Transpro, Inc. | 1/31/2005 |
| Contribution Agreement | Modine Manufacturing Company, Modine Aftermarket Holdings, Inc. and Transpro, Inc. | 1/31/2005 |
| OEM Acquisition Agreement | Modine Manufacturing and Transpro, Inc. | 1/31/2005 |
| Aftermarket Transition Services Agreement | Modine Manufacturing Company and Modine Aftermarket Holdings, Inc. | 7/22/2005 |
| Aftermarket Supply Agreement | Modine Manufacturing Company and Modine Aftermarket Holdings, Inc. | 7/22/2005 |
| Supply Agreement | Modine Manufacturing Company, Manufacturera Mexicana de Partes S.A. de C.V. and Transpro, Inc. | 7/22/2005 |

| Agreement, as amended | Parties | Date |
|---|---|---|
| Aftermarket License Agreement | Modine Manufacturing Company and Modine Aftermarket Holdings, Inc. | 7/21/2005 |
| OEM Employee Lease Agreement | G&O Manufacturing Company, Inc., Modine Manufacturing Company and Transpro, Inc. | 3/1/2005 |
| OEM License Agreement | G&O Manufacturing Company, Inc., Modine Manufacturing Company and Transpro, Inc. | 3/1/2005 |
| OEM Supply Agreement | G&O Manufacturing Company, Inc., Modine Manufacturing Company and Transpro, Inc. | 3/1/2005 |
| OEM Transition Services Agreement | G&O Manufacturing Company, Inc., Modine Manufacturing Company and Transpro, Inc. | 3/1/2005 |
| Assumption of Benefit Plan Liabilities | Modine Manufacturing Company, Modine Delaware LLC, Modine Aftermarket Holdings, Inc. and Transpro, Inc. | 7/22/2005 |

3.   The following owned real property:

820 Brunner Street, Peru, Illinois

4.   License and Technology Assistance Agreement, dated December 1, 2005, between the Company and Nederlandse Radiateuren Fabriek B.V.

5.   Services Agreement, by and between the Company and Manufacturera Mexicana de Partes de Automoviles SA de CV.

6.   Relationship and Supply Agreement, dated June 4, 2002, by and between Enterex Industrial Co. Ltd. and the Company, and related agreements thereto including the Pledge and Security Agreement

7.   Asset Purchase Agreement, dated September 28, 2007, by and between the Company and Radiator Express Warehouse

8.   The following agreements:

### Contracts

| Counterparty Name | Address | City | State | ZIP Code | Contact Name | Type of Contract |
|---|---|---|---|---|---|---|
| 4M Parts Warehouse | 402 E. Chambers Street | Cleburne | TX | 76031 | | Customer agreement |
| ABC Auto Parts, Ltd. | 920 W. Marshall Avenue | Longview | TX | 75601 | | Customer agreement |

| | | | | | | |
|---|---|---|---|---|---|---|
| ACP | 121-A E. Morse Road | Winter Parke | Florida | 32789 | Bruce McAllister | Asset Purchase Agreement |
| ACP | 121-A E. Morse Road | Winter Parke | Florida | 32789 | Bruce McAllister | Supply Agreement |
| Aetna, Inc. | 1000 Middle Street | Middletown | CT | 06457 | Amanda Reichenbach | Benefit Plan Admin Agreement |
| Allianz Global Risks US Insurance Co. | 225 W. Washington St., Suite 2000 | Chicago | IL | 60606-3484 | Jill Knecht | Insurance Agreement |
| Aon Risk Services Northeast, Inc. | 1660 W. 2nd St. Suite 650 | Cleveland | OH | 44113 | Jerry Kysela | Insurance Agreement |
| Advance Auto Parts | 5008 Airport Road | Roanoke | VA | 24012 | Dave Hart | Customer agreement |
| AIM | 645 Henderson Drive, Suite 10 | Cartersville | GA | 30120 | Ron Pierce | Customer agreement |
| All Car Automotive Warehouse | 206 Hutchings | Cahokia | IL | 62206 | | Customer agreement |
| All Car Automotive Warehouse | 4701 W. Cortland Avenue | Chicago | IL | 60639 | | Customer agreement |
| Alpha Warehouse, Inc. | 3816 Alameda Avenue | El Paso | TX | 79905 | | Customer agreement |
| ASWA, Inc. | 235 Deming Way | Summerville | SC | 29483 | | Customer agreement |
| Auto Electric Services | 1360 Broad St. | Regina, Saskatchewan | Canada | S4R 1Y5 | | Customer agreement |
| Auto Pride | TBD | TBD | TBD | TBD | Bruce Listorti | Customer agreement |
| Auto Sense Auto Parts | 87 Caplan Avenue | Barrie | ON | L4N 9J3 | Reid Ferguson | Customer agreement |
| Atlantic Customs Brokers | PO Box 189 | North Haven | CT | 06473 | Caroline Cassella | Customs broker agreement |
| Automotive Cooling Parts, Inc. | 600 Kasota Ave. | Minneapolis | MN | 55414 | Shawn Lewis | Supply and Asset Transfer agreement |

| Counterparty Name | Address | City | State | ZIP Code | Contact Name | Type of Contract |
|---|---|---|---|---|---|---|
| Automotive Parts Headquarters, Inc. | 2815 Clearwater Road | St. Cloud | MN | 56301 | | Customer agreement |

| | | | | | | |
|---|---|---|---|---|---|---|
| AutoParts International | 192 Mansfield Avenue | Norton | MA | 02766 | Jacob Einhorn | Customer agreement |
| Auto-Wares, Inc. | 440 Kirkland S.W. | Grand Rapids | MI | 49507 | | Customer agreement |
| Autozone | 123 South Front Street | Memphis | TN | 38103 | David Wilbanks | Customer agreement |
| Beazley Insurance Co. | 30 Batterson Park Rd. | Farmington | CT | 06032 | Jim Seymour | Insurance agreement |
| Blue Back Group, LLC | 924 Farmington Avenue Suite 105 | West Harford | CT | 06107 | Eric Thompson | Benefit plan admin agreement |
| Bennett Auto Supply, Inc. | 3141 S.W. 10th Street | Pampano Beach | FL | 33069 | | |
| Bond Auto Parts, Inc. | 272 Morrison Road | Barre | VT | 05641 | | Customer agreement |
| Carparts Distribution Center | 95A Plaistow Road | Plaistow | NH | 03865 | | Customer agreement |
| Carquest Corp., Carquest Products, Inc. | 4721 Hargrove Road | Raleigh | NC | 27616 | Todd Hack | Customer agreement |
| Central Auto Parts Distributors, Ltd. | 34 Highfield Circle S.E. | Calgary, AB | Canada | T2G 5N5 | | Customer agreement |
| Ceridian Corporation | 3311 E. Old Shakopee Rd | Minneapolis | MN | 55425 | | Payroll Services |
| Chris Kouri & Associates | 1200 N. Jefferson, Suite K | Anaheim | CA | 92807 | Chris Kouri | Rep agreement |
| Chubb/Federal Ins Co. | Sears Tower Suite 4700 233 S. Wacker Drive | Chicago | IL | 60606 | Jason E. Bransteter | Insurance Agreement |
| Connolly Sales & Marketing | 1384 Pittsford Mendon Road | Mendon | NY | 14506 | James Connolly | Rep agreement |
| Crescent Radiator Dist | 1153 Magazine Street | New Orleans | LA | 70130 | Rob Congemi | Customer agreement |
| Crown Credit Corp | TBD | TBD | TBD | TBD | | Equipment lease |
| CSK Auto, Inc. | 645 East Missouri Ave. | | | | | CSK Auto, Inc. |
| Distributors Warehouse, Inc. | 1900 N. 10th Street | Paducah | KY | 42002 | | Customer agreement |
| E&L Battery & Ignition Company | 28 William Street | Newark | NJ | 07102 | | Customer agreement |

