# EXHIBIT A

## [Purchase Agreement]

SALE AND PURCHASE AGREEMENT

RELATING TO ALL ISSUED SHARES IN

NEDERLANDSE RADIATEUREN FABRIEK B.V.

among

**(1) AFTERMARKET DELAWARE CORPORATION**
**(as Seller)**

**(2) BANCO PRODUCTS (INDIA) LTD.**
**(as Purchaser)**

**and**

**(3) NEDERLANDSE RADIATEUREN FABRIEK B.V.**
**(the Company)**

February 19, 2010

Van Doorne N.V.
Jachthavenweg 121
1081 KM Amsterdam
P.O. Box 75265
1075 AG Amsterdam

# INDEX

| Clause | | Page |
|---|---|---|
| 1 | Interpretation | 2 |
| 2 | Sale and purchase of the Shares | 3 |
| 3 | Purchase Price and Deposit | 4 |
| 4 | Conditions precedent | 4 |
| 5 | Bankruptcy matters | 6 |
| 6 | Termination | 7 |
| 7 | Pre-Completion covenants | 8 |
| 8 | Settlement of intercompany relations | 10 |
| 9 | Completion | 10 |
| 10 | Seller Warranties | 11 |
| 11 | Purchaser Warranties | 11 |
| 12 | [Reserved] | 12 |
| 13 | Confidentiality | 12 |
| 14 | Notices and other communications | 14 |
| 15 | Waiver of right to annul or dissolve | 15 |
| 16 | Assignment | 15 |
| 17 | Partial invalidity | 15 |
| 18 | Fees and costs | 15 |
| 19 | Entire agreement, amendments | 16 |
| 20 | Miscellaneous provisions | 16 |
| 21 | Applicable law | 17 |
| 22 | Settlement of disputes | 17 |

NYI-4254371v3

# SCHEDULES

**Number  Schedule**

  1  Subsidiaries
  2  Definitions
  3  Conduct of Business
  4  Completion Actions
  5  Seller Warranties
  6  Purchaser Warranties
  7  Bidding Procedures Order
  8  Deed of Transfer
  9  Reserved
10  Sale Order
11  Seller Disclosure Letter

# SALE AND PURCHASE AGREEMENT
# RELATING TO ALL ISSUED SHARES IN
# NEDERLANDSE RADIATEUREN FABRIEK B.V.

THIS AGREEMENT IS MADE THE 19TH DAY OF FEBRUARY 2010 BY AND BETWEEN:

(1)     **AFTERMARKET DELAWARE CORPORATION**, a company incorporated under the laws of the State of Delaware, United States of America, having its registered office in New Haven, Connecticut, United States of America (**"Seller"**); and

(2)     **BANCO PRODUCTS (INDIA) LTD.**, a public limited company incorporated under the laws of India (**"Purchaser"**); and

(3)     **NEDERLANDSE RADIATEUREN FABRIEK B.V.**, a private company with limited liability (*besloten vennootschap met beperkte aansprakelijkheid*) incorporated under the laws of The Netherlands, having its registered office in Mill, The Netherlands, registered with the Dutch Chamber of Commerce under number 16020946 (the **"Company"**);

Seller, Purchaser and the Company hereinafter jointly be referred to as "Parties" and each of them individually as a "Party";

WHEREAS:

(A)     Seller is the holder of all issued and outstanding shares (the **"Shares"**) in the capital of the Company;

(B)     The Company is the holder, directly or indirectly, of all of the issued and outstanding shares in the capital of the companies listed in Schedule 1 (the **"Subsidiaries"** and, together with the Company, hereinafter the **"Companies"** or the **"NRF-Group"**);

(C)     The NRF-Group is engaged in the manufacturing and distribution of heat transfer products;

(D)     Seller has decided to divest its shareholding in the NRF-Group and has invited interested potential purchasers to make an offer for the purchase of the Shares in a controlled auction process;

(E)     Seller and Purchaser have entered into a confidentiality agreement, dated February 9, 2010 (the **"Confidentiality Agreement"**), pursuant to which certain information relating to the NRF-Group and its business was made available to Purchaser;

(F)     On July 2, 2009 Seller, its parent company Proliance International, Inc., a company-incorporated under the laws of the State of Delaware, United States of America, having its registered office in New Haven, Connecticut, United States of America, (**"Proliance"**) and certain other subsidiaries of Proliance (collectively, the **"Proliance Parties"**) filed voluntary petitions (the **"Bankruptcy Proceedings"**) in the U.S. Bankruptcy Court for the District of Delaware (the **"Bankruptcy Court"**) under Chapter 11 of the U.S. Bankruptcy Code (the **"Bankruptcy Code"**);

(G)     In respect of the acquisition of the Shares contemplated by this Agreement, Purchaser and Seller have to their mutual satisfaction complied with their obligations vis-à-vis the appropriate trade unions pursuant to the SER Merger Code (*het SER-Besluit Fusiegedragsregels 2000*), any applicable Collective Labour Agreements (*Collectieve Arbeidsovereenkomsten*) and they have notified the SER secretariat (*secretariaat van de SER*) thereof;

(H)     The Works Council of the Company ("Works Council") has given a positive advice with respect to the transactions contemplated by this Agreement;

(I)     Subject to the terms and conditions set forth herein and as authorized by sections 363 and 365 of the Bankruptcy Code, Seller and Purchaser have now reached definitive agreement on the sale and purchase of the Shares and, consequently, the business of the Companies on the terms and conditions set forth in this Agreement; and

(J)     Each of the Parties has taken all necessary corporate action and has obtained all necessary internal approvals, consents and permits for the acquisition of the Shares contemplated by this Agreement (except for such approvals, consents and permits which are pending as conditions precedent as set forth below);

HAVE AGREED AS FOLLOWS:

1       **Interpretation**

1.1     <u>Schedule 2</u> contains a list of definitions. All capitalised terms used herein shall have the meaning as set out in such <u>Schedule 2.</u>

1.2     In this Agreement, a reference to:

        1.2.1     a **"subsidiary"** or **"holding company"** is to be construed in accordance with section 2:24a DCC;

        1.2.2     a **"group"** or **"group company"** is to be construed in accordance with section 2:24b DCC;

NYI-4254371v3
RLF1 3539972v.1

1.2.3 a **"participation"** is to be construed in accordance with section 2:24c DCC;

1.2.4 a document in the **"agreed form"** is a reference to a document in a form approved and for the purposes of identification initialled by or on behalf of each Party;

1.2.5 a statutory provision includes a reference to any subordinate legislation made under the statutory provision before the date of this Agreement;

1.2.6 singular words shall include the plural and vice-versa and words in a particular gender shall include all genders, unless the context requires otherwise;

1.2.7 a reference to a **"person"** includes a reference to any individual, company, association, partnership (whether or not having legal personality (*rechtspersoonlijkheid*)) or other business organisation, trust, union, association, or governmental entity and that person's legal representatives and successors; and

1.2.8 **"it"** includes a reference to he or she, as applicable, and **"its"** includes a reference to his or her, as applicable.

1.3 Clause headings are inserted for convenience purposes only and shall neither affect the contents nor the interpretation of this Agreement.

1.4 Unless specifically stated otherwise or so required in the relevant context, terms in this Agreement refer to Dutch legal concepts only and shall be interpreted accordingly. The use of these or similar terms in any other jurisdiction shall be disregarded. In the event of any translation of this Agreement or any agreement resulting there from, the English language version shall prevail for any and all purposes, including for interpretation purposes.

2 **Sale and purchase of the Shares**

2.1 Subject to the terms and conditions of this Agreement, Seller hereby agrees to sell the Shares to Purchaser, and Purchaser hereby agrees to purchase the Shares from Seller on the Completion Date.

2.2 Subject to the terms and conditions of this Agreement, the sale and purchase of the Shares shall have effect as from the Effective Date, meaning that as from such date all benefits and obligations of any nature whatsoever attached to or accrued in respect of the Shares are benefits and obligations of Purchaser, unless explicitly provided otherwise in this Agreement.