| Counterparty Name | Address | City | State | ZIP Code | Contact Name | Type of Contract |
|---|---|---|---|---|---|---|
| Eastern Automotive Warehouse | 50 Whiting Road | Fredericton, NB | Canada | E3B 4Y2 | | Customer agreement |
| Eastern Warehouse Distributors, Inc. | 355 S. Flowers Mill Road | Langhorne | PA | 19047 | | Customer agreement |
| FedEx Trade Networks | PO Box 1188 | Buffalo | NY | 14240 | Mike Penfold | Customs broker agreement |
| Federated Auto Parts Distributors, Inc. | 795 Statler Blvd | Staunton | VA | 24402 | Rusty Bishop | Customer agreement |
| Federated CoMan Warehouse | PO Box 2248 | Staunton | VA | 24402 | Rusty Bishop | Customer agreement |
| Gantt-Thomas Assocs. | 546 Inverrary Court | Eureka | MO | 63025 | Tom Shaefer | Rep agreement |
| Great American Insurance Company | 300 S. Wacker Dr., Suite 650 | Chicago | IL | 60606 | G. Tyler DeFend | Insurance Agreement |
| | 900 Oakmont Lane Suite 425 | Westmont | IL | 60559-5571 | Matthew E. Lindborg | |
| Hahn Automotive Warehouse, Inc. | 415 West Main Street | Rochester | NY | 14608 | | Customer agreement |
| Hanson Distributing Company, Inc. | 10802 Rush Street | South El Monte | CA | 91733 | | Customer agreement |
| Henderson Wheel & Supply | 1825 South 300 | West Salt Lake | UT | 84115 | | Customer agreement |
| Hooker & Holcomb Consultants | 65 LaSalle Road | West Harford | CT | 06107 | Evan (Bill) Woollacott | Benefit Plan Admin |
| Independent Warehouse Distributors (IWD) | 688 East Main Street | Branford | CT | 06405 | Bill Burns | Customer agreement |
| Jackson & Cooksey | 12770 Merit Drive, Suite 760 LB 51 | Dallas | TX | 75251 | Chris Mason | Brokerage Agreement |
| JK Distributors, Inc. | 3437 Carlin Springs Road | Falls Church | VA | 22041 | | Customer agreement |
| Jobbers Automotive | 801 East Zimmerly | Wichita | KS | | | Customer agreement |

| Warehouse | | | | | | |
|---|---|---|---|---|---|---|
| KAM Marketing | 4001 Kennet Pike Suite 220 | Greenville | DE | 19807 | Bernie Meyer | Rep agreement |
| Kaiser Foundation Health Plan, Inc. | 17284 Slover Avenue | Fontana | CA | 92337 | Hilda Parra | Benefit Plan Admin Agreement |
| Keystone Automotive Operations, Inc. | 44 Tunkhannock Avenue | Exeter | PA | 18643 | Joseph Amato | Customer agreement |
| KOI Warehouse | 2701 Spring Grove Avenue | Cincinnati | OH | 45225 | Dave Wesselman | Customer agreement |

| Counterparty Name | Address | City | State | ZIP Code | Contact Name | Type of Contract |
|---|---|---|---|---|---|---|
| Konica Minolta | 5522 Maple Ave | Dallas | TX | 75235 | | Equipment lease |
| Kuehne & Nagel | 101 Wrangler Drive Suite 101 | Coppell | TX | 75019 | Rick Mosley | Customs broker agreement |
| Lang Distributing, Inc. (North) | 1180 Lesco Road | Kankakee | IL | 60901 | | Customer agreement |
| Lang Distributing, Inc. (South) | 2505 North Shore Road | Urbana | IL | 61801 | | Customer agreement |
| Lee Tippy | 213 N. Dixie | Odessa | TX | 79761 | Lee Tippy | Rep Agreement |
| Luvata Sweden AB, Luvata Netherlands B.V., Luvata Buffalo, Inc. | 129 Fairfield Way | Bloomingdale | IL | 60108 | Ulf Anvin | Supplier agreement |
| Marketing & Promotion, Inc. | 204 N. Dooley Street Suite 100 | Grapevine | TX | 76051-3315 | Walter Pletz, Sr. | Rep agreement |
| Marlin Leasing | 300 Fellowship Road | Mount Laurel | NJ | 08054 | | Equipment lease |
| Maslack Supply Limited | 488 Falconbridge Road | Sudbury | ON, Canada | P3A 4S4 | | Customer agreement |
| McLaughlin Automotive Stores | 140 Narragansett Avenue | Providence | RI | 02907 | | Customer agreement |
| Merrill Lynch | 1400 Merrill Lynch Drive | Pennington | NJ | 08534 | Norma Jean Pecklo | Benefit Plan Admin Agreement |
| METLIFE | 501 Route 22 | Bridgewater | NJ | 08807 | Diana Kearns | Benefit Plan Admin |

| Counterparty Name | Address | City | State | ZIP Code | Contact Name | Type of Contract |
|---|---|---|---|---|---|---|
| | | | | | | Agreement |
| Metro Automotive Parts Distributor | 535 Tennis Court Lane | San Bernardino | CA | 92402 | | Customer agreement |
| MidSouth Digital | 2837 Appling Way | Memphis | TN | 38133 | Drew Murrah | Equipment lease |
| Mile High Sales Agency | 3669 S. Huron Street Suite 201 | Englewood | CO | 80110 | Todd Romsdahl | Rep agreement |
| Moog Louisville Warehouse | 1421 W. Magazine Avenue | Louisville | KY | 40203 | | Customer agreement |
| NAPA Auto Parts | 2999 Circle 75 Parkway | Atlanta | GA | 30339 | Alan Woll | Customer agreement |
| National Pronto | 204 N. Dooley Street, Suite 30 | Grapevine | TX | 76051 | Bill Maggs | Customer agreement |
| N.A. Williams Co. | 2900A Paces Ferry Rd. | Atlanta | GA | 30339 | Roger McCollum | Rep agreement |
| Norca Heat Transfer, LLC | 185 Great Neck Road | Great Neck | NY | 11022 | Tom Tinghitelli | Consignment agreement |
| **Counterparty Name** | **Address** | **City** | **State** | **ZIP Code** | **Contact Name** | **Type of Contract** |
| Norwood Motor Parts Co, Inc. | 43 N. Montello Street | Brockton | MA | 02301 | | Customer agreement |
| Oracle License Agreement | 500 Oracle Parkway | Redwood City | CA | 94065-1677 | Mark O'Sullivan | IP License agreement |
| Parts Central | 3243 Whitfield Street | Macon | GA | 31204 | | Customer agreement |
| Parts Depot Company | 2177 Dale Avenue, SE | Roanoke | VA | 24013 | Mark Noble | Customer agreement |
| Parts Warehouse, Inc. | 1901 E. Roosevelt Road | Little Rock | AR | 72206 | | Customer agreement |
| PepBoys Auto | 3111 West Allegheny Avenue | Philadelphia | PA | 19132 | George Williams | Customer agreement |
| Performance Warehouse | 9440 N. Whitaker Road | Portland | OR | 97217 | | Customer agreement |
| Piston Ring Service Supply | 660 Wall Street | Winnipeg, Manitoba | Canada | R3C 2P7 | | Customer agreement |
| Pro Parts | PO Box 13785 | Roanoke | VA | 24037 | Mark Noble | Customer agreement |
| Rodriguez and Assocs. | 3054 Ala Poha Place | Honolulu | HI | 96818 | Alex Rodriguez | Rep agreement |
| Radiator Express | 4401 Park Road | Benicia | CA | 94510 | | Customer agreement |
| Radiator Express, dated | 4401 Park Road | Benicia | CA | 94510 | | Supply Agreement |

| 12/28/07 | | | | | | |
|---|---|---|---|---|---|---|
| Radiator Express, dated 9/28/07 | 4401 Park Road | Benicia | CA | 94510 | | Supply Agreement |
| SEI Private Trust Company | 1 Freedom Valley Drive | Oaks | PA | 19456 | Alex Bronstein | Benefit Plan Admin Agreement |
| Seth F Johnson Sales | 7 Pelham Island Road | Wayland | MA | 01778 | Clark Johnson | Rep agreement |
| Shearman-Person | 26309 Miles Road | Cleveland | OH | 44128 | John Stojak | Rep agreement |
| Smith Auto Parts, Inc. | 216 S. Bridge Street | Visalia | CA | 93291 | | Customer agreement |
| South Jersey Auto Supply | 516 West Leeds Avenue | Pleasantville | NJ | 08232 | | Customer agreement |
| SRS Marketing Co., Inc. | 963 Rush Hollow Road | Westbury | NY | 11590 | Robit Riefberg | Rep agreement |
| St. Paul Fire & Marine Insurance Co. | 6150 Oak Tree Blvd., Ste. 500 | Independence | OH | 44131 | Karen Ormsby Carol C. Nelson | Insurance agreements |
| St. Paul Mercury Ins. Co. | 200 N. LaSalle St. Ste. 2200 | Chicago | IL | 60601 | Shane P. Elliott | Insurance agreement |
| Star Distributing Company | 1911 N. 22nd Avenue | Phoenix | AZ | 85009 | | Customer agreement |
| Superior Automotive Warehouse, Inc. | 22 Pratt Street | Boston | MA | 02134 | | Customer agreement |
| TALX | 11432 Corporation | St. Louis | MO | 63146 | William Canfield | Unemployment services |
| Travelers Indemnity Company | 300 Windsor St. | Hartford | CT | 06120 | David T. King | Insurance agreements |
| The Merrill Company, LLP | 601 1st Avenue S.W. | Spencer | IA | 51301 | | Customer agreement |