NYI-4254371v3
RLF1 3539972v.1

2.3    Subject to the terms and conditions of this Agreement, Seller shall transfer title to the Shares to Purchaser, and Purchaser shall accept the same from Seller, on the Completion Date through the execution of the Deed of Transfer before the Notary. Seller shall procure that the Company acknowledges the transfer of the Shares.

3    **Purchase Price and Deposit**

3.1    The purchase price for the Shares shall be a fixed amount of EUR 17,700,000 (in words: seventeen million seven hundred thousand euro) (the **"Purchase Price"**).

3.2    Simultaneously with the execution of this Agreement, Purchaser has deposited with the Seller a down payment on the Purchase Price of EUR 1,070,000 (one million seventy thousand euro) (such amount, including any interest accrued thereon, the **"Deposit"**). The Deposit shall be held and disbursed pursuant to the terms of this Agreement.

3.3    The Purchase Price (less the Deposit) shall be payable in full, without any withholding, discount or set-off, and in cash to Seller on the Completion Date in accordance with Clause 4.2.4. If Completion occurs, the Deposit shall be disbursed to Seller on the Completion Date.

4    **Conditions precedent**

4.1    Completion is subject to each of the following conditions precedent (*opschortende voorwaarden*) being satisfied or waived, as the case may be, in accordance with this Clause 4.

4.2    *Conditions precedent to Seller's obligations.* The obligation of Seller to sell and transfer the Shares on the Completion Date to Purchaser is subject to the satisfaction of each of the following conditions or, alternatively, the waiver thereof by Seller:

4.2.1    The Purchaser Warranties shall be true and accurate in all respects as of the Completion Date, except where the failure of such representations and warranties to be so true and accurate, individually or in the aggregate, does not have, and is not reasonably likely to have, a material adverse effect on the ability of Purchaser to consummate the transactions contemplated by this Agreement.

4.2.2    Purchaser shall have performed in all material respects all obligations required under this Agreement to be performed by it on or before the Completion Date (except with respect to the obligation to pay the Purchase Price in accordance with the terms of this Agreement pursuant to Clause 4.2.4, which

obligation shall be performed in all respects as required under this Agreement);

4.2.3   Purchaser shall have delivered to Seller a certificate, dated the Completion Date and executed on behalf of Purchaser by the managing directors (*de raad van bestuur*) of Purchaser, to the effect that each of the conditions specified in Clauses 4.2.1 and 4.2.2 has been satisfied in all respects; and

4.2.4   the Purchase Price, less the Deposit, shall have been paid into the Notary's Bank Account.

4.3   *Conditions precedent to Purchaser's obligations:* The obligation of Purchaser to purchase and accept the Shares on the Completion Date from Seller is subject to the satisfaction of each of the following conditions or, alternatively, the waiver thereof by Purchaser:

4.3.1   Proliance shall have assumed (i) the Agreement and Plan of Merger among Modine Manufacturing Company, Modine Aftermarket Holdings, Inc. and Transpro, Inc., dated as of January 31, 2005, (ii) the Aftermarket Supply Agreement between Modine Manufacturing Company and Modine Aftermarket Holdings, Inc., dated as of July 22, 2005, and (iii) the Aftermarket License Agreement between Modine Manufacturing Company and Modine Aftermarket Holdings, Inc., dated as of July 21, 2005, in each case pursuant to section 365 of the Bankruptcy Code and shall have assigned all of its rights thereunder to either Purchaser or the Company, in each case effective as of the Completion Date; and

4.3.2   [intentionally omitted]

4.3.3   Seller and the Company shall have performed in all material respects all obligations required under Schedule 4 of this Agreement to be performed by them on or before the Completion Date.

4.4   *Conditions precedent to Purchaser's and Seller's obligations:* The obligations of Seller and Purchaser to sell and transfer and, respectively, to purchase and accept the Shares at the Completion Date are subject to the satisfaction of each of the following conditions or, alternatively, the waiver thereof by Seller and Purchaser jointly:

4.4.1   The unconditional an irrevocable release of any Encumbrance over any part of the Shares by Silver Point Finance, LLC shall have been obtained;

NYI-4254371v3
RLF1 3539972v.1

4.4.2   the Bankruptcy Court shall have entered the Sale Order, authorizing Seller to sell the Shares to Purchaser free and clear of all Encumbrances and interests pursuant to section 363(f) of the Bankruptcy Code, and no order staying, reversing, modifying or amending, the foregoing shall be in effect on the Completion Date; and

4.4.3   no injunction or other order, judgment or decree by any competent court of jurisdiction or any government that declares this Agreement invalid or unenforceable in any material respect or restrains, prohibits, prevents or otherwise affects the consummation of the transactions contemplated by this Agreement shall be in effect.

4.5   Subject to Clause 5.4, the Parties undertake to use all reasonable efforts to satisfy the conditions precedent set out in this Clause 4 as soon as possible after signing this Agreement. The Parties will inform each other immediately when any of these conditions has been satisfied. If at any time Purchaser or Seller becomes aware of any fact or circumstance which would reasonably be expected to prevent a condition set out in this Clause 4 from being satisfied before Completion, it shall promptly inform the other Party. No Party may rely on the failure of any condition precedent set forth in Clause 4.2, 4.3 or 4.4, as the case may be, if such failure was caused by such Party's failure to comply with any provision of this Agreement.

## 5   Bankruptcy matters

5.1   This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller and the Bankruptcy Court of higher or better competing bids.

5.2   [intentionally omitted]

5.3   Purchaser will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code. In the event the entry of the Sale Order is appealed, Seller and Purchaser will use their respective reasonable efforts to defend such appeal. Nothing in this Agreement or otherwise will preclude or otherwise limit Seller from taking any position in the Bankruptcy Case that the Board of Directors of Seller or Proliance determines is appropriate in the circumstances then-existing.

5.4     At Completion and pursuant to section 365 of the Bankruptcy Code, Proliance will assume and assign to Purchaser or the Company, and Purchaser or the Company will assume from Proliance, the agreements referenced in Clause 4.3.1 of this Agreement; provided, however, that no Party shall have any obligation under this Agreement to pay any cure amounts necessary to cure any defaults under such agreements as finally determined by the Bankruptcy Court unless such Party so determines in its sole discretion to pay such cure amounts, in which case no other Party will have any liability therefor. To the extent a Party elects to pay such cure amounts pursuant to this Clause 5.4, such amounts will be paid at Completion.

## 6     Termination

6.1     This Agreement may be terminated at any time before Completion:

6.1.1     by mutual written consent of Seller and Purchaser;

6.1.2     by Seller if Purchaser shall have breached or failed to perform in any material respect any of its representations, warranties, covenants or other agreements contained in this Agreement which breach or failure to perform would give rise to the failure of a condition set forth in Clause 4.2.1 or 4.2.2 and either (i) has not been cured within 15 Business Days after notice of such breach or failure to perform has been delivered to Purchaser or (ii) is incapable of being cured prior to April 30, 2010 (the **"Long Stop Date"**) (other than as a result of Seller's failure to perform any of its obligations set forth herein required to be performed by Seller);

6.1.3     by Purchaser or Seller if Completion has not occurred by the Long Stop Date as long as such failure of Completion to occur is not caused by a breach of this Agreement by the terminating Party;

6.1.4     by Purchaser if Seller shall have breached or failed to perform in any material respect any of its representations, warranties, covenants or other agreements contained in this Agreement which breach or failure to perform would give rise to the failure of a condition set forth in Clause 4.3.3 and either (i) has not been cured within 15 Business Days after notice of such breach or failure to perform has been delivered to Seller or (ii) is incapable of being cured prior to the Long Stop Date (other than as a result of Purchaser's failure to perform any of its obligations set forth herein required to be performed by Purchaser); or

NYI-4254371v3
RLF1 3539972v.1

6.1.5 by Seller if Completion has not occurred by 11:59 p.m. Eastern Standard Time on February 24, 2010 as long as such failure of Completion to occur is not caused by a breach of this Agreement by Seller.