| Counterparty Name | Address | City | State | ZIP Code | Contact Name | Type of Contract |
|---|---|---|---|---|---|---|
| Tri-States Automotive Warehouse, Inc. | 3966 Old Cottondale Road | Marianna | FL | 32448 | | Customer agreement |
| TruStar Group | 2404 South Grand Blvd | Pearland | TX | 77581 | Steve Upton | Customer agreement |
| Uni-Select | 170 Boul Industrial | Boucherville | QU | J4B 2X3 | Michelle Laverdure | Customer agreement |

| | | | | | | |
|---|---|---|---|---|---|---|
| UPS Canada | PO Box 2127 | Halifax | NS | B3J 3B7 | Mary Post | Customs broker agreement |
| UPS Supply Chain Solutions | 28013 Network Place | Chicago | IL | 60673-1280 | Mary Post | Customs broker agreement |
| Vast-Auto distribution LTEE (including Ontario) | 4840 boul. Des Grandes Prairies | Montreal, Quebec | Canada | H1R 1A1 | | Customer agreement |
| Warren distributing, inc. | 8737 Dice Road | Santa Fe Springs | CA | 90670 | | Customer agreement |
| White Brothers Warehouse, Inc. | 356 Walnut Street | Macon | GA | 31201 | | Customer agreement |
| W.R. Zanes & Co. | PO Box 233 223 Tchoupitoulas Street | New Orleans | LA | 70130 | Bill Lusk | Customs broker agreement |
| Yellow Freight Settlement Agreement | 10990 Roe Avenue | Overland Park | KS | 66211 | | Settlement Agreement |
| Zurawel, Patton & Sample | 9 Crawford Street | Guelph | Canada | N1G 1Y9 | Bill Sample | Rep agreement |

## ADDITIONAL LEASES

| Lessor Name | Address | City | State | ZIP Code | Property Location |
|---|---|---|---|---|---|
| WHX Corporation and Handy & Harmon | 231 Ferris Avenue | East Providence | RI | 02916 | Cleveland |
| Concord Street Associates | 116 Flanders Road, Suite 2000 | Westborough | MA | 01581 | Framingham |
| c/o TA Realty Associates | 28 State St., 10th Floor | Boston | MA | 02109 | Houston |
| Prologis | 1201 West Loop North, Suite 100 | Houston | TX | 77055 | Houston |
| Steven Bloom | 1300 Rt. 73, Ste 106 | Mt. Laurel | NJ | 08054 | Pennsauken |
| Reliance Management, LLC | 2122 East Highland Ave, Suite 400 | Phoenix | AZ | 85072 | Phoenix |

## LABOR CONTRACTS

| Location | Union |
|---|---|
| Houston Drivers/Warehouse 9290-B Baythorne Drive | International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW), Local 864. July 29, 2008 through July 29, 2012 |

| | |
|---|---|
| Houston, TX 77041 | |
| Burr Ridge, Plant<br>421 Heathrow Court<br>Burr Ridge, IL 60521 | Miscellaneous Warehousemen and Production Employees'<br>Union Local No. 781, International Brotherhood of Teamsters.<br>Nov. 1, 2006 through Oct. 31, 2009 |
| Burr Ridge, Drivers<br>421 Heathrow Court<br>Burr Ridge, IL 60521 | Teamsters Local Union No. 710 Highway Drivers, Dockmen,<br>Spotters, Rampmen, Meat Packing House and Allied<br>Products Drivers and Helpers, Office Workers and<br>Miscellaneous Employees, affiliated with the International<br>Brotherhood of Teamsters. Jan. 2007 through Dec. 2009 |
| Cleveland, Plant<br>15600 Commerce Park Dr.<br>Cleveland, OH 44142 | Industrial Maintenance and Vending Machine Service<br>Employees Local Union No. 416 affiliated with the<br>International Brotherhood of Teamsters, Chauffeurs,<br>Warehousemen and Helpers of America. Nov. 23, 2006<br>through Nov. 22, 2009 |

9.    All Subsidiary Equity Interests of Proliance International Sales, Ltd. (Canada).

**Assumed Trade Payables**

None.

**Sellers Cure Costs**

**[See Attached]**

## SELLERS' CURE COSTS

| Counterparty Name | Address | City | State | ZIP Code | Contact Name | Type of Contract | Cure Cost |
|---|---|---|---|---|---|---|---|
| A.C. Radiator Supply, Inc. | 10114 North Palafox | Pensacola | FL | 32534 | Alen Eafinga | Agency agreement | $0.00 |
| ARI Lease Agreement (Vehicles) | 9000 Midlantic Drive, PO Box 5039 | Mt. Laurel | NJ | 08054 | Tony Kylm | Equipment lease | $31,733.00 |
| Bank of America | PO Box 7023 | Troy | MI | 48007-7023 | | Equipment lease | $378.00 |
| Contrato De Maquila Y. Asistencia Tecnica | TBD | TBD | TBD | TBD | | Maquiladora Agreement | $0.00 |
| De lage landen Financial Services (Lilly) | TBD | TBD | TBD | TBD | | Equipment Leases | $51,800.00 |
| Dell Computers | Legal Department, One Dell Way | Round Rock | TX | 78682 | | Equipment lease | $6,352.00 |
| Esprix Technologies L.P. | 7680 Matoaka Road | Sarasota | FL | 34243 | | Consignment agreement | $0.00 |
| GE (Transpro) | 1010 Thomas Edison Blvd S.W. | Cedar Rapids | IA | 52404 | | Equipment lease | $0.00 |
| GE Capital (Blooms Business Systems) | 1967 Hirst Drive | Moberly | MO | 55270 | | Equipment lease | $500.00 |
| GE Capital (CBS) | 1967 Hirst Drive | Moberly | MO | 55270 | | Equipment lease | $350.00 |
| GE Capital (Proliance International—Fax Server T1) | Connecticut Business Systems, 56 Rockwell Road | Newington | CT | 06111 | | Equipment lease | $350.00 |
| GE Capital (Proliance International—Ricoh 2020 SPF) | Connecticut Business Systems, 56 Rockwell Road | Newington | CT | 06111 | | Equipment lease | $350.00 |
| GE Capital (Proliance International—Ricoh 3025) | Connecticut Business Systems, 56 Rockwell Road | Newington | CT | 06111 | | Equipment lease | $100.00 |

| Counterparty Name | Address | City | State | ZIP Code | Contact Name | Type of Contract | Cure Cost |
|---|---|---|---|---|---|---|---|
| GE Capital (Proliance International—Ricoh 3045 S/P) | Connecticut Business Systems, 50 Rockwell Road | Newington | CT | 06111 | | Equipment lease | $100.00 |
| GE Capital (Proliance International—Ricoh 3310Le) | Connecticut Business Systems, 50 Rockwell Road | Newington | CT | 06111 | | Equipment lease | $250.00 |
| GE Capital (Proliance International—Ricoh 4410 L and 3320L) | Connecticut Business Systems, 50 Rockwell Road | Newington | CT | 06111 | | Equipment lease | $100.00 |
| GE Capital (Proliance International—Ricoh Aficio 1013, Ricoh Fax 1160 L) | Connecticut Business Systems/ Bloom's Business Systesm, 31 Inwood Road | Rocky Hill | CT | 06067 | | Equipment lease | $100.00 |
| GE Capital (Proliance International—Ricoh Aficio 2018, Orlando, FL) | Connecticut Business Systems/ Bloom's Business System, 31 Inwood Road | Rocky Hill | CT | 06067 | | Equipment lease | $338.00 |
| GE Capital (Proliance International—Ricoh MP5500 & 3045) | Connecticut Business Systems, 50 Rockwell Road | Newington | CT | 06111 | | Equipment lease | $2,480.00 |
| GE Capital (Proliance International—Ricoh Aficio 2018, San Bernardino, CA) | Connecticut Business Systems/ Bloom's Business System, 31 Inwood Road | Rocky Hill | CT | 06067 | | Equipment lease | $300.00 |
| GE Capital Vehicles | 3 Capital Drive | Eden Prairie | MN | 55344 | Mike Osdoba | Equipment lease | $0.00 |
| Harborside Capital Group, LLC | 18 Sylvia Court | Woodcliff Lake | NJ | 07677 | | Equipment lease | $0.00 |
| Heatex Radiator | TBD | TBD | TBD | TBD | Joseph Deponio JR | Supply and Asset Transfer agreement | $0.00 |
| IBM Corporation | 1360 Rene Levesque Blvd. West | Montreal | QC, Canada | H3GZW6 | Robert St-Pierre | Disaster Recovery | $6,480.00 |
| Miller Radiator Service | 711 W. 6th | Amarillo | TX | 79101 | Floyd Fain | Agency agreement | $0.00 |
| Mr. Gasket | 10601 Memphis Avenue #12 | Cleveland | OH | 44144 | Tyler Cooper LLP | IP License agreement | $0.00 |