6.2 In the event of termination pursuant to Clause 6.1, this Agreement shall become null and void and have no further effect (other than this Clause 6.2 and Clauses 13 (Confidentiality), 14 (Notices and other communications), 16 (Assignment), 17 (Partial invalidity), 18 (Fees and costs), 19 (Entire agreement), 20 (Miscellaneous), 21 (Applicable law) and 22 (Settlement of disputes), which shall survive termination, with no liability on the part of any of the Parties with respect to this Agreement, except for any liability provided for in Clause 6.2.1, Clause 6.2.2 or Clause 6.3.

6.2.1 Except as set forth in Clause 6.2.2, if this Agreement is terminated pursuant to any provision of Clause 6.1, then the Deposit shall forthwith be returned to Purchaser.

6.2.2 If this Agreement is terminated by Seller pursuant to Clause 6.1.2 or 6.1.3 (but only to the extent Purchaser could not have terminated this Agreement at such time pursuant to Clause 6.1.3), then Seller shall be paid the Deposit and, in addition, shall have the right to pursue any other remedies available to Seller at law.

6.3 Nothing contained in this Agreement will relieve any Party from any liability for any breach prior to termination of such Party's representations, warranties, covenants or agreements set forth in this Agreement, except that:

6.3.1 Seller will have no liability for any such breach; and

6.3.2 Proliance will have no liability for any such breach.

7 **Pre-Completion covenants**

7.1 Until the earlier of Completion or termination of this Agreement in accordance with Clause 6 (Termination), Seller and Proliance shall, except (a) with the prior consent of Purchaser (which shall not be unreasonably withheld, delayed or conditioned), (b) as contemplated by this Agreement or (c) when prohibited, ordered or summoned by the Bankruptcy Court:

7.1.1 procure that each of the Companies shall carry on its business in the ordinary course of business and in substantially the same manner as conducted before,

NYI-4254371v3
RLF1 3539972v.1

recognizing that Seller is a debtor-in-possession in the Bankruptcy Proceedings and is subject to certain limitations as a result;

7.1.2   promptly notify Purchaser of any material change, occurrence or event not in the ordinary course of the business of the Companies, and of any change, occurrence or event which, individually or in the aggregate with any other changes, occurrences and events, could reasonably be expected to have a Material Adverse Effect on the Companies; and

7.1.3   until the earlier of the termination of this Agreement and the Completion, cause the Companies to conduct their respective businesses in accordance with Schedule 3.

7.2   Between the date hereof and the Completion Date, Seller shall, and shall cause the Companies to, afford to Purchaser, and to the professional advisors and other authorized representatives of Purchaser, reasonable access to the Companies' offices and facilities, books and records during normal business hours. Between the date hereof and the Completion Date, Seller and Purchaser shall cooperate to provide an opportunity for representatives of Purchaser to meet directly with the key management of the Companies. The rights of access contained in this Clause 7.2 are granted subject to, and on, the following terms and conditions:

7.2.1   any such investigation will be conducted in a reasonable manner taking into account the business interest of the Companies, its resources and other commitments, including as to confidentiality;

7.2.2   Purchaser shall not have access to personnel records of Seller or the Companies relating to personal data to the extent Seller is not legally authorized to disclose or otherwise share such information with Purchaser by law; and

7.2.3   during the period from the date hereof to the Completion Date, all information provided to Purchaser or its agents or representatives by or on behalf of Seller, the Companies or their respective agents or representatives (whether pursuant to this Clause 7.2 or otherwise) will be governed and protected by the terms of Clause 13 (Confidentiality) hereto.

7.3   Subject to the terms and conditions of this Agreement, each Party will use all reasonable efforts (a) to take, or cause to be taken, all actions necessary, proper or advisable to comply promptly with all legal requirements which may be imposed on it with respect to this Agreement and the transactions contemplated hereby, and, subject to the conditions

NYI-4254371v3
RLF1 3539972v.1

set forth in Clause 4 hereof, to consummate the transactions contemplated by this Agreement as promptly as practicable, and (b) to obtain (and to cooperate with the other Parties to obtain) any consent or order of, or any exemption by, any governmental authority and any other Person that is required to be obtained in connection with this Agreement and the other transactions contemplated hereby, and to comply with the terms and conditions of any such consent or order.

7.4     [intentionally omitted]

8       **Settlement of intercompany relations**

Any and all accounts receivable by the Company from Proliance or any of its group companies shall be netted against any and all accounts payable by the Company to Proliance or any of its group companies, in each case as of the Completion Date, and the obligation remaining as a result of such netting will be fully written-off by the Company or Proliance or any of its group companies, as the case may be, on or before the Completion Date.

9       **Completion**

9.1     Completion shall take place at the offices of Van Doorne N.V., Jachthavenweg 121, Amsterdam, The Netherlands on the third Business Day following the date of satisfaction or waiver of all of the conditions precedent set forth in Clause 4 (other than the conditions that by their nature are to be satisfied at Completion, but subject to the satisfaction and waiver of such conditions), unless otherwise agreed between Seller and Purchaser in writing (**"Completion Date"**).

9.2     At Completion, the Parties shall perform the actions set out in Schedule 4 in the order set out therein, it being understood and agreed that the valid execution and delivery of any documents or performance of any items which have already been executed or delivered before Completion shall be deemed to have been executed or delivered at Completion save to the extent such conditions have been waived in accordance with Clause 4.

9.3     Seller and Purchaser shall execute all such further documents in the form and substance reasonably satisfactory to each Party as shall be necessary to fully effect the transactions contemplated by this Agreement.

9.4     If Seller or Purchaser fails to perform any of the actions listed in Schedule 4, the other Party may, without prejudice to its rights to claim damages pursuant to this Agreement or applicable law, demand that the Party not performing shall perform the relevant action(s)

on a day to be determined by it but not beyond ten Business Days after the date set for Completion in this Clause 9.

## 10    Seller Warranties

10.1    Seller hereby represents and warrants to Purchaser that the Seller Warranties made in <u>Schedule 5</u> are true and accurate on the date hereof.

10.2    Purchaser acknowledges that the Seller Warranties are the only representations or warranties given by Seller and that any and all other express or implied warranties, whether at civil or common law, by statute or otherwise, relating to the condition of its assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials), and any other representation, warranty, projection, forecast, statement or information made, communicated or furnished to Purchaser or its affiliates or representatives, are explicitly disclaimed. Seller makes no representations or warranties to Purchaser regarding the probable success or profitability of the Companies.

10.3    Purchaser acknowledges and agrees that it has performed a satisfactory due diligence investigation into the financial, legal, environmental, tax, commercial and operational aspects of NRF-Group and its business with the assistance of well-qualified professional advisors of its choice, has attended and participated in the management presentation and site visit to the premises and has raised with Seller any and all specific issues which it considers relevant in connection with the transactions contemplated hereby.

10.4    Purchaser acknowledges and agrees that the sale and purchase of the Shares is made lock, stock and barrel (on an "as is and where is" basis) and that none of the Seller Warranties shall survive the Completion.

## 11    Purchaser Warranties

11.1    Purchaser hereby represents and warrants to Seller that the Purchaser Warranties made in <u>Schedule 6</u> are true and accurate on the date hereof and shall be true and accurate on the Completion Date.

11.2    If one or more of the Purchaser Warranties proves not to be true and accurate at the time this Agreement is entered into or at Completion Date, Purchaser shall be liable to Seller for compensation of any losses of Seller resulting therefrom, subject to Clause 11.3.

11.3    None of the Purchaser Warranties shall survive the Completion, other than the representations and warranties contained in Clauses 6, 7 and 8 of the Purchaser

Warranties, which representations and warranties shall only survive for one year from the execution of this Agreement; provided, however, that in no event shall Purchaser have any liability pursuant to this Clause 11.3 following Completion for any amounts in excess of EUR 1,000,000 in the aggregate.

12      [intentionally omitted]

13      **Confidentiality**

13.1    Save to the extent reasonably required pursuant to the auction process provided for in the Bidding Procedures Order or in connection with activities permitted under Clause 5.1, Seller shall, subject to the further provisions of this Clause, not, either directly or indirectly, disclose to any person any information relating to a confidential aspect of the Companies' business.