| Counterparty Name | Address | City | State | ZIP Code | Contact Name | Type of Contract | Cure Cost |
|---|---|---|---|---|---|---|---|
| National Cooling Products | 717 SW 4th Street | Oklahoma City | OK | 73109 | John Schneider | Agency Agreement | $0.00 |
| Ready Aire Compressors, Inc. | 100 Gando Drive | New Haven | CT | 06613 | | JV agreement | $0.00 |
| Roppel Industries | TBD | TBD | TBD | TBD | Thomas Roppel | Supply and Asset Transfer agreement | $0.00 |
| Toyota Motor Credit | P.O. Box 3457 | Torrance | CA | 90510 | | Equipment lease | $21,489.00 |
| US BankCorp Lease | 1310 Madrid Street | Marshall | MN | 56258 | Natasha Miller | Equipment lease | $5,311.00 |
| Val's Radiator + AC Inc | 1715 2nd Ave. N. | Billings | MT | 59101 | Dave Doll | Agency agreement | $0.00 |
| Wells Fargo | CBS/Blooms Business 006-601-0871-001-007 95 N. Route 17 South | Paramus | NJ | | Sandy Swanson | Equipment lease | $1,893.00 |
| Raulet Partners | 621 North Ave., N.E. | Atlanta | GA | 30308 | | Lease - Atlanta | $0.00 |
| Layland Busch LLC | 210 W. 22nd Street, Suite 138 | Oak Brook | IL | 60523 | | Lease - Burr Ridge | $0.00 |
| Kyle Budd Sr. and Kyle Budd Jr. | 605 Philomena | Corpus Christie | TX | 78412 | | Lease - Corpus Christi | $0.00 |
| Maple/Douglas, L.P. | 402 Calle Miramar | Redondo Beach | CA | 90277 | | Lease - Dallas | $56,000.00 |
| Bryant Street Quad & Annex Ltd. | 8400 E. Prentice Ave. | Greenwood Village | CO | 80111 | | Lease - Denver | $0.00 |
| J & S Project, Inc. | 748 Peggs St. | De Sota | TX | 75115 | | Lease - Ferris | $0.00 |
| One Laredo Industrial | 108 Sandau , Suite 300 | San Antonio | TX | 78216 | | Lease - Laredo | $0.00 |
| Star Supply | P.O. Box 9494 | New Haven | CT | 06534 | | Lease - New Haven | $0.00 |
| Prologis | 4105-A 34th St. | Orlando | FL | 32811 | | Lease - Orlando | $0.00 |

| Counterparty Name | Address | City | State | ZIP Code | Contact Name | Type of Contract | Cure Cost |
|---|---|---|---|---|---|---|---|
| Ronald B. Davey | 76-809 Io Place | Kailua-Kona | HI | 96740-9707 | | Lease - Sacramento | $0.00 |
| G&S Properties, LLC | P.O. Box 9069 | Salt Lake City | UT | 84109-0069 | | Lease - Salt Lake City | $0.00 |
| Pan Am Realty C/O Cavender & Hill | 900 Isom Road , Suite 306 | San Antonio | TX | 78216 | | Lease - San Antonio | $0.00 |
| Donald M. Kaplan and Linda Kaplan | 1719 Stewart Street | Santa Monica | CA | 90404 | | Lease - San Bernardino | $0.00 |
| Colliers Turley Martin Tucker | 4678 World Parkway Circle | St. Louis | MO | 63134 | | Lease - Southaven | $0.00 |
| Carpenters District Council of St. Louis | 1401 Hampton Avenue | St. Louis | MO | 63139 | | Lease - St. Louis | $0.00 |
| G.O.S.S. Industries International, Inc.[2] | 6226 Danville Road | Mississauga | ON | L5T2H7 | Mike Laneville | Lease - Toronto, ON | $0.00 |
| New Beverly Realty | 436 Hayden Station | Windsor | CT | | | Lease - Windsor | $0.00 |
| **TOTAL:** | | | | | | | $186,734.00[3] |

_____

[2]   Note that this agreement governs Seller's rental of certain space in a warehouse for a sum certain, and is not a traditional lease.

[3]   Subject to final determination by the Bankruptcy Court.

NY1-4207872v5

**Buyer Cure Costs**

**[See Attached]**

## BUYER'S CURE COSTS

| Counterparty Name | Address | City | State | ZIP Code | Contact Name | Type of Contract | Cure Cost |
|---|---|---|---|---|---|---|---|
| 2009 Alliance Group Program and Aftermarket Auto Parts Alliance Guaranty Agreement (including all Alliance Group Members) | 2706 Treble Creek, Suit 100 | San Antonio | TX | | Bruce Lestorti | Customer agreement | $92,956.00 |
| Automotive Distribution Network | 3085 Fountainside Drive, Suite 210 | Germantown | TN | 38138 | Dave Lambert | Customer agreement | $4,367.00 |
| Automotive Parts Assocs. | 1551 Lackman Road | Lenexa | KS | 66219 | Dan Freeman | Customer agreement | $1,358.00 |
| Fast Undercar | 4277 Transport Street | Ventura | CA | 93003 | Victor Davis | Customer agreement | $0.00 |
| O'Reilly/Ozark Purchasing LLC | 233 S. Patterson | Springfield | MO | 65802 | Michael Swearengin | Customer agreement | $0.00 |
| Standard Customer Terms and Conditions (Proliance) | 100 Gando Drive | New Haven | CT | 06513 | | Customer agreement, Product warrantee | $0.00 |
| **TOTAL:** | | | | | | | $99,681.00[4] |

---

4    Subject to final determination by the Bankruptcy Court.

**New Hires**

Prior to the Closing, Buyer will offer employment to each employee of the Sellers, except for those individuals set forth below.

| Emp | Name | Code & Title |
|-----|------|--------------|
| 1048 | Canny, Priscilla A | 0616008 Accounts Payable Mgr. |
| 1539 | Chambrelli, Melissa | 0618004 Human Resources Mgr. |
| 1441 | Corriveau Jr, Franklin E | 0611003 Account Clerk |
| 5716 | Donovan, Lorraine Ann | 0613003 Credit Rep. |
| 5689 | Duffy, AnnaMaria I | 0617002 Sr. Financial Analyst |
| 1488 | Flynn Jr, Kenneth T | 0623001 Dir. External Report. |
| 2284 | Frappier, Thomas G | 0617010 Payroll Mgr. |
| 5737 | Henock, Arlen Frederick | 0626001 EVP & CFO |
| 2098 | Jackson, Jeffrey L | 0625003 VP Human Resources |
| 1303 | Johnson, Charles E | 0628001 President & CEO |
| 1510 | Jordan, Harold E | 0618003 Finance & Account. Mgr |
| 1624 | Kotyk, Carole C | 0615001 Executive Assistant |
| 5730 | Leavitt, Steven Craig | 0614006 Sr. Credit Rep. |
| 3237 | Lepeska, Laura | 0617012 Benefits Manager |
| 2295 | Listi, Patricia A | 0613002 Payroll Assistant |
| 5497 | Long, William J | 0627001 Exec. Vice President |
| 5622 | Mckenzie, Tammie | 0611003 Account Clerk |
| 5659 | McNally, Karen Ann | 0614003 Executive Secretary |
| 2480 | Medina, Amelia | 0611003 Account Clerk |
| 5766 | Moore, Donna Lynn | 0617002 Sr. Financial Analyst |
| 1991 | Pavlisko, Elizabeth | 0611003 Account Clerk |
| 5752 | Puglisi, Frank J | 0617002 Sr. Financial Analyst |
| 2357 | Rhodes, Barbara L | 0611003 Account Clerk |
| 2337 | Riccio, Karen M | 0611003 Account Clerk |
| 1438 | Wisot, Richard A | 0624003 VP & Treasurer |
| 5738 | Angelino, Antonietta Diane | 0614002 Planner |
| 1511 | Griffith, Marjorie A | 0616001 Planner II |
| 2606 | Lucibella, Jean A | 0614002 Planner |
| 1531 | Walker, Alan J | 0616001 Planner II |
| 5379 | Fuentes, Miguel A | 0610001 Driver/Warehouse |
| 4970 | Tapia, Miguel A | 0611002 Customer Service Rep. |
| 4325 | Alexander, Calvin | 0611001 Warehouser |
| 5630 | Brooks, Angela Renee | 0610002 Clerk |
| 4806 | Hayslett, John Wesley | 0611001 Warehouser |
| 5605 | McKinnie, Priscilla Ann | 0611001 Warehouser |
| 1415 | Miller, Kevin E | 0611001 Warehouser |
| 5694 | Price, Jerry Ray | 0611001 Warehouser |
| 1193 | Rice, Patrick C | 0611001 Warehouser |
| 5693 | Robinson, Kathryn Lee | 0611001 Warehouser |

| 5611 | Street, Karen D | 0611001 Warehouser |
|------|-----------------|---------------------|
| 5692 | Johnson, Kevin | 0611001 Warehouser |
| 1981 | Monroe, Demetrius | 0615005 Quality Control Supv. |
| 0135 | Cantu, Alfonso * | 06DR002 Driver/Whse Houston Un |
| 4804 | Fox, Angela L * | 0611002 Customer Service Rep. |
| 0647 | Macias, Jesus Omar * | 0611002 Customer Service Rep. |
| 0114 | Martinez, Robert * | 06DR002 Driver/Whse Houston Un |
| 0104 | Scott, Felix L * | 06DR002 Driver/Whse Houston Un |
| 1583 | Daniel, Gary L * | 0615004 Sr. Branch Mgr. |
| 1818 | Cao, Hua-Thanh * | 06CM001 Coremaker |
| 0586 | Robinson, Raymond * | 0614005 Branch Manager |