13.2    Subject to the further provisions of this Clause 13, neither Party shall disclose to any person confidential information which relates to the other Party and which it received or obtained as a result of or in relation to this Agreement and the transactions contemplated by this Agreement and neither Party shall disclose any information or make any public announcement concerning the subject matter of this Agreement or the transactions contemplated by this Agreement without the prior written consent of the other Party to this Agreement. Notwithstanding the foregoing, the Parties acknowledge that this Agreement (together with the Annexes and Schedules attached hereto) or any other agreement to which Purchaser or any of its affiliates a party may be filed by Seller or its affiliates with the Securities and Exchange Commission or other governmental authorities and made publicly available, and disclosures related to the transactions contemplated by this Agreement and the agreements referred to herein will be made to Seller's and its affiliates' creditors, representatives and other persons having an interest in Seller and its affiliates. Any such filings and disclosures by Seller or any of its representatives or affiliates will not violate any confidentiality obligations owing to any party, whether pursuant to the Confidentiality Agreement, this Agreement or otherwise. Furthermore, this Clause 13.2 will not limit the disclosure of information by Seller or its affiliates in connection with the administration of the Bankruptcy Proceedings or preclude any filing or other communication with the Bankruptcy Court, disclosure in connection with the auction provided for in the Bidding Procedures Order or disclosure to creditors or other representatives, made by Seller or its affiliates in good faith.

13.3    Without limiting Clauses 13.1 or 13.2, either Party may disclose information which would otherwise be subject to this confidentiality obligation to the extent:

13.3.1    required by the law of any relevant jurisdiction;

13.3.2 required to be disclosed under the rules and regulations of any recognised stock exchanges on which the shares of any Party (or a party controlling such Party) are listed;

13.3.3 the disclosing Party can demonstrate that such information is already in the public domain at the time of disclosure (unless the information is in the public domain as a result of a breach of this Agreement by such Party);

13.3.4 the disclosing Party can demonstrate that such information is already in its lawful possession at the time of disclosure (unless as a result of a breach of this Agreement);

13.3.5 required to enforce the obligations of such Party under this Agreement; or

13.3.6 the other Parties have given prior written approval to the disclosure.

subject, in the event of Clauses 13.3.1 and 13.3.3, to the prior notification of the other Party and the obligation to take all reasonably possible measures to prevent or limit the damages the other Party may suffer from the disclosure of such information, including but not limited to consultation on the form, content and timing of such disclosure.

13.4 Except in connection with a disclosure permitted by Clauses 13.1 or 13.2, if a Party is requested to disclose any information subject to this confidentiality obligation in connection with any legal or administrative proceeding, such Party will promptly notify the other Party of the existence, terms and circumstances surrounding such request so that the other Party may seek a protective order or other appropriate remedy and/or take steps to resist or narrow the scope of the disclosure sought by the request. The Parties agree to cooperate and assist in seeking such protective order or other remedy.

13.5 Each Party shall procure that all of its group's employees, agents, representatives and other persons related to it shall comply with the obligations set forth in this Clause.

13.6 For a period of one year from the date hereof, neither Party shall, and each Party shall cause its respective affiliates not to, directly or indirectly, solicit for employment or hire any director, officer or employee of (i) any of the other Parties, (ii) any of their respective affiliates or (iii) any of the Companies, whose salary and bonus exceeded EUR 75,000 in the year prior to the earlier of the date of such solicitation or the date of hire.

NYI-4254371v3
RLF1 3539972v.1

## 14    Notices and other communications

14.1    Except as otherwise required by law, all notices, announcements, summons and/or communications pursuant to this Agreement shall be in writing in the English language and be delivered to the addresses stated hereunder (or to such other address as a Party has communicated to the other Parties in accordance with this Clause) by registered mail with return receipt, by courier or by telefax.

      14.1.1    if directed to Seller or      with a copy to:
the Company (prior to completion):

| | |
|---|---|
| Aftermarket Delaware Corporation | Jones Day |
| c/o Proliance International, Inc. | 222 East 41st Street |
| 100 Gando Drive | New York, NY 10017 |
| New Haven, Connecticut 06513 | Attn: Pedro Jimenez |
| Attn: Richard Wisot |      Andrew Levine |
| Telefax: (203) 401-6470 | Telefax: (212) 755-7306 |

and:

Van Doorne N.V.
Jachthavenweg 121
1081 KM Amsterdam
P.O. Box 75265
Attn: Johan Boeren
Telefax: +31 (0) 20 7954 274

      14.1.2    if directed to Purchaser      with a copy to:
or the Company (after completion):

| | |
|---|---|
| Banco Products (India) Ltd. | Van Benthem & Keulen N.V. |
| Bil, Near Bhali Railway Station | Euclideslaan 51 |
| Padra Road, Dist. Vadodara - | 3584 BM Utrecht |
| 391 410 | The Netherlands |
| India | Att'n W.Th.A. Schermer |
| Att'n: Mr. Mehul K. Patel | Telefax: +31 30 2595505 |
| Telefax: +91 (265) 2680433 | |

14.2    Notices, announcements, summons and/or communications pursuant to this Agreement shall be deemed to have been received at the following moments:

NYI-4254371v3
RLF1 3539972v.1

14.2.1 if sent by registered letter: at the date of delivery evidenced by the return receipt;

14.2.2 if sent by courier: at the date of delivery by the courier to the addressee; and

14.2.3 if sent via telefax: at the time of sending evidenced by the transmission report.

14.3 Any communications copied to the respective advisors as set out above shall be for information purposes only and shall not constitute a valid notification under this Agreement.

## 15 Waiver of right to annul or dissolve

The Parties hereby irrevocably waive their right to dissolve (*ontbinden*) or annul (*vernietigen*), or to demand the amendment, dissolution and/or annulment (*in rechte wijziging, ontbinding en/of vernietiging vorderen*) of this Agreement, either in whole or in part, by virtue of section 6:228 DCC in conjunction with section 230 (error; "*dwaling*"), section 6:258 DCC or section 6:265 et seq DCC, following the Completion.

## 16 Assignment

This Agreement and any rights and obligations of the Parties hereunder may not be assigned by any Party to a third party without the prior written consent of the other Parties, which consent shall not be withheld unreasonably, provided, however, that Purchaser may without consent assign this Agreement to an affiliate that it wholly controls if Purchaser remains liable (along with such affiliate) for all of its obligations and liabilities hereunder.

## 17 Partial invalidity

In the event that any provision of this Agreement is determined to be non-binding, the other provisions of this Agreement will continue to be effective. The Parties are obliged to replace the non-binding Clause with another clause that is binding, in such manner that the new provision differs as little as possible from the non-binding Clause, taking into account the object and the purpose of this Agreement.

## 18 Fees and costs

18.1 Unless expressly stipulated otherwise in this Agreement, each Party shall bear the costs it incurs, including fees charged by third-party advisors engaged by it, arising from or relating to the conclusion and performance of this Agreement, including all negotiations, preparations and investigations.

NYI-4254371v3
RLF1 3539972v.1

18.2    The Notary's fees for the transfer of the Shares shall be borne by the Company.

## 19    Entire agreement, amendments

19.1    The Schedules and the Annexes form an integral part of this Agreement and references to this Agreement include the Schedules and the Annexes. Any definitions used in this Agreement shall have the same meaning when used in the Schedules and the Annexes unless explicitly stipulated otherwise.

19.2    This Agreement contains all of the agreements between the Parties with respect to the transactions contemplated by this Agreement and supersedes all earlier written and/or oral agreements with respect to the subject matter(s) hereof, including but not limited to any letters of intent and earlier drafts of this Agreement exchanged in connection with the negotiations and preparations hereof. This Agreement contains all of Purchaser's rights and remedies pursuant to this Agreement. For the avoidance of doubt, the Confidentiality Agreement shall survive Completion.

19.3    This Agreement can be amended or supplemented only by an instrument in writing signed by all Parties.

## 20    Miscellaneous provisions

20.1    Purchaser acknowledges that Seller is represented in this transaction by a lawyer of Van Doorne N.V., while the Notary is associated with the same law firm, and explicitly agrees that Seller may seek Van Doorne N.V.'s legal assistance in any dispute that may arise in respect of this Agreement or any related agreement.