**REVISED ARTICLE III**

**ARTICLE III**
**CONSIDERATION**

3.1    Purchase Price.  The aggregate purchase price (the "Purchase Price") is (a) $15,020,089.64 (the "Cash Purchase Price") and (b) the assumption by Buyer of the Assumed Liabilities.

3.2    The Closing.  (a)  Unless this Agreement has been terminated pursuant to Section 9.1, and subject to the satisfaction or waiver of the conditions set forth in Article VIII, the closing of the transactions contemplated by this Agreement (the "Closing") will take place at the offices of Jones Day, 222 East 41st Street, New York, NY 10017, on the first Business Day following the date of satisfaction of the conditions set forth in Article VIII (other than the conditions that by their nature are to be satisfied at Closing, but subject to the satisfaction and waiver of such conditions), unless another date, time or place is mutually agreed to in writing by the parties hereto (the "Closing Date"); provided, that for tax, accounting and computational purposes the Closing will be deemed to be effective as of 11:59 p.m. EST on the Closing Date.

(b)    At the Closing, (i) Buyer will pay the Cash Purchase Price, less the amount of (A) the Initial Escrow Deposit and (B) $20,089.64 (which amount will be payable to Sellers as provided in Section 3.4) (the "Salary Continuation Amount"), by wire transfer of immediately available United States funds to an account or accounts designated by the Company no later than two Business Days prior to the Closing Date, (ii) Sellers will deliver the certificates and other documents to be delivered under Article VIII and (iii) Buyer will deliver the documents to be delivered under Article VIII.

3.3    Initial Escrow Deposit.  (a)  Buyer has delivered to Wells Fargo Bank, National Association (the "Escrow Agent") cash in an amount equal to $2,000,000 (including all interest accrued thereon, collectively, the "Initial Escrow Deposit").  The Initial Escrow Deposit will be held by the Escrow Agent during the Initial Escrow Period in an account and will be released as follows and in accordance with the terms of the escrow agreement entered into among Buyer, the Company and the Escrow Agent on the date hereof in the form of Exhibit C (the "Escrow Agreement").

(1)    the Initial Escrow Deposit will be paid to Buyer in the event this Agreement is terminated by the Company or Buyer, or both of them, pursuant to Section 9.1(a), 9.1(b)(i) (unless, in the case of a termination by the Company, Buyer could not have terminated this Agreement at such time pursuant to Section 9.1(b)(i), 9.1(b)(iv), 9.1(b)(v) or 9.1(c), or by Buyer pursuant to Section 9.1(b)(ii), 9.1(b)(iii) or 9.1(d), and, in each event, will be paid upon such termination;

(2)    the Initial Escrow Deposit will be paid to the

Company in the event this Agreement is terminated by the Company pursuant to Section 9.1(e), 9.1(b)(i) (but only to the extent that Buyer could not have terminated this Agreement at such time pursuant to Section 9.1(b)(i)), 9.1(b)(ii) or 9.1(b)(iii), and, in each event, will be paid upon such termination;

(3)     if the Closing occurs, the Initial Escrow Deposit will be paid to the Company.

3.4     <u>Post-Closing Payments</u>. (a) By no later than the close of business on the first Business Day following the Closing Date, Buyer and Sellers will in good faith calculate the amount of cash collected from customers by Sellers from and including August 10, 2009 through and including August 14, 2009 (the "<u>Closing Week Cash</u>"). To the extent that such Closing Week Cash (excluding for this purpose the amount of any such cash collected and subsequently paid by Sellers during such period as payment for inventory either delivered on a C.O.D. or C.I.A. basis) exceeds $2,128,000, the amount of such excess (the "<u>Excess Cash</u>") will be payable by Sellers to Buyer on the second Business Day following the Closing Date in accordance with Section 3.4(c).

(b)     Buyer will pay to Sellers the portion of the Cash Purchase Price constituting the Salary Continuation Amount on the second Business Day following the Closing Date in accordance with Section 3.4(c). The Salary Continuation Amount will be used by the Company solely for the purpose of making salary continuation payments to the individuals who are identified with an asterisk on <u>Schedule 7.9(a)</u>.

(c)     If the Excess Cash exceeds the Salary Continuation Amount, then Sellers will pay Buyer the amount of such excess on the second Business Day following the Closing Date by wire transfer of immediately available funds to one or more bank accounts designated by Buyer in writing to the Company. If the Salary Continuation Amount exceeds the Excess Cash, then Buyer will pay Sellers the amount of such excess on the second Business Day following the Closing Date by wire transfer of immediately available funds to one or more bank accounts designated by the Company in writing to Buyer.

3.5     <u>Additional Matters</u>. (a) <u>D&O</u>. In the event of any threatened or actual Action or Proceeding, whether civil, criminal or administrative, in or to which any current or former director or officer of the Company (each, an "<u>Indemnified Party</u>") is, was or becomes a party or witness or other participant, or is threatened to be made a party or witness or other participant, based on, or arising out of or relating to (i) the fact that such Person is serving or did serve in the capacity of a director or officer of the Company or (ii) this Agreement or any of the transactions contemplated by this Agreement or the process leading up to the negotiation, execution and delivery of this Agreement, whether asserted or arising before or after the Closing, from and after the Closing, the Indemnified Parties will be entitled to be indemnified by Buyer from and against any losses, claims, damages (including consequential damages), liabilities, costs, legal and other expenses (including reasonable expenses of investigation and litigation and attorneys' and other professionals' fees and costs incurred in the investigation or defense thereof or the enforcement of rights hereunder), judgments,

fines and amounts paid in settlement that are incurred by such Indemnified Parties, after deducting therefrom the amount of any insurance proceeds from a third-party insurer actually received by such Indemnified Parties in respect of such amounts (net of any costs and expenses incurred by such Indemnified Parties); provided, however, that in no event will Buyer's obligations pursuant to this Section 3.5(a) (i) exceed $200,000 in the aggregate or (ii) extend to claims for indemnification first asserted after the first anniversary of the Closing Date.

(b)      IBNR.  To the extent that any Seller incurs any Liabilities in excess of $350,000 following the Closing Date in respect of any claims under a group health or flexible spending plan of Sellers that were incurred but not yet reported or paid as of the Closing Date (such excess Liabilities, "Eligible IBNR Claims"), Buyer will pay to the Company the amounts necessary to satisfy all Eligible IBNR Claims payable prior to the end of the first anniversary of the Closing Date, up to an aggregate amount of $150,000.

(c)      Individual Health Insurance.  To the extent that any Employee as of immediately prior to the New Hire Deadline who does not become a New Hire ("Eligible Employees") (i) receives benefits under a group health plan, including under the Consolidated Omnibus Budget Reconciliation Act ("COBRA") or purchases an individual or family health insurance policy for the Eligible Employee and/or the dependents of the Eligible Employee who were covered by a group health plan of any Seller prior to the Closing Date that provides coverage for either of the first two full calendar months following the Closing Date (the "Eligible Monthly Periods") and (ii) provides the Company, within three months following the Closing Date, with written evidence of any out-of-pocket premium payments made by such Eligible Employee pursuant to such group health plan (including COBRA) or such individual or family health insurance policy in respect of one or more Eligible Monthly Periods, the Company will notify Buyer of such evidence within five Business Days following the date such Eligible Employee provides such evidence, Buyer will pay to the Company, within five Business Days following such notice by the Company, $1,000 per Eligible Monthly Period in respect of such Eligible Employee (up to an aggregate amount of $2,000 per Eligible Employee) and the Company will in turn pay to such Eligible Employee, within five Business Days following Buyer's payment to the Company, $1,000 per Eligible Monthly Period (less applicable withholding, which will be calculated by the Company), up to an aggregate amount of $2,000 (less applicable withholding).