20.2    If a Party does not exercise any right under this Agreement, including the right to demand that any of the other Parties meets its obligations under this Agreement, or does so unduly, it shall not be deemed to thereby have waived this right. If a Party, in a specific case, waives any right it may have with respect to any of the other Parties by virtue of the fact that this Party has not fully or unduly fulfilled any obligation under the Agreement, it shall not be deemed to thereby have waived any other right it has in that specific case, nor have given up any possibility of invoking that right in other cases.

20.3    This Agreement is drawn up for the exclusive use of the Parties. Except to the extent expressly stipulated otherwise in this Agreement, no clause in this Agreement intends to create any right for any third party to claim performance or to rely upon the Agreement in any way. In the event a third party stipulation (*derdenbeding*) is accepted by a third party, such third party shall not become a party to this Agreement. Any and all provisions

NYI-4254371v3
RLF1 3539972v.1

relating to members or former members of the management or employees or former employees of the Companies or Seller do not qualify as a third party stipulation.

20.4  This Agreement may be signed in any number of counterparts, each of which shall be an original, but only all of which, when taken together, shall constitute one and the same document.

20.5  Damages at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, any Party hereto will be entitled to seek injunctive relief with respect to any such breach, including specific performance of such covenants, promises or agreements or an order enjoining a Party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement. The rights set forth in this Clause 20.5 will be in addition to any other rights which a party hereto may have at law or in equity pursuant to this Agreement.

21  **Applicable law**

This Agreement and any dispute arising from this Agreement shall be construed, performed and enforced in accordance with, and governed by, the laws of The Netherlands provided, however, that the Parties acknowledge and accept that this Agreement is subject to the entry of the Bidding Procedures Order and the Sale Order by the Bankruptcy Court in accordance with the Bankruptcy Code.

22  **Settlement of disputes**

22.1  The Parties irrevocably elect as the sole and exclusive judicial forum for the adjudication of any and all disputes under or in connection with this Agreement arising prior to the close of the Bankruptcy Proceedings, and consent to the exclusive jurisdiction of, the Bankruptcy Court. Following the completion of the Bankruptcy Proceedings, the Parties irrevocably elect as the sole and exclusive judicial forum for the adjudication of any and all disputes under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the competent court in Amsterdam, The Netherlands.

SIGNED IN DUPLICATE

*remainder of this page intentionally left blank*

NYI-4254371v3
RLF1 3539972v.1

AFTERMARKET DELAWARE
CORPORATION (SELLER)
By: Richard A. Wisot
Title: Vice President
Date: 19th February 2010

BANCO PRODUCTS (INDIA) LTD.
(PURCHASER)
By:
Title: Director
Date: 17th February 2010


For the purpose of Clauses 4.3.1, 5.4, 6.3,
7.1 and 8 only:


NEDERLANDSE RADIATEUREN
FABRIEK B.V.
By: Michael W. Sisson
Title: Managing Director
Date: 19th February 2010

PROLIANCE INTERNATIONAL, INC.

By: Richard A. Wisot
Title: Vice President
Date: 19th February 2010

NYI-4254371v3
RLF1 3539972v.1

# SCHEDULE 1

## SUBSIDIARIES

| Name | Statutory seat | Percentage of shareholding |
|------|----------------|----------------------------|
| Skopimex B.V. | Mill | 100% |
| NRF France SARL | Valenciennes (France) | 100% |
| NRF B.V.B.A. | Aartselaar (Belgium) | 100% |
| NRF (United Kingdom) LTD. | Birmingham (England) | 100% |
| NRF G.M.B.H. | Vienna (Austria) | 100% |
| NRF Deutschland GmbH | Emmerich (Germany) | 100% |
| NRF España S.A. | Granada (Spain) | 100% |
| NRF Poland sp.z.o.o. | Gdansk (Poland) | 100% |
| NRF Italia S.r.l. | Prato (Italy) | 100% |
| NRF Switzerland AG | Urdorf (Switzerland) | 100% |

NYI-4254371v3
RLF1 3539972v.1

## SCHEDULE 2

## DEFINITIONS

In this Agreement the following capitalized words shall have the following meanings:

| | |
|---|---|
| **"Agreement"** | means this sale and purchase agreement, including the Recitals, the Schedules and the Annexes thereto; |
| **"Annexes"** | means the annexes to the Warranties; |
| **"Auction Date"** | has the meaning ascribed thereto in Clause 5.1; |
| **"Bankruptcy Code"** | has the meaning ascribed thereto in Recital (F); |
| **"Bankruptcy Court"** | has the meaning ascribed thereto in Recital (F); |
| **"Bankruptcy Proceedings"** | has the meaning ascribed thereto in Recital (F); |
| **"Bidding Procedures Order"** | means the bankruptcy procedures order as referred to in Clause 5 substantially in the form attached hereto as Schedule 7; |
| **"Business Day"** | means any day other than a Saturday, a Sunday or a public holiday in The Netherlands or the United States of America; |
| **"Clause"** | means a clause of this Agreement; |
| **"Company"** | means Nederlandse Radiateuren Fabriek B.V.; |
| **"Companies"** | has the meaning ascribed thereto in Recital (B); |
| **"Completion"** | means the completion of the sale and purchase of the Shares by the carrying out of each of the actions listed in Schedule 4; |
| **"Completion Date"** | means the date set for Completion pursuant to Clause 9.1; |
| **"Confidentiality Agreement"** | has the meaning ascribed thereto in Recital (E); |
| **"DCC"** | means Dutch Civil Code (*Burgerlijk Wetboek*); |

NYI-4254371v3
RLF1 3539972v.1

| | |
|---|---|
| **"Deed of Transfer"** | means the notarial deed of transfer of the Shares substantially in the form of the draft which is attached hereto as <u>Schedule 8</u>; |
| **"Deposit"** | has the meaning ascribed thereto in Clause 3.2; |
| **"Effective Date"** | means July 1, 2009; |
| **"Encumbrance"** | means all public and private encumbrances, restrictions, interests and charges of any kind, including, without prejudice to the generality of the foregoing, rights of pledge, mortgages, rights of usufruct, rights of servitude, leaseholds, licenses, retention of title, liens, claims, rights of pre-emption, restrictions on voting or transfer, rights of first refusal or other third party rights, attachments, contractual rights to create any of the foregoing, whether or not resulting or arising from facts or circumstances which are registrable in any public register, other than any encumbrances, restrictions, interests or charges of any kind arising under any applicable constituent documents or applicable securities or other laws; |
| **"Financial Statements"** | has the meaning ascribed thereto in <u>Schedule 5</u>; |
| **"Long Stop Date"** | has the meaning ascribed thereto in Clause 6.1.2; |
| **"Material Adverse Effect"** | shall mean a state of facts, event, change or effect which, individually or in the aggregate with all other facts, events, changes or effects, has had or could reasonably be expected to have or result in a material adverse effect on or a material adverse change in or to the business, assets, properties, results of operations or financial condition of the Companies (taken as a whole), but excludes any state of facts, event, change or effect caused by events, changes or developments relating to or resulting from (a) any action of Seller or Proliance to the extent such action is ordered or summoned by the Bankruptcy Court; (b) any effect resulting from or arising out of the filing of the Bankruptcy Proceedings to the extent this is not a result of acts voluntarily initiated by Seller or Purchaser; (c) facts, events, changes or effects known to |

- 21 -

Purchaser the date hereof; (d) changes or conditions affecting the industry in which the Company generally operates, except to the extent such changes or conditions are disproportionately adverse to the Company, as compared to other companies in its industry; (e) changes in economic, regulatory or political conditions generally, except to the extent such changes or conditions are disproportionately adverse to the Company, as compared to other companies in its industry; (f) the effect of any actions taken by Purchaser with respect to the acquisition of the Shares; (g) the effect of any changes in applicable laws or accounting rules; or (h) any effect resulting from or arising out of the permitted disclosure hereunder, compliance with terms of hereof or the consummation of the transaction as contemplated hereby;