## TRANSITION SERVICES AGREEMENT

THIS TRANSITION SERVICES AGREEMENT (this "<u>Agreement</u>") is made and entered into as of August [14], 2009 (the "Effective Date"), between Proliance International, Inc., a Delaware corporation (the "<u>Company</u>"), Centrum Equities Acquisition, LLC, a Delaware limited liability company, Vista Automotive Acquisition, LLC, a Delaware limited liability company, and HD Branch Acquisition, LLC, a Delaware limited liability company (collectively, "<u>Purchasers</u>" and together with the Company, the "<u>Parties</u>").

### Recitals

A.　On July 2, 2009 (the "<u>Petition Date</u>"), the Company and certain of the Company's domestic Subsidiaries became debtors and debtors in possession under title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "<u>Bankruptcy Code</u>"), and filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>") (the "<u>Bankruptcy Case</u>").

B.　On the Petition Date, the Company, together with certain of its Subsidiaries (collectively, the "<u>Sellers</u>"), and Centrum Equities XV, LLC ("<u>Centrum</u>") entered into an Acquisition Agreement, dated as of July 2, 2009 (the "<u>Acquisition Agreement</u>"), pursuant to which, among other things, on the terms and conditions contained in the Acquisition Agreement, the Sellers have sold and assigned to Purchasers, and Purchasers have purchased and assumed, the Purchased Assets and Assumed Liabilities, in each case of the date hereof. Purchasers are Affiliates of Centrum that are wholly owned by Vista Automotive LLC, the sole entity that owns all of the outstanding equity interests of Centrum, to which Centrum has assigned its rights to purchase and assume the Purchased Assets and Assumed Liabilities.

C.　In connection with the transactions contemplated by the Acquisition Agreement, Purchasers and the Company are willing to provide, or cause to be provided, to the other party and its respective Affiliates, certain Transition Services (as defined below) for the periods set forth herein to provide, among other things, the Company access to certain assets and records to wind down its bankruptcy estate.

D.　Capitalized terms used but not defined herein will have the respective meanings set forth in the Acquisition Agreement.

NOW, THEREFORE, the Parties agree as follows:

### I. Agreement to Provide Transition Services

1.1　<u>Agreement</u>.　(a) Purchasers hereby agree to provide, or cause its Affiliates or other third parties to provide, to the Company and its Affiliates, the services set forth

on the schedules attached hereto (the "Schedules"), and the Company and its Affiliates hereby agree to pay or to cause to be paid to Purchasers or its Affiliates the applicable fees for such services (the "Service Fees") set forth on the Schedules. Notwithstanding anything contained herein to the contrary, all such services to be provided by Purchasers will be provided (i) during normal business hours, (ii) only so long as such activities do not interfere with the operations of Purchasers and (iii) only so long as such services are then being offered by Purchasers to its own employees.

(b)     (i)     Following the Closing, the Company will make its then-current employees reasonably available during normal business hours to Purchasers and Centrum to assist in the operations of the Business following the Closing so long as such activities do not interfere with the operations of the Company, including any bankruptcy proceedings, sale of Excluded Assets or other wind-down activities. No Service Fee, other than Expenses as described below, will be payable in respect of such Transition Services.

(ii)     Further, after the Closing, the Company specifically agrees to promptly (but in no event more than 24 hours after any such amount is received by the Company) forward to Centrum and/or Purchasers any post-Closing cash collections that are Acquired Assets and that are received by the Company or any of its Affiliates.

(iii)     Further, prior to or as of the Closing, the Company specifically agrees to (1) cooperate with and assist Purchasers to effectuate the transfer to Centrum or a Purchaser of (A) the depository account at JP Morgan Chase / Bank One with the account number ending in 7012; (B) the depository account at Regions Bank with the account number ending in 6927; (C) the lockbox account at Wachovia Bank with the account number ending in 3188; (D) the depository account at Wachovia Bank with the account number ending in 3201; (E) the depository account at Wells Fargo Bank with the account number ending in 9679; (F) the lockbox account at Wachovia Bank numbered 75586; and (G) the lockbox account at Wachovia Bank numbered 79508 (such accounts, the "Transferred Accounts"); (2) cooperate with and assist Purchasers in redirecting the Transferred Accounts to be directed and/or swept into an account or accounts held by Centrum or a Purchaser; (3) provide the additional Transition Services set forth on Annex A attached hereto; and (4) cause any and all blocked account agreements entered into by the Company and/or by any of its Affiliates to be terminated.

(c)     Any party providing services under this Agreement will be deemed to be the "Performing Party" with respect to such services, and any party receiving services under this Agreement will be deemed to be the "Receiving Party" with respect to such services.

1.2     Transition Services. As used in this Agreement, the term "Transition Services" means (a) with respect to the services provided by Purchasers, the services described in the Schedules, and (b) with respect to services provided by the Company, the services described in Section 1.1(b). Notwithstanding anything to the contrary contained herein or in any Schedule, the Performing Party will have no obligation under

this Agreement to (i) operate the business of the Receiving Party or any of its Affiliates or any portion thereof, (ii) advance funds (for the avoidance of doubt, the foregoing does not include the funds referred to in Section 1.1(b)(ii)), (iii) provide services or licenses to any Person other than the Receiving Party, or (iv) engage in any unlawful activity. The Receiving Party will, and will cause its respective Affiliates, employees, agents, representatives and subcontractors to, cooperate fully with the Performing Party and its Affiliates, employees, agents and representatives to facilitate, in all respects, the provision of Transition Services to the Receiving Party and its Affiliates.

1.3    Transition Period. The Performing Party will provide or cause to be provided to the Receiving Party the Transition Services for the periods set forth on the applicable Schedule or elsewhere in this Agreement (as applicable, the "Transition Period"), and the Performing Party will not be obligated to provide or cause to be provided to the Receiving Party any Transition Service during any period other than the applicable Transition Period described on the applicable Schedule or elsewhere in this Agreement. The Transition Period for the Transition Services described in Section 1.1(b)(i) will be with respect to each such employee, the period of the time during which such employee is employed by the Company.

## II. Payment for Transition Services

2.1    Service Fees. In consideration for any of the Transition Services, the Receiving Party will pay to the Performing Party the applicable Service Fees, prorated for each month of service.

2.2    Out-of-Pocket Expenses. All (a) reasonable out-of-pocket expenses (excluding the salary of the individuals performing such Transition Services and other similar labor-related costs) that arise directly out of the provision of Transition Services pursuant to this Agreement and are incurred by the Performing Party (the "Out-of-Pocket Expenses") and (b) sales or similar non-income taxes incurred by the Performing Party or any of its Affiliates in connection with the provision of Transition Services pursuant to this Agreement (together with the Out-of-Pocket Expenses, "Expenses") will be reimbursed by the Receiving Party; provided, however, that for any Expense described in clause (a) in excess of $500 per occurrence or event, the Performing Party will be required to obtain prior approval thereof from the Receiving Party.

2.3    Invoicing of Service Fees. The Performing Party will invoice the Receiving Party for Service Fees and Expenses promptly after the end of each calendar week during the Transition Period. All invoices will be paid by the Receiving Party to the Performing Party not later than 5 Business Days after receipt by the Receiving Party of the Performing Party's invoice.

## III. Service Standards and Warranty Disclaimer

3.1    Service Standard. Subject to compliance with applicable Law and except as otherwise expressly provided in the Schedules or elsewhere in this Agreement, the

Performing Party will, and will cause its Affiliates to, perform the Transition Services in a commercially reasonable manner.

3.2    Disclaimer of Warranty.  EXCEPT AS EXPRESSLY PROVIDED IN SECTION 3.1 HEREOF, THE PERFORMING PARTY HEREBY EXPRESSLY DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES, EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, WITH RESPECT TO THE TRANSITION SERVICES.  FURTHER, THE PARTIES AGREE THAT THE PURCHASERS WILL HAVE NO RESPONSIBILITY OR LIABILITY FOR THE ACCURACY OR COMPLETENESS OF ANY DATA PROVIDED TO THE COMPANY OR ITS AFFILIATES AS PART OF THE TRANSITION SERVICES.

## IV. **General Provisions**

4.1    Force Majeure.  The Performing Party will not be liable for any failure of performance attributable to acts, events or causes (including war, riot, rebellion, civil disturbances, terrorism, power failures, failures of telephone lines and equipment, strikes, lockouts, labor disputes, flood, storm, fire and earthquake or other acts of God or conditions or events of nature, or any Law, demand or requirement of any Governmental Authority) beyond its reasonable control.  Subject to the foregoing, the affected provisions and other requirements of this Agreement will be suspended during the period of such force majeure event and the Performing Party will have no liability to the Receiving Party or any other party in connection therewith.  The Performing Party will use commercially reasonable efforts to remove such force majeure event as soon as and to the extent reasonably possible.