**"Notary"**       means one of the civil law notaries, or his deputy, of Van Doorne N.V.;

**"Notary's Bank Account"**       means the Notary's third party account with ABN AMRO Bank N.V, account number 54.41.32.440, with BIC code: ABNANL2A and IBAN: NL70ABNA0544132440;

**"NRF-Group"**       has the meaning ascribed thereto in Recital (B);

**"Parties"**       means the signatories to this Agreement;

**"Proliance"**       has the meaning ascribed thereto in recital (F);

**"Proliance Parties"**       has the meaning ascribed thereto in recital (F);

**"Purchase Price"**       has the meaning ascribed thereto in Clause 3.1;

**"Purchaser"**       means Banco Products (India) Ltd.;

**"Purchaser Warranties"**       means the representations and warranties made by Purchaser in Schedule 6;

**"Recital"**       means a recital of this Agreement;

| | |
|---|---|
| **"Sale Order"** | means a final order (or orders) of the Bankruptcy Court which is not subject to a stay pending appeal, in substantially the form attached as <u>Schedule 10</u> with such changes therein as may have been ordered or otherwise made by the Bankruptcy Court so long as the effects thereof, considered as a whole, are not materially adverse to Purchaser or Seller, as applicable; |
| **"Schedules"** | means the schedules to this Agreement including the Annexes; |
| **"Seller"** | means Aftermarket Delaware Corporation; |
| **"Seller Disclosure Letter"** | means the disclosure letter delivered to Purchaser prior to the execution and delivery of this Agreement and attached as <u>Schedule 11</u>. |
| **"Seller Warranties"** | means the statements made by Seller in <u>Schedule 5</u>; |
| **"Shares"** | means all issued and outstanding shares in the capital of the Company; |
| **"Subsidiaries"** | means the Company's subsidiaries listed in <u>Schedule 1</u>; |
| **"Subsidiary Shares"** | has the meaning ascribed thereto in <u>Schedule 5</u>; |
| **"Works Council"** | means the Company's works council. |

NYI-4254371v3
RLF1 3539972v.1

# SCHEDULE 3

## CONDUCT OF BUSINESS PRIOR TO COMPLETION

As from the date of this Agreement, Seller and Proliance shall, and shall cause the Companies not to do, cause or permit any of the following (except to the extent (i) expressly provided otherwise in this Agreement, (ii) with the prior written approval of Purchaser, which approval shall not unreasonably be withheld, delayed or conditioned, or (iii) in relation to paragraphs 3, 4, 10, 11, 14 and 16 (to the extent paragraph 16 relates to the aforementioned paragraphs) of this Schedule 3, in the ordinary course of business):

1.  Make any investments or divestments exceeding EUR 100,000 by any of the Companies;

2.  Make any capital expenditures or commitments, capital additions or capital improvements in excess of EUR 100,000, in the aggregate;

3.  Unless required by applicable law or regulation, make any change in accounting principles, practices or policies from those utilized in the preparation of the annual accounts, make any material write-off or write-down of or make any determination to a material write-off or write-down any of its assets or properties, or make any change in its general pricing practices or policies or any change in its credit or allowance practices or policies;

4.  Unless required by applicable law or regulation, make or change any material election in respect of taxes, adopt or change any accounting method in respect of taxes, file any material tax return or any amendment to a material tax return, enter into any material closing agreement in respect of taxes, settle any material claim or assessment in respect of taxes, or consent to any extension or waiver of the limitation period applicable to any material claim or assessment in respect of taxes;

5.  Cause or permit any amendments to organizational documents (e.g. by-laws and articles of association) of any of the Companies;

6.  Declare or pay any dividends on or make any other distributions and/or (capital) (re-) payments (whether in cash, stock or property) in respect of any of its capital stock, or split, combine or reclassify any of its capital stock or issue or authorize the issuance of any other securities in respect of, in lieu of or in substitution for shares of its capital stock, or repurchase, redeem or otherwise acquire, directly or indirectly, any shares of its capital stock;

7.  Issue or grant any securities or agree to issue or grant any securities of the Companies;

8. Make any material change in the debt position of the Companies e.g. by means of entering into new or changing existing loan or hedging agreement(s), including raising interest rates or break fees, other than the loan and hedging agreements known to Purchaser;

9. Enter into any material contract or materially violate, amend or otherwise modify or waive any of the material terms of any of such contracts;

10. Increase the salaries or wage rates of any employees of the Companies, hire any additional employees or enter into any employment agreement with any person with an annual gross salary in excess of EUR 50,000; or hire any consultant or independent contractor or enter into any consulting agreement with any person;

11. Sell, lease, license or otherwise dispose of or create any Encumbrances over any properties or assets of any of the Companies, unless summoned thereto by the Bankruptcy Court;

12. Guarantee any indebtedness of others or issue or sell any debt securities or guarantee any debt securities of others, unless summoned by the Bankruptcy Court;

13. Terminate or waive any contractual right exceeding a value of EUR 100,000;

14. Adopt or amend any employee or compensation benefit plan, including any stock purchase, stock issuance or stock option plan, or amend any compensation, benefit, entitlement, grant or award provided or made under any such plan, or hire any new officer-level or other management-level employee, or add any new members to the board of directors of the Companies;

15. Pay any special bonus or special remuneration to any employee or non-employee director;

16. Acquire or agree to acquire by merging or consolidating with, or by purchasing substantially all of the assets of, or by any other manner, any business or any company, partnership, association or other business organization or division thereof, or otherwise acquire or agree to acquire any assets which are material, individually or in the aggregate, to the business of the Companies; and

17. Take or agree in writing or otherwise to take, any of the actions described in the foregoing clauses of this Schedule 3.

NYI-4254371v3
RLF1 3539972v.1

## SCHEDULE 4

## COMPLETION ACTIONS

At Completion, the Parties shall perform the following or procure that the following shall be performed in the order set out below, it being understood and agreed that the Pre-completion actions shall be a condition for the obligation of Parties to perform the Completion actions and that any documents or items referred to below which have already been executed or delivered before Completion, shall be deemed to have been executed or delivered at Completion:

*Pre-completion actions*

1.      [intentionally omitted]

2.      [intentionally omitted]

3.      Seller shall submit a copy of a notarial deed of release of the right of pledge over (part of) the Shares in favour of Silver Point Finance LLC;

4.      Seller, Purchaser and the Company shall each deliver a duly executed power of attorney to execute the Deed of Transfer on their behalf;

5.      Purchaser shall deliver to Seller a certificate, dated the Completion Date and executed on behalf of Purchaser by the managing directors (*de raad van bestuur*) of Purchaser, to the effect that each of the conditions specified in Clauses 4.2.1 and 4.2.2 has been satisfied in all respects;

6.      [intentionally omitted]

7.      Purchaser shall pay the Purchase Price, less the Deposit, into the Notary's Bank Account;

*Completion actions*

8.      Each of the Purchaser, the Seller and the Company shall execute the Deed of Transfer;

9.      The transfer of the Shares shall be recorded in the Company's shareholders register; and

10.     The Notary shall release the Purchase Price to Seller in to the bank account as designated in writing by the Seller.

NYI-4254371v3
RLF1 3539972v.1

# SCHEDULE 5

## SELLER WARRANTIES

Except as set forth in the Seller Disclosure Letter:

### Authority and capacity of Seller

1. Seller has been duly incorporated and validly exists under the laws of its jurisdiction and has the necessary corporate capacity and, subject to the limitations imposed on Seller as a result of having filed for relief under the Bankruptcy Code, power to enter into the Agreement and to perform its obligations under the Agreement.

2. All corporate action required to be taken by Seller to authorise the execution of the Agreement and the performance of its obligations under the Agreement has been duly taken.

3. The Agreement has been duly executed on behalf of Seller and, subject to the entry of the Bidding Procedures Order and the Sale Order and such other authorization as is required by the Bankruptcy Court, constitutes legal, valid and binding obligations of Seller, enforceable in accordance with their terms.