4.2    Exculpation.  Neither the Performing Party nor any other Person involved at the Performing Party's behest in the provision of the Transition Services to the Receiving Party will have any liability to the Receiving Party or any Person claiming derivatively by, through or under the Receiving Party in connection with or as a result of this Agreement or the Transition Services, except for any damages that will have been actually sustained by the Receiving Party as a result of the negligence or willful misconduct of the Performing Party or such other Persons involved at the Performing Party's behest in the provision of the Transition Services to the Receiving Party.

4.3    Successors and Assigns.  The provisions of this Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and assigns; provided, however, that no Party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of each other Party hereto.

4.4    Interpretation.  The words "hereof," "herein" and "hereunder" and words of like import used in this Agreement will refer to this Agreement as a whole and not to any particular provision of this Agreement.  Terms defined in the singular in this Agreement will also include the plural and vice versa.  The captions and headings herein are included for convenience of reference only and will be ignored in the construction or

interpretation hereof. References to Articles, Sections and Schedules are to Articles, Sections and Schedules of this Agreement unless otherwise specified. Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation," whether or not they are in fact followed by those words or words of like import. The phrases "the date of this Agreement," "the date hereof" and phrases of similar import, unless the context otherwise requires, will be deemed to refer to the date set forth in the Preamble to this Agreement. The Parties have participated jointly in the negotiation and drafting of this Agreement. If any ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties, and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

4.5     Amendments and Waivers. Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each Party to this Agreement, or in the case of a waiver, by the Party against whom the waiver is to be effective. No failure or delay by any Party in exercising any right, power or privilege hereunder will operate as a waiver thereof nor will any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

4.6     Counterparts. This Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

4.7     Invalid Provisions. If any provision of this Agreement is held to be illegal, invalid or unenforceable under any present or future Law, and if the rights or obligations of any party hereto under this Agreement will not be materially and adversely affected thereby, (a) such provision will be fully severable, (b) this Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof, and (c) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom.

4.8     Governing Law. This Agreement will be governed by and construed in accordance with the Laws of the State of Delaware applicable to a Contract executed and performed in such State, without giving effect to the conflict of laws principles thereof.

4.9     Submission to Jurisdiction; Consent to Service of Process. (a) Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court will retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing will be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and will receive notices at such locations as

indicated in Section 10.2 of the Acquisition Agreement; provided, however, that if the Bankruptcy Case has closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York and any appellate court from any thereof, for the resolution of any such claim or dispute. The parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b)     Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 10.2 of the Acquisition Agreement.

4.10     Specific Performance. The Parties acknowledge and agree that the failure of any Party to perform its agreements and covenants hereunder will cause irreparable injury to the other Party for which damages, even if available, will not be an adequate remedy. Accordingly, each Party consents to the issuance of injunctive relief by any court of competent jurisdiction to compel performance of such Party's obligations and to the granting by any court of the remedy of specific performance of its obligations hereunder.

4.11     No Agency, Authority or Franchise. Neither Purchasers nor the Company will act or represent or hold itself out as having authority to act as an agent or partner of the other, or in any way bind or commit the other to any obligations. Nothing contained in this Agreement will be construed as creating a partnership, joint venture, agency, trust or other association of any kind, each Party being individually responsible only for its obligations as set forth in this Agreement. Furthermore, nothing contained in this Agreement, or any Party's performance under this Agreement, will be construed as creating a franchisee/franchisor relationship.

4.12     Term of Agreement. This Agreement will terminate upon the conclusion of the Transition Period for final Transition Services to be provided hereunder. Upon termination of this Agreement, (i) no Party will be relieved of any liability for any breach or nonfulfillment of any provision of this Agreement and (ii) Article II (as to any unpaid amounts) and Article IV will survive any termination of this Agreement.

4.13     Entire Agreement. This Agreement (including the Schedules) and the Acquisition Agreement constitute the entire agreement between the Parties with respect to the subject matter of this Agreement and supersede all prior agreements and understandings, both oral and written, between the Parties with respect to the subject matter of this Agreement.

4.14     Notices. All notices, requests and other communications to any Party hereunder will be in writing (including electronic facsimile transmission) and will be given in accordance with Section 10.2 of the Acquisition Agreement.

4.15     <u>Limitation on Damages</u>.  Notwithstanding anything contained herein to the contrary, in no event will the aggregate liability of the Company, on the one hand, or of the Purchasers, on the other hand, with respect to claims for a breach of this Agreement (excluding claims for payment of Service Fees and Expenses) exceed $100,000.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**PROLIANCE INTERNATIONAL, INC.**

By: _____
    Name:
    Title:

**CENTRUM EQUITIES ACQUISITION, LLC**

By: _____
    Name:
    Title:

**VISTA AUTOMOTIVE ACQUISITION, LLC**

By: _____
    Name:
    Title:

**HD BRANCH ACQUISITION, LLC**

By: _____
    Name:
    Title:

## Schedule 1

## Office Space and Network Services

| | |
|---|---|
| **Transition Services:** | ▪ Purchasers will provide employees of the Company that do not become New Hires (the "<u>Company Employees</u>") with access to and use of office space designated by Purchasers in their reasonable discretion (and appropriate use of common areas, such as parking lots, coffee rooms, lunch rooms, break rooms and bath rooms) in the Purchaser's Connecticut facility (or an equivalent replacement facility if Purchasers are no longer using the existing Connecticut facility at the applicable time), including related furniture; provided, however, if any Company Employee is moved from their existing office space to alternate space, then the cost to move such Company Employee will be paid by the Purchasers. |
| | ▪ Purchasers will provide the Company Employees with reasonable access to and use of general office equipment, including copiers, phones, fax machines and other similar devices. |
| | ▪ Purchasers will provide the Company Employees with reasonable access to and use of hardware and applications (including Purchasers' internal and external networks, including use of network applications such as e-mail, internet and similar application suites) used by the Company Employees in the ordinary course immediately prior to the Closing Date (collectively, the "<u>Hardware</u>"), or a reasonable equivalent, as long as Purchasers are using such Hardware or its equivalent in their own operations. |
| | ▪ Such services are in addition to the services and payments described in Section 7.9(f) of the Acquisition Agreement (and the associated Schedule 7.9(f)) and nothing herein will be deemed to modify or reduce Centrum's obligations thereunder. |
| | ▪ Such services shall be provided only to the extent that it does not violate any of Purchasers' license agreements. The Company agrees to use and maintain such Hardware consistently with Purchasers' confidentiality policies in order to maintain the confidential nature of Purchasers' confidential information, including the Hardware. |
| | Collectively, the "<u>Office Services</u>." |
| **Transition Period:** | The Office Services will be available to all Company Employees until September 15, 2009, and thereafter the Office Services will be limited to up to 13 Company Employees engaged in the Company's wind-down activities until such time as such wind-down activities are complete or until such earlier date that the Company has provided Purchasers |

| | |
|---|---|
| | written notice of its desire to terminate the Office Services; <u>provided, however</u>, that in no event (i) will the Office Services be provided at any time after the first anniversary of the Closing Date and (ii) will the termination of such transition period for the Office Services limit or otherwise affect the obligations of Purchasers and/or its affiliates under the Acquisition Agreement, including Section 7.9(f) thereof (and the associated Schedule 7.9(f)). |
| <u>Equipment Purchase Right:</u> | At the termination of the Transition Period, Purchasers may (in its sole determination), but are not required to, offer each Company Employee the right to acquire from Purchasers such Company Employees' computer or other network equipment (e.g., mobile telephone) at the net book value of, or, if applicable, the net lease liability remaining on, such equipment. Prior to the consummation of any equipment purchase, each Company Employee shall surrender such equipment to Purchasers in order to facilitate the removal all of Purchasers' confidential information from such equipment. |
| <u>Service Fee:</u> | The monthly cost to the Company will be $1.00. In addition, the Company will be responsible for Expenses pursuant to Section 2.2 of the Agreement. |