4. Other than approvals required by the Bankruptcy Court, the execution and performance of the Agreement do not conflict with or result in a breach of any provision of, or require any consent under, (a) the articles of association of Seller or (b) any provision of any applicable law or any agreement to which Seller is a party except, with respect to sub-clause (b), as would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

5. Other than approvals required by the Bankruptcy Court, no approval, consent, license or notice to any regulatory or governmental body that has not yet been obtained or filed, is necessary to ensure the validity, enforceability or performance of the obligations of Seller under this Agreement or to effect the Completion other than as set out in this Agreement.

### Corporate Status of the Companies

6. Each of the Companies is duly incorporated and validly existing under the laws of its jurisdiction with all requisite power to carry on its business as presently conducted, except where the failure to be so could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

NYI-4254371v3
RLF1 3539972v.1

7. The Company has been duly registered with the Trade Register of the Dutch Chamber of Commerce (*Handelsregister van de Kamer van Koophandel*) in accordance with Netherlands law. The information reflected in the excerpt of the Company's registrations attached as **Annex 1** is true and complete in all material respects.

8. The Company is not involved in proceedings for (i) a legal merger (*fusie* within the meaning of section 2:309 DCC), (ii) a legal division (*splitsing* within the meaning of section 2:334 (a) DCC), (iii) its dissolution (*ontbinding*), (iv) its liquidation (*vereffening*), (v) its bankruptcy (*faillissement*), (vi) suspension of payment (*surséance van betaling*) and/or (vii) the offering of a settlement agreement to its creditors outside bankruptcy.

9. The Company does not, directly or indirectly, have any participations (whether as shareholder, partner, investor or otherwise) in any company, corporation, firm or partnership other than listed in Schedule 1 nor any obligation to acquire such participation.

10. Each of the Companies has at all times fully, properly and accurately kept and maintained its books, in accordance with all applicable laws, except as would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect. In keeping books, none of the Companies depends on any third party in any material respect, and none of the material records, documents and other media connected therewith is held by any third party.

## Title of Shares and Subsidiary Shares

11. The Shares and the issued and outstanding shares in the Subsidiaries ("**Subsidiary Shares**") have been validly issued and are fully paid-up in accordance with all requirements under applicable law.

12. Seller is the unassailable (*onaantastbaar*) holder of the Shares. The Company, directly or indirectly, unassailably holds the Subsidiary Shares.

13. At Completion, the Shares and the Subsidiary Shares are free and clear of any Encumbrances.

14. There are no third party rights outstanding to acquire new shares in any of the Companies, by conversion or otherwise. There are no outstanding options or rights under which third parties could demand the sale, transfer and/or Encumbrance of any of the Shares or the Subsidiary Shares, by conversion or otherwise, except as contemplated by this Agreement.

15. No depository receipts of shares (*certificaten van aandelen*) have been issued in respect of the Shares with or without the co-operation of any of the Companies.

NYI-4254371v3
RLF1 3539972v.1

16. No dividends, interim dividends or other distributions, whether paid or still outstanding, have been declared on any of the Shares since the Effective Date, nor is there any other right outstanding to distribution from or payment based upon reserves or profits of the Company.

## Financial Statements

17. The consolidated financial statements (*geconsolideerde jaarrekening*) of the Company as of November 30, 2008 ("**Financial Statements**") were prepared, audited and adopted with due observance of all statutory provisions in all material respects.

18. The Financial Statements in all material respects truly and fairly (*getrouw*), clearly (*duidelijk*) and systematically (*stelselmatig*) reflect (i) the consolidated net assets (*vermogen*) and composition of the assets and liabilities of the Companies as per November 30, 2008, and (ii) the consolidated results of the Companies for the financial year ended on November 30, 2008.

19. The Financial Statements reflect all material liabilities, financial commitments, risks and liabilities, whether actual, contingent or otherwise, including but not limited to tax and pension as of November 30, 2008.

20. All assets of the Companies are free and unencumbered to the extent that no creditors, suppliers or other non-affiliated third parties of the group to which Seller belongs have any lien or attachment in connection to any (alleged) claim or receivable in connection with the Bankruptcy Proceedings, except to the extent such lien or attachment (a) would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (b) arises under any applicable constituent documents or any applicable securities or other laws, or (c) is in the ordinary course of the business of the Companies such as but not limited to securities granted by any of the Companies for financing of the NRF-group.

21. Since November 30, 2008, (i) each of the Companies has carried on its business consistent with past practice in all material respects, recognizing for this purpose that Seller is a debtor-in-possession under the Bankruptcy Proceedings and (ii) no undisclosed material liabilities have incurred which would reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect.

## Litigation

21. Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, none of the Companies is (other than as plaintiff in debt-collection procedures) involved in any proceedings, including civil-law, criminal, administrative or tax proceedings, before any court or arbitration tribunal, nor are any such proceedings, to the

NYI-4254371v3
RLF1 3539972v.1

best of Seller's knowledge, threatened and/or to be anticipated against any of the Companies.

* * *

NYI-4254371v3
RLF1 3539972v.1

# SCHEDULE 6

## PURCHASER WARRANTIES

### Authority and capacity of Purchaser

1. Purchaser has been duly incorporated and validly exists under the laws of its jurisdiction and has the necessary corporate capacity and power to enter into the Agreement and to perform its obligations under the Agreement.

2. All corporate and other action required to be taken by Purchaser to authorise the execution of the Agreement and the performance of its obligations under the Agreement has been duly taken.

3. The Agreement has been duly executed on behalf of Purchaser and constitutes legal, valid and binding obligations of Purchaser, enforceable in accordance with its terms.

4. The execution and performance of the Agreement do not conflict with or result in a breach of any provision of, or require any consent under, (i) the articles of association of Purchaser or (ii) any provision of any applicable law or any agreement to which Purchaser is a party.

5. No approval, consent, license or notice to any regulatory or governmental body that has not yet been obtained or filed, is necessary to ensure the validity, enforceability or performance of the obligations of Purchaser under this Agreement or to effect the Completion other than as set out in this Agreement.

### In relation to the acquisition of the Company

6. Purchaser does not envisage to proceed to a split up of the Company.

7. Purchaser does not envisage to integrate the Companies' business with any of its, or any of its affiliates or, to the extent Purchaser would envisage to integrate the Companies' business with any of its, or any of its affiliates (wholly or partly), Purchaser shall conduct such integration process in such a way that this shall not be disruptive for the Companies' business and Purchaser will duly observe in this regard the applicable workers consultation process under the Works Council Act (*Wet op de ondernemingsraden*).

8. Purchaser does not foresee any redundancies and/or deterioration of the employment conditions at the Company as a result of the sale of the Companies.

NYI-4254371v3
RLF1 3539972v.1

9. Funds unconditionally available to Purchaser will be sufficient to fund the Purchase Price and to make all other necessary payments of fees and expenses of Purchaser in connection with the transactions contemplated by this Agreement. At Completion, Purchaser will have sufficient funds to consummate the transactions contemplated by this Agreement and acknowledged and agreed that its obligations hereunder to consummate the transactions contemplated by this Agreement are not subject to financing or any financing contingencies.

10. There are no legal proceedings pending against, relating to or affecting, Purchaser which would reasonably be expected to, individually or in the aggregate with other actions or legal proceedings, have a material adverse effect on, or a material adverse change in or to, the ability of Purchaser to consummate the transactions contemplated by this Agreement or perform its obligations under this Agreement.

11. [intentionally omitted]

12. No person has acted, directly or indirectly, as a broker, finder or financial advisor for Purchaser or any of its subsidiaries in connection with the transactions contemplated by this Agreement.

13. To the best of Purchaser's knowledge, neither it nor any of its affiliates is a party to any agreement with any Person that is a creditor in the Bankruptcy Proceedings.