## Schedule 2

## Financial and Human Resources

| | |
|---|---|
| Transition Services: | ▪ Purchasers will provide the Company with reasonable access to supporting technology applications, to the extent such applications are Purchased Assets, related to financial systems and human resources processes (including general ledger, accounts payable and payroll), including software applications and systems provided by JD Edwards and Ceridian, as was available to and used by the Business in the ordinary course immediately prior to the Closing Date; provided, however, that such access shall be provided only to the extent that it does not violate any of Purchasers' license agreements and only if Purchasers are using such items in their own operations. The Company agrees to use and maintain such information consistently with Purchasers' confidentiality policies in order to maintain the confidential nature of Purchasers' confidential information.<br><br>▪ Purchasers will make available to the Company such personnel necessary to support such applications and provide information as is reasonably requested by the Company.<br><br>Collectively, the "Financial and HR Services." |
| Transition Period: | The Financial and HR Services will be available to all Company Employees until September 15, 2009, and thereafter the Financial and HR Services will be limited to up to 13 Company Employees engaged in the Company's wind-down activities until such time as such wind-down activities are complete (or until such earlier date that the Company has provided Purchasers written notice of its desire to terminate the Financial and HR Services); provided, however, that in no event (i) will the Financial and HR Services be provided at any time after the first anniversary of the Closing Date and (ii) will the termination of such transition period for the Financial and HR Services limit or otherwise affect the obligations of Purchasers and/or its affiliates under the Acquisition Agreement, including Section 7.9(f) thereof (and the associated Schedule 7.9(f)). |
| Service Fee: | The Company will be responsible for Expenses pursuant to Section 2.2 of the Agreement. |

## Schedule 3

## Data Access

| | |
|---|---|
| Transition Services: | ▪ Purchasers will provide the Company with reasonable access to information and data related to the Business, including the Books and Records, as well as network data and other physical and electronic files existing as of Closing, in each case to the extent such items are Purchased Assets, as may be reasonably required by the Company for the purposes of winding down the affairs of the Company and as necessary to comply with applicable Law or the request or inquiry (or any filing required by) any Governmental Authority. However, such access shall be provided only to the extent that it does not violate any of Purchasers' license agreements. The Company agrees to use and maintain such information consistently with Purchasers' confidentiality policies in order to maintain the confidential nature of Purchasers' confidential information.<br><br>▪ Purchasers will permit the Company to prepare copies of records for the Company's use in the form of tape or other electronic media, but only to the extent it contains information to which the Company is entitled pursuant to the preceding bullet (and only if the Company complies with its obligations described therein). For the avoidance of doubt, any Books and Records relating to the wind-down of the Estate, including electronic files, will be deemed to be Excluded Assets and will remain the property of the Company.<br><br>▪ Purchasers will make available such personnel familiar with such records to answer questions and provide information as may be reasonably necessary to complete the Company's required use of such records, including reasonable accounting support and analysis; provided, however, that the provision of such support is not unduly burdensome to Centrum or Purchasers.<br><br>▪ Purchasers will retain the applicable Books and Records and other data for use in Data Services for the period that the Company is required to maintain such Books and Records and data in order to comply with applicable Law.<br><br>Collectively, the "Data Services." |
| Transition Period: | The Data Services will be available to all Company Employees until September 15, 2009, and thereafter the Data Services will be limited to up to 13 Company Employees engaged in the Company's wind-down activities until such time as such wind-down activities are complete (or until such earlier date that the Company has provided Purchasers written notice of its |

| | |
|---|---|
| | desire to terminate the Data Services); provided, however, that in no event (i) will the Data Services be provided at any time after the first anniversary of the Closing Date and (ii) will the termination of such transition period for the Data Services limit or otherwise affect the obligations of Purchasers and/or its affiliates under the Acquisition Agreement, including Section 7.9(f) thereof (and the associated Schedule 7.9(f)). |
| Service Fee: | The Company will be responsible for Expenses pursuant to Section 2.2 of the Agreement. |

## ANNEX A

| | |
|---|---|
| Leases: | Reference is hereby made to: |
| | (i) the Lease between The Bloom Organization of South Jersey, LLC and the Company for space known as 9240 Commerce Highway, Pennsauken, New Jersey, dated November 20, 1980, as amended and modified (the "NJ Lease"); |
| | (ii) the Lease between Trustees of Commonwealth Center Trust and the Company for space known as 1455 Concord Street, Framingham, Massachusetts, dated April 14, 1986, as amended and modified (the "Framingham Lease"); |
| | (iii) the Lease between Prologis and the Company for space known as 1231 D North Post Oak Road, Houston, Texas, dated June 11, 2009 (the "Houston Lease"); and |
| | (iv) the Lease between Presson Equity Partners, L.L.P. and the Company for space known as 2517 West McDowell Road, Suites 107, 108, 109 and 110, Phoenix, Maricopa County, Arizona, dated November 8, 1994, as amended and modified (the "Phoenix Lease"). |
| | The NJ Lease, Framingham Lease, Houston Lease and Phoenix Lease are individually referred to herein as a "Lease" and collectively, the "Leases." |
| Transition Services: | The Company shall provide Purchasers with access to the buildings and property at each location as is available to the Company and governed by the Leases (the "Real Estate Services"). The premises used in connection with the Real Estate Services shall be referred to herein as the "Service Premises." |
| | For purposes of this Schedule, "access" shall mean access to the Service Premises for the purposes of transitioning operations to another location of Purchasers, including the appropriate use of common areas and parking in connection therewith, all during normal and customary business hours and as otherwise reasonably permitted under the Leases. |
| Transition Period: | The provision of the Real Estate Services shall begin on the Closing Date and continue thereafter until the earliest to occur of (i) the underlying Lease terminating, (ii) 90 days following the Closing and (iii) Purchasers notice to the Company of Purchasers' desire to terminate the Real Estate Services (which notice can be given for specific a Service Premise without causing a termination of the Real |

| | |
|---|---|
| | Estate Services at any other Service Premise). |
| Service Fee: | Purchasers shall pay to the Company for the Real Estate Services the rent and direct operating expenses, utility and janitorial services, insurance and any other direct expenses paid by the Company to the applicable landlord or utility or other provider with respect to the Service Premises under the terms of the Leases. |
| Security Deposit: | The Company shall be entitled to the return of any security deposits due to tenant under the Leases. For the avoidance of doubt, the security deposits under the Leases are Excluded Assets. |
| Other Provisions: | Except as otherwise set forth in this Annex A, the Real Estate Services shall be governed by the same terms as contained in the Leases (with Purchasers agreeing to comply with all terms thereof as though it were the "Tenant" (except with respect to the payment of rent and operating expenses, which will be paid as provided for herein) and being obligated to perform the obligations of "Tenant" thereunder with respect to the Service Premises) unless the parties agree otherwise in writing. Notwithstanding the foregoing, Purchasers shall have no rights to extend the term of any Lease. |

**Exhibit C**

**Escrow Notice**

**Proliance International, Inc.**
100 Gando Drive
New Haven, CT 06513

**Centrum Equities XV, LLC**
c/o SSI Automotive, LLC
5111 Maryland Way, Suite 210
Brentwood, TN 37027

August [14], 2009

Wells Fargo Bank, National Association
230 W. Monroe Street
Corporate Trust Department
Chicago, IL 60606
Attn: Timothy P. Martin
Telephone: (312) 726-2158
Facsimile: (312) 726-2137

Re:  Joint Instructions to Disburse Initial Escrow Deposit and Terminate the Escrow Agreement

Dear Mr. Martin:

Reference is hereby made to that certain Escrow Agreement, dated as of July 2, 2009 (the "Escrow Agreement"), by and among Proliance International, Inc. (the "Company"), Centrum Equities XV, LLC ("Buyer"), and Wells Fargo Bank, National Association ("Escrow Agent"). Capitalized terms which are used but not otherwise defined herein shall have the meaning ascribed to such terms in the Escrow Agreement. This letter constitutes the notice to Escrow Agent by the Company and Buyer, pursuant to Sections 3(b) and 8 of the Escrow Agreement, to disburse the Initial Escrow Deposit in accordance with the instructions set forth herein.

Notwithstanding any provisions in the Escrow Agreement that are to the contrary, including Sections 3(b), 3(c) and 3(e), the Company and Buyer have agreed to, and you are hereby authorized and instructed by the Company and Buyer to, disburse the entire Initial Escrow Deposit, including all interest and other amounts earned thereon in accordance with the Escrow Agreement, to the Company, by wire transfer of immediately available funds to the account designated in, and in accordance with, the wire transfer instructions set forth below:

Bank:
ABA:
Account Name:
Account Number:

Immediately following confirmation of such disbursement, the Escrow Agreement will be terminated.

Sincerely,

PROLIANCE INTERNATIONAL, INC.


By:_____
      Name:  Arlen F. Henock
      Title:    Executive Vice President and
                Chief Financial Officer


CENTRUM EQUITIES XV, LLC


By:_____
      Name:  Roger Brown
      Title:    LLC Manager


**Agreed:**

WELLS FARGO BANK, NATIONAL ASSOCIATION,
as Escrow Agent

By: _____
      Name:  Timothy P. Martin
      Title:    Vice President