NYI-4254371v3
RLF1 3539972v.1

# SCHEDULE 7

## BIDDING PROCEDURES ORDER

[See Attached]

**SCHEDULE 8**

**FORM OF
DEED OF SALE, PURCHASE AND TRANSFER**

**DEED OF SALE, PURCHASE AND TRANSFER OF TWENTY FIVE THOUSAND (25,000) SHARES IN THE CAPITAL OF NEDERLANDSE RADIATEUREN FABRIEK B.V.**

**ON THE [●] DAY OF [●] TWO THOUSAND AND TEN APPEARED BEFORE ME, DAAN TER BRAAK, CIVIL-LAW NOTARY IN AMSTERDAM:**

[●], for the purposes hereof acting as written proxy of:

1.  **Aftermarket Delaware Corporation**, a company incorporated and existing under the laws of the State of Delaware (United States of America), having its business office at Gando Drive 100 New Haven, Connecticut (United States of America), registered with the Secretary of State of the State of Delaware under number 3996903, hereinafter referred to as: "**Seller**";

2.  **Banco Products (India) Limited**, a public limited company incorporated and existing under the laws of India, having its corporate seat at Vadodara (India) and its business office at Bil, Near Bhaili Railway Station, Padra Road, District Vadodara 391 410 (India), registered under Company Identification Number (CIN): L 51100GJ1961PLC001039, hereinafter referred to as: "**Purchaser**";

3.  **Nederlandse Radiateuren Fabriek B.V.**, a private company with limited liability incorporated and existing under the laws of the Netherlands, having its corporate seat in Mill (the Netherlands) and its business office at Langenboomseweg 64, 5451 JM Mill (the Netherlands), registered with the Trade Register of the Chamber of Commerce under number 16020946, hereinafter referred to as: the "**Company**".

**The appearer, acting in [his/her] aforementioned capacities, considers that:**

-   on the [●] day of [●] two thousand and ten, Seller and Purchaser entered into a sale and purchase agreement, hereinafter referred to as: the "**Agreement**", whereby Seller agreed to sell to Purchaser and Purchaser agreed to purchase twenty five thousand (25,000) shares, each share with a nominal value of four euro and fifty-four eurocents (EUR 4,54), numbered 1 up to and including 25,000, in the capital of the Company, hereinafter referred to as: the "**Shares**";

-   a photocopy of the Agreement is attached to this deed as <u>Annex I</u>;

-   unless otherwise expressly stated in this deed, the terms and definitions in this deed will have the same meaning as the terms and definitions laid down in the Agreement. The definitions in

the Agreement shall apply mutatis mutandis and are hereby incorporated herein by reference as if set forth in full in this deed;

- pursuant to the Agreement, Seller is obliged to sell and transfer the Shares to Purchaser, pursuant to the terms and subject to the conditions set out in the Agreement and below.

**Sale and transfer of the Shares.**

**Article 1.**

Pursuant to the terms and subject to the conditions of the Agreement, Seller hereby sells and transfers the Shares to Purchaser, who buys and accepts the Shares from Seller.

**Purchase price. Payment.**

**Article 2.**

1. The Purchase Price of the Shares amounts to seventeen million seven hundred thousand euro (EUR 17,700,000).

2. Purchaser has paid the Purchase Price to Seller as follows:

    - an amount of one million seventy thousand euro (EUR 1,070,000) has been transferred as a good faith deposit into the third party account (*kwaliteitsrekening*), as referred to in article 25 of the Dutch Notaries Act (*Wet op het notarisambt*), of Van Doorne N.V. (the **"Deposit"**), for which payment Seller grants full discharge to Purchaser;

    - the Purchase Price less the Deposit has been transferred into the third party account (*kwaliteitsrekening*), as referred to in article 25 of the Dutch Notaries Act (*Wet op het notarisambt*), of Van Doorne N.V., for which payment Seller grants full discharge to Purchaser.

**Warranties. Representations.**

**Article 3.**

The Seller warrants and represents vis-à-vis Purchaser that:

a. Seller has a complete and unencumbered right to the Shares;

b. the Shares have been paid up in full;

c. the entire issued share capital of the Company consists of the Shares.

**Previous acquisition of the Shares.**

**Article 4.**

Seller acquired the Shares by deed of transfer of shares executed on the seventeenth day of July two thousand and seven before M.P. Bongard, civil-law notary in Amsterdam.

**Share transfer restrictions.**

**Article 5.**

The share transfer restrictions (also referred to as the "blocking clause") referred to in article 10 of the Company's articles of association has been complied with since on the [●] day of two thousand and ten, the general meeting of shareholders of the Company has granted its approval to the present

transfer of the Shares, as appears from the minutes of the extraordinary meeting of shareholders attached to this deed as **Exhibit**.

**Dissolution.**

**Article 6.**

1.   This deed does not modify the terms and conditions of the Agreement and the parties hereto acknowledge and agree that all conditions precedent (*opschortende voorwaarden*) to the Agreement have been fulfilled or waived in accordance with the Agreement.

2.   Seller and Purchaser each waive the right to wholly or partly nullify the Agreement and this deed pursuant to the provisions of article 6:265 of the Dutch Civil Code.

**Acknowledgement.**

**Article 7.**

The Company hereby acknowledges the transfer of the Shares as recorded in this deed and ensures that the transfer of the Shares and the acknowledgment of this transfer shall forthwith be entered in the shareholders' register of the Company.

**Article 2:204c Dutch Civil Code.**

**Article 8.**

The provisions of article 2:204c of the Dutch Civil Code do not apply to the transfer contemplated in this deed.

**Costs.**

**Article 9.**

All costs arising in connection with the preparation and execution of this deed shall be borne by the Company.

**Governing law.**

**Article 10.**

This deed is construed and shall be governed by Dutch law.

**Final statement - civil-law notary.**

The parties to this deed are aware that the undersigned civil-law notary works with Van Doorne N.V., the firm that has advised Seller in this transaction. With reference to the Code of Conduct ("*Verordening beroeps- en gedragsregels*") established by the Royal Notarial Professional Organisation ("*Koninklijke Notariële Beroepsorganisatie*"), the parties hereby explicitly consent to the undersigned civil-law notary executing this deed.

**Conclusion.**

The appearer is known to me, civil-law notary.

THIS DEED, drawn up to be kept in the civil-law notary's custody, was executed in Amsterdam on the date first above written.

The contents of this deed were given and explained to the appearer. The appearer then declared that she had timely noted and approved the contents of this deed and that she did not want a full reading thereof. Thereupon, after partial reading of the deed, this deed was signed by the appearer and by me, civil-law notary.

# SCHEDULE 9

# RESERVED

# SCHEDULE 10

# SALE ORDER

[See Attached]

# SCHEDULE 11

# SELLER DISCLOSURE LETTER

This Seller Disclosure Letter is being delivered by Aftermarket Delaware Corporation (the "Seller") and Proliance International, Inc. ("Proliance") to Banco Products (India) Ltd. ("Purchaser") in connection with the execution of the Sale and Purchase Agreement (the "Agreement"), dated February _____, 2010, by and among the Company, Seller and Purchaser. Capitalized terms used in this Seller Disclosure Letter but not otherwise defined herein have the respective meanings ascribed to such terms in the Agreement.

The information contained herein is strictly confidential and is in all events subject to the confidentiality provisions contained in the Clause 13 of the Agreement and the Confidentiality Agreement.

Disclosure Items:

- Seller, Proliance and certain other subsidiaries of Proliance have filed voluntary petitions in the U.S. Bankruptcy Court for the District of Delaware under Chapter 11 of the U.S. Bankruptcy Code, pursuant to which the sale of Shares is subject to the approval of the Bankruptcy Court.

- A settlement has been reached between the Company and Luvata Netherlands BV with respect to a deposit of EUR 1.2 million and such settlement is in the process of being documented and completed between the parties.

- Proceedings are currently pending between Proliance and the Pension Benefit Guaranty Corporation ("PBGC") regarding the obligations of Proliance with respect to its pension plans in connection with PBGC's delivery of notice of its intention to terminate such pension plans.

- The consent of, approval from or compliance with each of the following may be required in connection with the proposed Transaction:

- The SER Merger Code 2000 (het SER-Besluit Fusiegedragsregels 2000)

  - The Works Council and the Works Council Act (which will be completed prior to execution of the Agreement)

  - Applicable Collective Bargaining Agreements (which will be completed prior to execution of the Agreement)

  - The Bankruptcy Court (which will be completed upon entry of the Bidding Procedures Order and Sales Order)